**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| OKLAHOMA POLICE PENSION FUND AND RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TELIGENT, INC. and JASON GRENFELL-GARDNER,<br><br>Defendants. | Case No. 1:19-cv-03354-VM |

**PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**

Lead Plaintiff Oklahoma Police Pension Fund and Retirement System ("Oklahoma Police" or "Plaintiff"), by and through its attorneys, and on behalf of all others similarly situated, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based on, among other things, its counsel's investigation, which includes, without limitation: (a) a review and analysis of regulatory filings made by Defendant Teligent, Inc. ("Teligent" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (b) a review and analysis of the U.S. Food and Drug Administration's ("FDA") regulatory findings and observations regarding the extent of Teligent's compliance with relevant laws and regulations; (c) a review and analysis of press releases and media reports issued and disseminated by the Company; (d) a review of other publicly available information concerning the Company; and (e) investigative interviews with former personnel with first-hand knowledge of the Company's operations.

## I. SUMMARY OF CLAIMS

1. This is a securities fraud class action brought to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of all persons or entities that purchased or otherwise acquired Teligent common stock between March 7, 2017 and November 6, 2017, inclusive (the "Class Period"), and who were damaged thereby.

2. Most prominently, Defendants (defined below) made a series of materially false and misleading statements during the Class Period that touted Teligent's ability to develop new generic drugs in compliance with stringent FDA regulations and to secure approval of those drugs from the FDA, going so far as to deny receiving any recent 483 Letters from the FDA, which list serious compliance failures. In fact, as Defendants knew, but concealed, Teligent had longstanding and substantial compliance failures that undermined its pipeline of new drugs, and therefore, its

ability to generate revenue and grow. The Company had, moreover, received a 483 Letter from the FDA in September 2016 just months before the Class Period started, which Defendants never disclosed. Teligent received subsequent 483 Letters. The Company received another 483 Letter shortly before the end of the Class Period in October 2017, and yet another 483 Letter after the Class Period ended in Spring 2019. Although Defendants eventually disclosed that Teligent's pipeline of new drugs sharply declined, along with other performance problems, they have never expressly disclosed any of those 483 Letters.

3. The Defendants here are Teligent, a small pharmaceutical company, and Jason Grenfell-Gardner ("Grenfell-Gardner"), the Company's Chief Executive Officer ("CEO"), who sought to radically transform and grow its operations. The Company has changed its name as it searches for a business model that it can execute successfully. Beginning in 2010, the Company began to transition from solely manufacturing pharmaceutical products for third parties to developing its own generic pharmaceutical products that it would manufacture and sell under its own brand, in particular for topical treatments (*i.e.*, treatments that are applied to a person's skin).

4. By 2012, the Company's attempts to develop its own products were still moving slowly, and in July of that year, Grenfell-Gardner joined the Company as its new CEO. On the Company's website, Grenfell-Gardner's biography states that his role is "leading [the Company's] transformation into an R&D-centered pharmaceutical company."

5. He sought to dramatically overhaul the Company and declared 2014 "a year of transformation." However, rather than focus on the expansion of its topical business, Grenfell-Gardner set out to execute a much more complicated and expensive transformation. It involved rapidly expanding into several additional generic markets in which the Company had little prior experience, while simultaneously undertaking a substantial increase of the Company's

manufacturing facilities, in anticipation of the many products that the Company planned to develop and manufacture.

6. Teligent's extensive transformation and expansion necessarily involved significant increases in the Company's costs. That was especially true with regard to the research and development ("R&D") of new products, the cost of which quickly ballooned to over 20% of the Company's annual revenue. At the start of the Class Period, Grenfell-Gardner claimed that this investment in R&D was driving Teligent's growth. He claimed:

> We're not so much playing defense trying to protect our installed markets, but rather playing offence as we launch new drugs into the market. That's why if you compare our results to those of our peers, a few key differentiators stand out. First, we invest significantly more in R&D and we get significantly more out of it.

7. However, in order to undertake that R&D, win approvals of its drugs, and receive continued permission to manufacture them, Teligent had to comply with stringent FDA regulations. Those regulations require companies like Teligent to follow established procedures to ensure the safety of their products, and to impose quality control procedures. Further, they require management to track any deviations from those procedures, to investigate and address those deviations, and, in some cases, to report those deviations to the FDA.

8. Complying with those regulations is difficult and takes substantial resources, not to mention that those regulations are designed to make companies move at a slower pace, to ensure the consistent safety of the products they develop and sell. In the alternative, patients could suffer serious harm, and if the FDA finds a regulatory or procedural violation, a company may be forced to move at an even slower pace and have more limited opportunities to develop products at all.

9. During the Class Period, Grenfell-Gardner repeatedly touted Teligent's strong record of compliance with FDA regulations. As an example, he claimed that, "We've had a very successful track record with the FDA in that facility. Our last three audits over the past five years,

there have been no 483 observations at that site." Similarly, he assured investors that "our cooperation with the FDA has been incredibly fruitful and straightforward." He also used Teligent's purported compliance prowess to justify the Company's exorbitant R&D costs, asserting that R&D is "the best investment that we can make because the FDA is approving the drugs that we submit," and so driving the Company's growth.

10. Those statements were materially false and misleading, because, among other things, at the time they were made:

(a) They concealed that Teligent was already experiencing serious development, manufacturing, quality control, laboratory, and regulatory failures. Moreover, those failures were negatively impacting the Company's ability to develop new products, win FDA approvals, and manufacture products. In turn, that undermined the purported value of Teligent's pipeline, the success of its expansion strategy, the benefits of its heavy R&D investments, and its positioning for growth and profitability;

(b) Moreover, they concealed the September 2016 483 Letter that Teligent had received from the FDA just months before the Class Period started, a regulatory problem which by itself would have required a substantial amount of Teligent's already overtaxed resources to respond to, thereby limiting Teligent's ability to execute its business plan. This further shows that Teligent was already experiencing serious regulatory problems with its *topical* drugs, which were easier to produce than the new categories of drugs Teligent was seeking to expand into, and which Teligent had significantly greater expertise with, thereby undermining Defendants' claim that they were well positioned to expand into new drug categories, that had better market conditions than topicals, such as injectables; and

(c) Also, they concealed that, amidst the development failures set forth in the preceding paragraphs, Teligent was already experiencing a substantial slowdown in its submission of new drugs to the FDA for its core topical business, which, in turn, delayed and threatened its ability to develop and produce the more complex new drugs, including injectables, on the promised timeline. The expansion of Teligent's facility that would allow for the production of those more complex drugs was also significantly behind schedule.

11. Indeed, the October 2017 483 Letter that Teligent received, which occurred during the Class Period, set forth a multitude of serious flaws in the Company's development and manufacture of drugs. Those flaws were confirmed by a confidential witness, who worked in Teligent's quality control group during the Class Period.

12. The October 2017 483 Letter, and an accompanying report from the FDA, also made clear that Grenfell-Gardner was aware of those development, production, and quality control flaws. Among other things, 483 Letters are, by design, directed to management, and this one indicated that: Grenfell-Gardner met with an FDA inspector regarding Teligent's flaws; that 483 Letters involving Teligent were to be addressed to Grenfell-Gardner; and that Grenfell-Gardner had direct reports from personnel who directly managed the development, quality control, and other areas of the Company where the flaws existed. Moreover, Grenfell-Gardner described himself as leading Teligent's strategy of developing and seeking FDA approval for new products, told investors that he was aware of what happened at the Company because, at approximately 150 employees overall, Teligent was a small management team, and he had his office in the same location where Teligent undertook its development and production activities.

13. The truth was revealed for the first time on November 6, 2017, after trading hours. For example, on that day, Defendants disclosed a sharp decline in Teligent's pipeline of new drugs

along with delays in that pipeline, manufacturing challenges, and products that were slow to launch. Defendants also revealed that this had caused reduced revenue, margins, and guidance. These pipeline, manufacturing, and performance declines resulted from Teligent's development and compliance failures.

14. The market reacted swiftly and negatively to the disclosures. As a consequence, on the next trading day, November 7, 2017, the price of Teligent common stock dropped 43.62%, from $5.25 per share to $2.96 per share, on a volume of 8.35 million shares.

15. Teligent's entrenched compliance flaws and poor performance have persisted after the Class Period. It has since received another 483 Letter from the FDA in Spring 2019, seen its pipeline decline even more, and its revenue stagnate even as its net losses increase on account of continued high expenses. As of this filing, Teligent's stock price is just $1.00

## II. JURISDICTION AND VENUE

16. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

17. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

18. Venue is proper in this judicial District pursuant to 28 U.S.C. §1391(b) and §27 of the Exchange Act (15 U.S.C. §78aa(a)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud occurred in this judicial District. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this judicial District.

19. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and facilities of a national securities exchange.

## III. PARTIES

20. Lead Plaintiff Oklahoma Police, as set forth in its certification (ECF No. 17-2), purchased Teligent common stock during the Class Period and suffered damages, as a result of the federal securities law violations and false and misleading statements alleged herein.

21. Defendant Teligent is a Delaware corporation with its principal executive offices located at 105 Lincoln Avenue, Buena, New Jersey 08310. During the Class Period, Teligent, through its officers and directors, published periodic filings with the SEC and made public statements that, as alleged herein, violated the securities laws and contained materially false and misleading statements.

22. Defendant Grenfell-Gardner was, at all relevant times, Teligent's President and CEO. Throughout the Class Period, Grenfell-Gardner made statements in the Company's press releases, earnings conference calls, and at other public events, which, as alleged herein, violated the securities laws and contained materially false and misleading statements. At all relevant times, Grenfell-Gardner made the false and misleading statements with scienter.

23. Hereinafter, Defendants Teligent and Grenfell-Gardner will be collectively referred to as "Defendants."

## IV. SUBSTANTIVE ALLEGATIONS

### A. Factual Background

#### 1. Defendant's Plan to Overhaul Teligent's Business Model

24. Defendants here are Teligent, a small pharmaceutical company, and Grenfell-Gardner, the Company's CEO, who sought to radically transform and grow its operations.

25. Teligent has gone through several changes over the past decade. Prior to 2010, the Company – then known as IGI Laboratories, Inc. ("IGI") – manufactured and developed pharmaceutical products for third-party customers ("contract manufacturing"), which then sold those products under their own brands. Beginning in 2010, the Company began to transition from solely contract manufacturing for third parties to developing its own generic pharmaceutical products that it would manufacture and sell under its own brand, in particular for topical treatments (*i.e.*, treatments that are applied to a person's skin).

26. In order to produce and market a generic product, companies must comply with numerous and stringent regulations. That includes submitting an Abbreviated New Drug Application ("ANDA") to the FDA and receiving FDA permission to sell the product. ANDAs are "abbreviated" because they concern approvals for generic versions of innovator drugs that are already marketed, so the application focuses on whether the company submitting the ANDA can consistently produce a generic version that works the same way as the approved innovator (innovator drugs are approved through New Drug Applications or "NDAs").

27. The Company's initial attempts to develop its own products moved slowly. In each of 2010, 2011, and 2012, it submitted only two to three ANDAs per year.

28. At the end of that period, in July 2012, Defendant Grenfell-Gardner joined the Company as its new CEO. On the Company's website, Grenfell-Gardner's biography states that his role is "leading [the Company's] transformation into an R&D-centered pharmaceutical company."

29. As Grenfell-Gardner explained at length during an earnings call held in April 2014, he was attempting to dramatically accelerate the Company's transformation:

> 2014 is a year of transformation in IGI, as we accelerate our business and solidify the foundation for future growth. Remember that in 2013 we transitioned our

> business from relying solely on Contract Services by introducing four IGI labeled generic topical pharmaceutical products.
>
> Now, we're set on moving even faster to transform our business, and we remain dedicated to our mission to become one of this [*sic*] top five leading companies in the generic topical pharmaceutical industry. Now, as we set out our plans for this transformational year, I set forth three key goals for IGI. First, revenue growth between 40% and 45%; second at least 10 ANDA filings with the FDA for generic topical pharmaceutical products; and third, maintaining profitability in 2014, while at least doubling our R&D spend to drive shareholder value.

30. Accordingly, after submitting 11 ANDAs in 2014, and five ANDAs the previous year, the Company finished 2014 with a total of 22 ANDAs pending at the FDA, one ANDA approved, and one ANDA temporarily approved – all for topical generic drugs that it had internally developed.

31. However, rather than focus on the expansion of its topical business, Grenfell-Gardner set out to execute a much more complicated and expensive transformation. That radical transformation, which had three broad parts, involved rapidly expanding into several additional generic markets in which the Company had little prior experience, while simultaneously undertaking a substantial increase of the Company's manufacturing facilities, in anticipation of the many products that they planned to develop and manufacture.

32. The first part of the plan called for the Company to develop injectable, complex, and ophthalmic generic drugs, in addition to topicals. As Grenfell-Gardner explained in the Q3 2014 earnings call in October 2014, Defendants referred to this "broader strategy" as "TICO" – an acronym for the topical, injectable, complex, and ophthalmic classes of generic products "where we at IGI plan to concentrate over the coming years as we continue to build and grow our business." Although the Company had little-to-no experience with those three new categories of drugs, Defendants believed that they would eventually make financially viable topical generic drugs and therefore needed further room to expand, and further that there was more competition

in the markets for topical generic drugs, so that they would get better returns in the markets for the new drug categories. For example, in the Q3 2014 conference call, Grenfell-Gardner referred to injectable drug shortages and the opportunity for the Company to position itself as a "go-to supplier" of injectables.

33. Second, in order to familiarize themselves with the new categories of generic drugs that they had committed to developing, and because their own pipeline of ANDAs was not yet producing significant revenue, Defendants began purchasing a large number of ANDAs, or the rights thereunder, from other companies. After acquiring one topical ANDA in 2013, in September 2014 Defendants acquired 20 ANDAs and NDAs, almost all of which were for injectable drugs related to pain management.

34. Third, the Company planned to significantly expand its facility in Buena, New Jersey (the "Buena facility"), a plant for manufacturing topical drugs, as well as administrative offices. Defendants "initiated the planning phase" of this expansion in 2014, with the intent to begin construction at the end of 2015 and complete the project by the end of 2017. For example, in the Q3 2015 earnings call on October 22, 2015, Grenfell-Gardner stated: "We still expect this in-house sterile manufacturing capacity to be online in 2017." The expansion would not only increase the facility's topical manufacturing capacity, but would also add the capability to produce more complex topical drugs that required clinical studies and other more intensive inputs. Moreover, the expansion would build a sterile facility capable of manufacturing injectable drugs, which the Company was not previously able to do. Manufacturing injectable drugs requires meeting even higher standards than for topical drugs, because injectables are administered inside a patient's body. In turn, though the Company had purchased the rights to injectable drugs, producing them through third-party manufacturers was generally cost-ineffective. The sterile

manufacturing facility would bring the cost structure down and enable the Company to enter what it described as the more attractive injectable markets.

35. To emphasize how completely the Company was being remade in such a short period, in October 2015, Defendants changed the Company's name to Teligent.

**2. Developing, Manufacturing, and Selling Its Own Broad Pipeline of Generic Products Required Teligent to Invest Substantial Amounts of Money and to Comply with Stringent FDA Regulations**

36. Teligent's extensive transformation and expansion necessarily involved significant increases in the Company's expenditures. For example, because the Company had no prior experiencing selling generic products that it had developed, it also had to build out sales and related teams, and its Selling, General & Administrative ("SG&A") expenses increased from $3.1 million and $3.5 million in 2012 and 2013, respectively, to $5.98 million in 2014, $11.34 million in 2015, and $15 million in 2016.

37. More significantly, its R&D costs more than doubled, from approximately $2.8 million in 2012 and 2013 to over $6.9 million in 2014. Given the small size of the Company in 2014, with only 81 full-time employees, that expenditure was enormous, equaling over 20% of its total revenues.

38. Indeed, as those costs continued to balloon over the following years, Defendants repeatedly assured investors that their heavy investment in R&D was driving Teligent's rapid transformation and revenue growth. By the start of the Class Period, during the March 7, 2017, investor call on the Company's full-year results FY2016 and standing heading into 2017, Defendants stated that R&D expenses had grown to over $17 million and approximately 26% of total revenue in 2016. Grenfell-Gardner explained this happened because "[w]e're not so much playing defense trying to protect our installed markets, but rather playing offence as we launch new drugs into the market. That's why if you compare our results to those of our peers, a few key

differentiators stand out. First, **we invest significantly more in R&D and we get significantly more out of it.**" [Emphasis added].

39. In short, high R&D expenditures were supposed to generate the wave of new generic products that Teligent would submit for FDA approval, manufacture, and sell. In an April 2016 conference call, Grenfell-Gardner emphasized that ANDA approvals were "the key to Teligent's growth." Defendants further stated that Teligent had 15 ANDAs in 2015, a new record, and was "on track" to file another 15 ANDAs in 2016 (it ultimately submitted 12 that year).

40. Moreover, in 2016, Teligent spent $13.5 million on capital expenditures related to its facility expansion, and Chief Financial Officer ("CFO") Jenniffer Collins ("Collins") stated that Teligent expected the final budget for the expansion to be $55 million.

41. Significantly, in order to undertake R&D, win ANDA approvals, and receive continued permission to manufacture approved products, Teligent had to comply with stringent regulations. Complying with those regulations is difficult and takes substantial resources, not to mention that those regulations are designed to make companies move at a slower pace to ensure the consistent safety of the products they develop and sell.

42. For instance, manufacturers of drug products must comply with the current good manufacturing practices ("cGMP" or "GMP") set forth in 21 C.F.R. 210 (general requirements) and 21 C.F.R. 211 (requirements for finished pharmaceuticals). GMPs are systems of manufacturing controls that are designed to ensure the identity, strength, quality, and purity of drug products.

43. In addition to GMP requirements, companies also must comply with Good Laboratory Practices ("GLP") and, to the extent that they undertake clinical studies, Good Clinical Practices ("GCP"). GLP requirements are specifically laid out in 21 C.F.R. 58, and Title 21 of the

C.F.R. also has numerous regulations governing GCP. For example, 21 C.F.R. 58.81 requires that a "testing facility shall have standard operating procedures in writing setting forth nonclinical laboratory study methods that management is satisfied are adequate to insure the quality and integrity of the data generated in the course of a study" and that "[s]tandard operating procedures shall be established" for a long list of subjects, including laboratory tests and data handling. 21 C.F.R. 58.105 further requires that "[t]he identity, strength, purity, and composition or other characteristics which will appropriately define the test or control article shall be determined for each batch and shall be documented."

44. Written procedures governing manufacturing and laboratory practices are often referred to as Standard Operating Procedures or "SOPs." The regulations in Title 21 of the C.F.R. include the minimum required SOPs.

45. Those required procedures must, among other things, ensure the quality of products that companies develop and manufacture:

> There shall be written procedures for production and process control designed **to assure that the drug products have the identity, strength, quality, and purity they purport or are represented to possess**. Such procedures shall include all requirements in this subpart. **These written procedures, including any changes, shall be drafted, reviewed, and approved by the appropriate organizational units and reviewed and approved by the quality control unit**.

21 C.F.R. 211.100(a). [Emphasis added]. Any lack of, or a failure to follow, written procedures designed to ensure the identity, strength, quality and purity of drug products violate 21 C.F.R. 211.100.

46. Moreover, companies must track and investigate any such insufficiencies or failures: "Written production and process control procedures shall be followed in the execution of the various production and process control functions and shall be documented at the time of performance. ***Any deviation from the written procedures shall be recorded and justified***." 21

C.F.R. 211.100(b) [emphasis added]. As discussed below, this tracking and investigations obligation required supervision and involvement from the highest levels of management.

47. Further, the regulations require investigations into unexplained discrepancies or failure to meet specifications for any drug product and other products that may have been "associated with the specific failure or discrepancy," whether the product was part of a batch that had been distributed or not. 21 C.F.R. 211.192. The regulations also require that a quality control unit exist and possess "the authority to review production records to assure that no errors have occurred or, if errors have occurred, that they have been fully investigated." 21 C.F.R. 211.22. The failures and discrepancies described in this paragraph and preceding one are known as "non-conformances" and are usually recorded in a non-conformance report or "NCR."

48. In its Annual Burden Estimate of September 28, 2011, the FDA estimated that it would take 20 hours per record-keeper to create 25 new SOPs and that the annual burden of the recordkeeping requirements in 21 C.F.R. 211.100 alone (requiring deviations from written procedures to be recorded and justified) would be 25,104 hours.

49. Additionally, the FDA may reject or delay ANDAs from a company with SOP violations if "[t]he methods used in, or the facilities and controls used for, the manufacture, processing, packing, of the drug product are inadequate to ensure and preserve its identity, strength, quality, and purity." 21 C.F.R. 314.127(a)(1). In turn, violations of SOPs designed to ensure the identity, strength, quality, and purity of drug products, in violation of 21 C.F.R. 211.100, could mean that the controls for preserving the identity, strength, quality, and purity of drug products are inadequate.

50. Consistent with companies' tracking obligations, even after an ANDA is approved, applicants must submit field application reports ("FAR") to the FDA in the event of any

mislabeling or misidentification, change, or deterioration, or failure to meet specifications with respect to drug approved products. *See* 21 C.F.R. 314.81(b)(1); 21 C.F.R. 314.98(b). A reported violation may delay a company's ability to continue producing the approved product.

51. FARs, ANDAs, and customer complaints may trigger FDA inspections of a company's facilities, on top of periodic inspections that the FDA undertakes. If the inspection results in negative findings, the FDA will issue the company a "483 Letter," which generally requires the company to implement changes fixing its SOP and/or violations.

52. In a 2009 presentation at a regulatory conference, the Deputy Director of the FDA's Office of Compliance for the Center for Drug Evaluation & Research provided examples of missing pharmaceutical quality control elements that have led to cGMP violations cited by the FDA. They included failure to have an adequate number of quality control personnel as required by regulations and failure to follow written procedures for annual product review.

53. Developing, maintaining, and correcting failures to follow procedures and regulations are resource-intensive, time-consuming tasks requiring substantial involvement from management, particularly since FDA communications on the subject are often with management. Such resource-intensive tasks necessarily slow down development, ANDA submissions, manufacturing, and other critical activities.

### 3. In Driving to Rapidly Generate the Many ANDAs Necessary to Support Defendants' Story of Transformation and Growth, Teligent Repeatedly Failed to Comply with FDA Regulations and Received Multiple 483 Letters

54. At the end of 2016, with only 153 full-time employees, Teligent lacked the resources necessary to develop products at the rate Defendants were touting and to rapidly expand its facilities while still complying with FDA regulations and SOP. Longstanding, substantial, and

systematic failures in Teligent's drug development and related processes were, in fact, undermining Teligent's business prior to and throughout the Class Period.

55. The FDA sent a series of "483 Letters" to Teligent, detailing those failures for the Company' management, including Grenfell-Gardner. As the FDA's website states, a Form 483 is "issued to firm management at the conclusion of an inspection when an investigator(s) has observed any conditions that in their judgment may constitute violations of the Food Drug and Cosmetic (FD&C) Act and related Acts. FDA investigators are trained to ensure that each observation noted on the FDA Form 483 is **clear, specific and significant**." [Emphasis added]. Further, a Form 483 "**notifies the company's management of objectionable conditions**" and is "**discussed with a company's management at the conclusion of the inspection.** Each observation is read and discussed so that there is a full understanding of what the observations are and what they mean." [Emphasis added]. The objectionable conditions listed on a Form 483 are also *not* all-inclusive.

56. Teligent received a 483 Letter from the FDA in September 2016 (the "September 2016 483 Letter"), about six months before the start of the Class Period. It followed an FDA inspection of Teligent's facilities from September 12-16, 2016. The inspection and letter were undertaken by the FDA's Bioresearch Monitoring Program ("BIMO"), which inspects drug development facilities for GLP and GCP, which are principles intended to ensure the integrity of scientific testing and the reliability of test data submitted to the FDA.

57. In an inspection for GLP conducted by the FDA's BIMO Program, FDA inspectors look for evidence of management involvement, or lack thereof, in, *inter alia*: reviewing and approving protocols and standard operating procedures; assuring that deficiencies noted by the Quality Assurance Unit are reported to study directors and acted upon; assuring that test and

control articles are appropriately tested for conformance with their specifications; and controlling study director workload.

58. Teligent proved unable to eliminate flaws in its development and related processes and received another 483 Letter from the FDA just a year later on October 19, 2017 (the "October 2017 483 Letter"), shortly before the end of the Class Period. This 483 Letter followed an FDA inspection of Teligent's facilities that occurred on October 2-5, October 10-13, October 16, and October 18-19 of 2017. The FDA conducted the inspection in response to several issues, including: (a) pending ANDAs submitted by Teligent; (b) FARs submitted by Teligent; and (c) the need for drug manufacturing surveillance coverage. Also, this 483 Letter was accompanied by a 48-page Establishment Inspection Report ("EIR"), which provides greater detail regarding the inspector's observations and findings.

59. The October 2017 483 Letter and EIR described several serious flaws with Teligent's manufacturing, research, and development processes, including problems with multiple ANDAs pending at the FDA. Further, many of these flaws were longstanding, reaching back to at least 2016, and, in some cases, earlier.

60. With respect to product manufacturing, the Form 483 and EIR found that Teligent had several breaches of GMP. As a result, in July 2016, Teligent employees observed that a raw material used in the Company's products was contaminated. Instead of quarantining or rejecting that material, as was required, Teligent used those contaminated materials to manufacture a batch of the Company's most profitable product, lidocaine ointment USP 5%. Teligent then released the product and shipped it into interstate commerce. Furthermore, Teligent's investigation into the contaminated material did not even determine if the Company used that material in the manufacture of other products or batches that it shipped.

61. These dangerous failures to detect and investigate contamination are evidence that Teligent's production and quality control processes harbored fundamental flaws. They are also consistent with the statements from the Confidential Witness, further described below, that Teligent had a significant backlog of non-conformances, which had not been investigated, and that management pressed to close out investigations with inappropriate haste.

62. In addition to Teligent's production flaws, the October 2017 483 Letter also found substantial flaws with Teligent's development, ANDA, and related quality control processes:

(a) First, Teligent either inadequately conducted or else *simply did not conduct* investigations into failures with respect to three drugs for which it had ANDAs pending at the FDA. In particular, Teligent did not investigate the failure of a batch of a drug product to meet its specifications (*i.e.*, the quality standards setting forth the criteria to which the drug must conform). For another drug product, Teligent failed to identify an unknown impurity in the product batch and did not conduct a manufacturing investigation into this failure to meet specifications. Nor did Teligent investigate or identify the root cause of packaging integrity failure of a third product, which impacted the product's *stability*. These failures and investigations, or lack thereof, took place between May 2015 and October 2017;

(b) Second, Teligent's microbiology test method for finished products was used on three drugs with pending ANDAs, even though that test method had not yet been verified as suitable. Furthermore, in at least one case, when Teligent attempted to validate the test method, it did so using incorrect media, so even the methods of confirmation were not appropriate;

(c) Third, Teligent tested and released a drug with a pending ANDA without including an appropriate laboratory determination that the drug conformed to its final specifications. Further, the inspector noted that stability testing of the drug had not produced initial results and so there would be no reference point for determining the product's stability over time;

(d) Fourth, Teligent did not follow its established laboratory control mechanisms as it was required to. Consequently, Teligent did not investigate nonconforming results, indicating that a drug did not meet its specifications, for at least one product with a pending ANDA submission. Teligent also did not investigate a microbiological failure for one product that had received ANDA approval. This meant that the quality of Teligent's drugs was not reliable.; and

(e) Fifth, in 2017, Teligent altered the compound stability specifications for one product, which are related to its purity, based on data for a different drug. Such an alteration means that, as the inspector found, Teligent failed to create laboratory controls that include the "establishment of scientifically sound and appropriate specifications designed to assure that drug products conform to appropriate standards of identity, strength, quality and purity."

63. All of these problems undermined the quality, identity, and purity of the drugs for which Teligent was seeking ANDAs. The failures described above included at least four specific pending ANDAs, as well as at least two products for which ANDAs had already been approved. Furthermore, these problems reflect either a failure to properly investigate non-conformance to specifications, a failure to establish controls for creating those specifications in the first places,

and/or a failure to conduct appropriate testing. Nor were they one-off problems, but rather recurring and longstanding failures of Teligent to follow required protocols.

64. In addition, the October 2017 483 Letter and accompanying EIR listed a number of other areas where Teligent did not comply with required SOP. The inspector found that Teligent had not submitted a FAR documenting a problem with one of its pending ANDA submissions in September 2017. Further, the inspector found that Teligent's SOP outlining the responsibility for submitting FARs was not clearly defined – indicating that this could happen more frequently. The inspector raised and discussed this issue directly with Grenfell-Gardner.

65. Similarly, the inspector reviewed several customer complaints from 2016 and 2017 regarding mold in the Company's products, and when questioning management regarding the SOP that was supposed to prevent such occurrences, was told by Teligent General Manager Troy Woelfel ("Woelfel") that the procedure would need to be updated to reflect current practice.

66. In sum, between 2015 and 2017, Teligent persistently breached manufacturing and laboratory procedures by: failing to take sufficient measures against contamination, failing to detect and investigate contamination, distributing contaminated product to the public, failing to adequately investigate (and in some cases, to investigate at all) products that did not meet specifications, failure to make sure the tests used were appropriate, failure to establish scientifically sound and appropriate specifications, and failure to follow *established* controls for investigating non-conformances and microbiological failures.

67. Notwithstanding Teligent's massive R&D investments, and costly expansion of its development and manufacturing facilities, these failures undermined Teligent's ability to develop products, submit ANDAs, and get them approved. That is, they undermined Teligent's much-touted mechanism for transformation, growth, and success.

68. Further, the October 2017 EIR noted that Teligent's failure to implement and follow these fundamental processes came in the midst of significant turnover in the Company's senior development, production, and quality control personnel. Teligent had approximately ten new employees in those roles since the FDA's last cGMP inspection in January 2016. They included the Senior Vice President of Quality, the Plant Manager/General Manager, and the Quality Control Manager.

69. Consistent with the guidance on the FDA's website, the October 2017 483 Letter and EIR also made clear that the inspector appraised Teligent's management of the foregoing issues. With respect to Grenfell-Gardner, the EIR specifically noted the inspector met with him, and that FDA communications are supposed to be addressed to him personally. Moreover, they noted that the Chief Scientific Officer, the General Manager/Plant Manager, and the Senior Vice President of Quality, all of whom are involved in areas of the Company with the fundamental failures, report directly to Grenfell-Gardner. All of those individuals also participated in the FDA's investigation.

70. Beyond communications with the FDA regarding the Company's development and production failures, Teligent's management was required by federal regulations to record and review those failures in order to ensure that it was producing safe products. Pursuant to 21 C.F.R. 211.100, Teligent had to maintain: "written procedures for production and process control designed **to assure that the drug products have the identity, strength, quality, and purity they purport or are represented to possess**," which "shall be drafted, reviewed, and approved by the appropriate organizational units and reviewed and approved by the quality control unit," and, "**[a]ny deviation from the written procedures shall be recorded and justified**." [Emphasis added]. On top of that, the FDA's effective *Guidance for Industry: Q10 Pharmaceutical Quality*

*System* instructs that senior management must "ensure an effective pharmaceutical quality system is in place to achieve the quality objectives, and that roles, responsibilities, and authorities are defined, communicated, and implemented throughout the company."

71. Although Teligent had multiple critical processes that it had failed to implement or follow, as detailed in the October 2017 483 Letter and EIR, Teligent was tracking NCRs and investigations to the extent that they occurred. From the NCRs cited by number in the October 2017 EIR, it appears that Teligent had at least 87 NCRs in 2017.

72. Implementing the required and missing SOPs, and ensuring that Teligent followed all of them, would require a fundamental shift in Teligent's business model, along with significant amounts of time and significant resources. All of which would detract from Teligent's attempt to rapidly transform itself and develop new products. As detailed by the Confidential Witness, further described below, Teligent had an established practice of understaffing and hurrying its investigations to a close in order to submit ANDAs faster. Taking the time to properly conduct investigations and develop the controls that were lacking would itself be a transformation.

73. Responding to a 483 Letter is also a substantial undertaking. It requires months of work, significant extra man-hours per employee per regulatory violation, and costs. This is a serious burden for a company as small and over-extended as Teligent.

74. Moreover, a 483 Letter is a non-exhaustive list of objectionable conditions, and companies are responsible for fixing all objectionable conditions, not just the cited ones. Any objectionable conditions known to the FDA decreases the chances of ANDA approval.

75. However, as discussed below, Defendants were unable to fix many of the longstanding problems identified in the October 2017 483 Letter, even well after the Class Period. In the spring of 2019, Teligent received yet another 483 Letter from the FDA ("Spring 2019 483

Letter"). It indicated that Teligent's development and production practices still had multiple flaws similar to those identified in the October 2017 483 Letter.

76. Teligent's longstanding development and production failures documented by the FDA, and that the Company tracked and monitored, were confirmed by Confidential Witness 1 ("CW1"). CW1 worked for Teligent in its facility as an investigations scientist throughout the Class Period, from approximately July 2016 to February 2018. CW1 was in the Quality Control group and initially reported to Quality Control Manager Ahmer Ali, later reporting to Vice President of Quality Control Barbara Lani ("Lani"), who reported directly to Defendant Grenfell-Gardner.

77. CW1's job responsibilities involved investigating out-of-specification test reports on products. After Teligent's Quality Control analysts conducted tests of products, if any of the product samples tested did not conform to their specifications, then the analysts would submit a report to CW1. CW1 would conduct the investigation to determine why the product failed the test, determine the root cause, and recommend corrective actions. Teligent had SOPs, which matched FDA guidelines, to determine the directly assignable cause for why the product was out-of-specification (or "out-of-spec"). The SOP for investigation included, among other things, checking the equipment used to conduct the test, to make sure it was functioning properly and correctly "validated"; checking the preparation of the test sample itself; checking the instruments used to prepare the sample for testing; and checking that the testing procedures were followed correctly. If these steps did not determine the cause, the investigation would become wider, including testing more samples. Once the investigation was complete and CW1 had determined the most likely root cause, CW1 would prepare a report and creates a Corrective Action Plan. If the root cause was determined to be a production or process problem, then a NCR was issued.

78. When CW1 had initially been hired, the manager who hired CW1 created the impression that role would largely involve supervision of other investigation scientists. In reality, CW1 was the only scientist conducting the actual investigations and was overwhelmed.

79. CW1 stated that the lack of staff and resources affected Teligent's Quality Control and that many people in the department were overwhelmed. There were enough staff members to conduct basic testing, but there was no help to conduct data analysis or investigations.

80. The lack of staff assistance, coupled with unrealistic deadlines, caused serious back-ups in Teligent's work during CW1's tenure at the Company. Unrealistic timelines were a recurring problem during CW1's employment at Teligent. CW1 explained that SOP within the industry was to try to close investigations within 30 days of receiving the out-of-spec test result. Doing so, however, was impossible, because CW1 often had between 30 and 40 open investigations at any one time.

81. CW1 stated that management nevertheless put intense pressure to submit a high volume of ANDA filings on timelines which were unrealistic, given Teligent's lack of resources.

82. Moreover, CW1 was pressured to close cases or investigations, regardless of outstanding issues, so that Teligent could submit its ANDA to the FDA, or so that products could be manufactured and shipped. This pressure was put on CW1 directly by Vice President of Quality Control Lani and General Manager Woelfel.

83. Attempting to submit a high volume of ANDAs at such a high speed led to mistakes being made. Mistakes often caused out-of-spec test results, which, in turn, triggered investigations, which caused further back-ups. CW1 believed that the problem of backlogged NCRs and related issues was because Teligent's Quality Control department was under-resourced.

84. While at Teligent, CW1 worked on about 400 investigations, out of which "dozens" involved pressure by Lani and Woelfel to close the investigations out before CW1 was comfortable and felt that the investigation was complete

85. Further, CW1 stated that Teligent's process for dealing with these NCRs and related issues was not fully in place or established when CW1 joined the Company prior to the Class Period in July 2016.

86. CW1 explained that an ANDA could not be filed with the FDA until everything – meaning every investigation and/or NCR – was "closed," and that Teligent's management regularly decided to declare investigations "closed" prematurely, without definitively determining what the root cause of the out-of-spec result was. For example, instead of completely proving that the test result was due to analyst error, CW1 was pressured to close the case by declaring it was "undetermined error" by the analyst. In other words, CW1 had to declare the most likely root cause, instead of fully investigating the situation to determine the precise root cause.

87. CW1 was generally aware that there were a large group of NCRs that had been created in the autumn of 2017, though he could not connect them specifically to the FDA inspection during that time. CW1 further explained that many of the NCRs were retro-active and related to issues that had been persisting for some time, including pre-dating CW1's employment at Teligent.

88. CW1 also stated that many of the issues in out-of-spec samples had been flagged in the NCRs and assessed as production issues, but were not being addressed. CW1 stated that these issues were left open for a very long time and should have been written up into NCRs earlier.

89. CW1 explained that Teligent's many overdue investigations continued after the October 2017 483 Letter and after the Class Period ended. CW1 recounted a meeting with Lani,

Teligent's Vice President of Quality Control, which CW1 believed took place in January 2018, regarding those investigations. Lani asked what CW1 needed to get the investigations completed in time, CW1 then asked for more staff and resources, and Lani told CW1 that would not happen.

90. CW1 was also aware that Teligent's sterile manufacturing facility was significantly behind on its development timeline.

91. As set forth below, Teligent's flawed development processes were causing its pipeline of new products to sharply decline and preventing the Company from diversifying its business with the new categories of products Defendants' had promised. At the same time, Defendants nevertheless continued expending significant amounts of money on R&D and on the facility expansion, which was actually behind schedule. Nevertheless, Defendants continued to tout the purported success of the Company's pipeline and TICO strategy, while concealing the serious flaws in its development and production processes – not to mention the existence of the 483 Letters.

**B. Defendants' Materially False and Misleading Statements During the Class Period**

92. On March 7, 2017, Teligent issued a press release announcing its Q4 2016 and FY2016 results. For Q4 2016, the Company's revenue from its topical and injectable products, almost doubled as compared to Q4 2015. For FY2016, the Company: had revenue of approximately $67 million, an increase of 51% over FY2015; had a net loss of approximately $12 million, compared to net income of approximately $6.7 million the previous year; submitted 12 ANDAs to the FDA (six of which were submitted in Q4 2016); and received nine ANDA approvals from the FDA. Additionally, for FY2017, Teligent provided revenue guidance of between $85 to $100 million, a projected increase of 27% to 49% as compared to FY2016.

93. The press release also quoted Defendant Grenfell-Gardner as making the false and misleading statement that "Teligent continued to execute and grow our business." Further, it quoted him touting Teligent's purported transformation and positioning for future growth, "[w]e are well underway with the significant expansion of our manufacturing facility located in Buena, NJ. . . . Completion of the facility expansion by the end of 2017 will allow us to plan to submit our first injectable ANDA to the FDA in the first half of 2018." Similarly, the press release quoted Grenfell-Gardner stating, "[w]e believe that we are well-positioned to increase revenue up to $85 to $100 million in 2017," and "we continue to invest in R&D to drive our future growth . . . [t]his investment would allow us to continue to file aggressively in the U.S. and Canada in 2017, and to advance our first organically-developed sterile injectable products."

94. Later on March 7, 2017, Defendants held a conference call during which Grenfell-Gardner made further false and misleading statements to the public. After touting Teligent's year-over-year growth in Q4 2016 and FY2016, Grenfell-Gardner claimed "[t]his growth continue[s] to be driven by Teligent's focus on execution through getting drugs approved, making them and launching them." As a result, Teligent's "portfolio has undergone a significant change and de-risking, as we've continued to bring new products to market."

95. He then went on to tout Teligent's pipeline:

> As of year-end 2016, our pipeline at FDA had a total addressable market for Quintiles IMS of $2 billion. **This pipeline that Teligent has built we believe is a rather unique asset and I want to be certain that we all understand how this pipeline sets Teligent apart from much of the rest of our peer group in the generic industry.** You may recall that I referred to Teligent as the disrupter in our industry early in 2016. What I meant by that was that **Teligent's ability to navigate drugs through the approval process at FDA in a timely manner and launch them successfully makes us a little bit different. We're not so much playing defense trying to protect our installed markets, but rather playing offence as we launch new drugs into the market.** That's why if you compare our results to those of our peers, a few key differentiators stand out. First, **we invest significantly more in R&D and we get significantly more out of it.**

* * *

> Second, **we punch above our weight when it comes ANDAs on file with the FDA, particularly in the specialty generic space.** And finally, because we are market entrants rather than incumbents, we don't face the same pricing erosion that our competitors do.

96. Similarly, Grenfell-Gardner claimed that Teligent's R&D was so robust that it would soon be able to move from topical products, which faced more competition, to injectable products, which could generally achieve greater returns:

> We've begun the process of transitioning our R&D focus from topicals to injectables, which will be largely complete by the fourth quarter of this year. We're able to do this as by the fourth quarter, we will have substantially achieved our goals around our topical development program with topical ANDAs becoming more focused on applications which require in-depth clinical endpoint studies.

97. He also stated that Teligent's imminent move to injectable products was a result of the Company's purported progress on updating its plant:

> We've been making great strides in the build out of our facility expansion at the manufacturing site in Buena Vista Township, New Jersey. We are on track to have the facility finished and validated by the end of this year, which will enable us to hit our timelines for in-house injectable ANDA submissions by the first half of 2018.

98. Grenfell-Gardner emphasized that Teligent's performance and positioning was based on Defendants' strong execution in developing generic products and timely ensuring their approval:

> **[W]e're committing to continuing our extreme focus on execution. We believe in developing drugs, getting them approved, and launching them in the market, all in a timely manner.** We believe this is the foundation of a sound specialty generic pharmaceutical business and we are absolutely dedicated to executing this business plan whilst continuing to manage our cost structure and our supply chain. **That's what we do best at Teligent**.

99. Further, he assured investors that Teligent's high development costs, which contributed to Teligent's net loss for FY2016 despite increased revenue, were driving the Company's growth and profitability:

> [W]e will continue to invest in R&D, as we maintain our aggressive focus on the pipeline. We anticipate the total R&D expense for the year 2017 to approximate 24% to 27% of total revenue. **Our investment in this pipeline is what drives and will continue to drive our growth and profitability in the years to come**.

100. In response to an analyst's comment that Teligent's six ANDA submissions in Q4 2016 were "a little bit light," and related question regarding what Teligent's "cadence" of ANDA "filings" would be in 2017, Grenfell-Gardner concealed the problems undermining the Company's ANDA pipeline and the September 2016 Letter it received from the FDA:

> So I think we intentionally didn't want to start thinking about numbers of filings in the year, but **rather the quality of the filings and their likelihood of approval within our first cycle review. That's our focus as we think about the pipeline.**
>
> And you go back and look at the fourth quarter of 2016, I think you can see some of that. **We actually responded to, I think the final total was something like 120 interactions with FDA related to the pipeline last year. So when you think about that workload, together with new ANDA submissions, obviously, getting stuff out of the FDA is probably more important than throwing stuff into the FDA, particularly if you don't have the time and the effort to quality check it.**
>
> We don't want to do that. So the other piece of this is to be mindful that in the first half of this year, you have the overlap of the review cycle periods for GDUFA Year 4 and GDUFA Year 5. You'll know, Matt, that in GDUFA Year 5, we're moving from a 15-month clock for first cycle review to a 10-month clock.
>
> So **that puts a lot of strain and stress on the organization and the regulatory team and all of the teams that support to make sure that we can continue to respond to FDA on time, in a complete manner and in a quality response to the information requests that they have. That's my number one priority for the first half of this year.**
>
> So we've staggered the ANDA filings. There will, of course, still be ANDA filings in the first half of this year. And we'll update you on a quarterly basis as we progress. But I don't want to focus on that ANDA submission cadence. **What I want to focus on is the quality of our responses to get drugs approved.**

101. Additionally, in response to an analyst's question about why Teligent's competitors were recently discussing plans for injectable products and how those plans impacted Teligent, Grenfell-Gardner touted Teligent's purported regulatory expertise compared to regulatory problems that other companies were having:

> **You look at some of the major facilities that supply the market and they continue to have ongoing regulatory challenges. We've seen warning letters even over the course of the past few weeks related to sterile injectable manufacturing sites run by some of the largest companies in the world.**
>
> So, look I think that you've got to be mindful of a couple of things. First, there is a physical plant question, where you're going to make these sterile injectable drugs. **I will tell you that many of the facilities that exist for sterile injectable manufacturer probably need to make some pretty significant investments around the manufacturing technology that supports that and that's not an easy thing to do.**
>
> * * *
>
> We've been working on this injectable plan since 2014 when we acquired our first injectable ANDAs and NDAs. We brought the first of those drugs back to market. We've built a team, a really amazing team for injectable drug development. And we've started building the physical plant that will now be in place at the end of this year. **That's a lot of work and a lot of process in a company that's very focused on getting stuff done. I'm not sure how in a slightly bigger or perhaps slower organization how that might happen quite to the extent that we do.**

102. The foregoing statements in ¶¶92-101 were false and misleading because, as noted in the September 2016 and October 2017 Letters, Teligent was already experiencing manufacturing and laboratory problems, and those problems were affecting its topical ANDA submissions. Teligent's growth strategy depended on its ANDA pipeline, which, in turn, depended on a steady stream of ANDA submissions. Teligent's undisclosed manufacturing and laboratory problems slowed its topical ANDA submissions (and decreased the likelihood of imminent injectable submissions and approvals). However, Defendants misleadingly glossed over and concealed this issue while touting its ANDA pipeline and its growth.

103. Moreover, the foregoing statements in ¶¶92-101 were materially false and misleading because, at the time they were made, Teligent had already received the September 2016 Letter, a regulatory problem which by itself would have slowed down the ANDA submission and approval process for Teligent. Consequently, the ANDA pipeline touted by Defendants was not as valuable as claimed, since it consisted partly of products that could not be approved without significant course-correction by Teligent. Furthermore, the September 2016 Letter was a "regulatory challenge," which Teligent was implying its prospective competitors had but Teligent itself would not have. The September 2016 Letter shows that Teligent was already experiencing serious laboratory-related regulatory problems with its *topical* drugs, with which it had significantly greater expertise than with injectables. Accordingly, Teligent touting its superior regulatory expertise compared with injectable-manufacturing companies was false and misleading because of its undisclosed problems affecting its already-existing topical business.

104. On March 13, 2017, Defendant Grenfell-Gardner spoke at the Roth Capital Conference, at which he made materially false and misleading statements to the public. He claimed that, "We've had a very successful track record with the FDA in that facility. Our last three audits over the past five years, there have been no 483 observations at that site." Similarly, he assured investors that "our cooperation with the FDA has been incredibly fruitful and straightforward."

105. Grenfell-Gardner also claimed that Defendants' plan to enhance the Company's facilities and develop injectable products was on track, due to its heavy investment in capital along with its development and regulatory capabilities:

> **The facility has made some really remarkable progress over the past many weeks. And we are on track to hit our goals. So, it's really exciting. So, Phase 1 is complete. Phase 2 is under way. We're actually finishing out in our Phase 3 in terms of the water tightness of that facility. And Phase 4, so the second**

> **and third quarters of this year, we'll be transitioning and sort of moving around the various manufacturing lines to be able to continue to support the business.**
>
> So, why are we then making that move into the injectable space? During these conferences and during these conversations, we often hear about people telling us lots of people are looking at the injectable space; lots of people are thinking about injectables. And it's really great, but there are lots of people thinking about stuff. **We're actually building it. So, we're dedicating the capital. We're doing the R&D. We have products on the market. We've got the development capability. And we the [*sic*] regulatory skills to take these products from thinking about to actually being available for patients.**

106. At the same time, with respect to Teligent's ANDA submission pipeline, Grenfell-Gardner told investors, "[i]f you think about the pace of the approvals that we had last year, the goal is to get as many into the FDA as we're getting out of the FDA."

107. He also told investors how Teligent's purported ability to get ANDAs approved by the FDA while developing and growing its pipeline of new ANDAs impacted the Company's FY2017 guidance:

> Just to talk a little bit about the financial highlights for 2017, we've given guidance of revenue of between $85 million and $100 million for 2017. Just to say the way that we construct our guidance is to start with the low end of the range being a sort of universe of what we know. So, what have we had approved, might be pending launch, building on the last quarter of 2016. **The upper end of that range is our expectations based on things we believe that could come out of FDA throughout the year, and we think that gives us a good starting point for the guidance for the year.**
>
> In addition, we're continuing to invest significantly in R&D. Obviously, the base of sales is where it is. So, we invest significantly more as a percentage of revenue than our peers, but we're investing now 24% to 27% for 2017. That will moderate over time as the pipeline grows; that percentage will trend towards industry norms of around 10% as you get in the out-years of the model. **But for now, that's the best investment that we can make because the FDA is approving the drugs that we submit.**

108. The foregoing statements in ¶¶104-07 were materially false and misleading because, at the time they were made:

(a) As explained in the October 2017 483 Letter, and confirmed by CW1, they concealed that Teligent was already experiencing serious development, manufacturing, quality control, laboratory and regulatory failures. Moreover, those failures were negatively impacting the Company's ability to develop new products, win ANDA approvals, and manufacture products. In turn, that undermined the purported value of Teligent's pipeline, the success of its TICO strategy, the benefits of its heavy R&D investments, and its positioning for growth and profitability.

(b) Moreover, they concealed the September 2016 483 Letter, a regulatory problem which by itself would have required substantial amount of Teligent's already overtaxed resources to respond to, thereby limiting Teligent's ability to execute its business plan. The September 2016 Letter was also a "regulatory challenge", which Teligent was implying its prospective competitors had but Teligent itself would not have. It further shows that Teligent was already experiencing serious regulatory problems with its topical drugs, which were easier to produce than the new categories of drugs Teligent sought to expand into, and which Teligent had significantly greater expertise with, thereby undermining Defendants' claim that they were well positioned to expand into injectables drugs and the other new drug categories, that had better market conditions than topicals.

(c) Also, the injectable facility was already experiencing significant delays in its development timeline, making it unlikely to support injectable products on the timeline Defendants' promised. Moreover, amidst the development failures set forth in the preceding paragraphs, Teligent was already experiencing a substantial slowdown in its ANDA submissions for its core topical business, which in turn delayed and threatened its ability to develop and produce the more complex injectable drugs on the promised timeline.

109. On March 15, 2017, Teligent filed its 10-K Annual Report for 2016. In the "Risk Disclosures" section of the 2016 10-K, Teligent made the following false and misleading statements:

> **We may encounter delays in testing and manufacturing new pharmaceutical products, submitting applications for regulatory approval, receiving approval from the relevant authorities and commercializing new products.**
>
> * * *
>
> **As a manufacturer of pharmaceutical products, we must also comply with cGMPs, or current Good Manufacturing Practices, which include requirements related to production processes, quality control and assurance and recordkeeping. Our manufacturing facilities and procedures and those of our suppliers are subject to periodic inspection by the FDA and foreign regulatory agencies. Any material deviations from pharmaceutical cGMPs or other applicable requirements identified during such inspections may result in recalls or other enforcement actions, including warning letters, a delay or suspension in manufacturing operations, consent decrees or civil or criminal penalties. Further, discovery of previously unknown problems with a product or manufacturer may result in restrictions or sanctions, including suspension or withdrawal of marketing approvals, seizures or recalls of products from the market, or civil or criminal fines or penalties, any of which could significantly and adversely affect supplies of our products.**

110. The foregoing statements in ¶109 were materially false and misleading, because:

(a) As explained in the October 2017 483 Letter, and confirmed by CW1, they concealed that Teligent was already experiencing serious development, manufacturing, quality control, laboratory and regulatory failures. Moreover, those failures were negatively impacting the Company's ability to develop new products, win ANDA approvals, and manufacture products. In turn, that undermined the purported value of Teligent's pipeline, the success of its TICO strategy, the benefits of its heavy R&D investments, and its positioning for growth and profitability.

(b) Moreover, they concealed the September 2016 483 Letter, a regulatory problem which by itself would have required substantial amount of Teligent's already

overtaxed resources to respond to, thereby limiting Teligent's ability to execute its business plan. The September 2016 Letter was also a "regulatory challenge", which Teligent was implying its prospective competitors had but Teligent itself would not have. It further shows that Teligent was already experiencing serious regulatory problems with its topical drugs, which were easier to produce than the new categories of drugs Teligent sought to expand into, and which Teligent had significantly greater expertise with, thereby undermining Defendants' claim that they were well positioned to expand into injectables drugs and the other new drug categories, that had better market conditions than topicals.

(c) Also, the injectable facility was already experiencing significant delays in its development timeline, making it unlikely to support injectable products on the timeline Defendants' promised. Moreover, amidst the development failures set forth in the preceding paragraphs, Teligent was already experiencing a substantial slowdown in its ANDA submissions for its core topical business, which in turn delayed and threatened its ability to develop and produce the more complex injectable drugs on the promised timeline.

111. Additionally, in the 2016 10-K, Teligent made the following false and misleading statement: "We have an FDA-registered, cGMP-compliant facility that is equipped for manufacturing topical, semi-solid and liquid products."

112. The foregoing statement was false and misleading because, at the time it was made, Teligent ***had several ongoing breaches of cGMP*** that were later noted in the October 2017 Letter, including failure to protect against, detect, or investigate contamination, resulting in the distribution of contaminated product to the public, and which had not been remedied by the time of the October 2017 Letter.

113. On May 2, 2017, Teligent issued a press release announcing its Q1 2017 quarterly results. It stated that the Company had increased revenue over the same quarter a year ago and sequentially, which included an increase in revenue from the products it had developed year over year. Two of the Company's ANDAs also received approval. Further, the Company maintained its revenue guidance of between $85 to $100 million for FY2017, with gross margins between 50% to 54%, and R&D costs between 24% to 27% of revenue.

114. Later that day, Defendants held a conference call at which Grenfell-Gardner made false and misleading statements to the public. He repeatedly claimed that Teligent's strong development, compliance, and regulatory capabilities were creating a successful pipeline of products and positioned that pipeline for growth:

> **[O]ur team is focused on delivering products in the existing product pipeline, responding to FDA and HealthCanada inquiries and preparing for the final submissions for 2017. . . . And we are committed to upholding our responsibilities with respect to the FDA to ensure the timely processing of our applications.**

[Emphasis added].

115. Similarly, he claimed that Teligent's business was:

> **[B]uilt on a solid product development platform, excellent regulatory capabilities and timely and effective product launch. With every quarter that passes, our fundamental commitment to this business plan diversifies our revenue base, improves our capabilities and delivers financial results.**

116. In response to a question regarding "the current timeline, are you still on track to be able to handle injectable submissions by the first half of 2018[,]" Grenfell-Gardner answered:

> **[Y]es. The goal, as I've said, in terms of facility expansion is to ensure that we have the facility. We're ready to produce injectable products by the end of this year, and the team has already identified the lead products that will go into that facility and what order as we get through the end of 2017 and into 2018.**

117. Further, in response to a related question regarding the range of capabilities "on the injectables front," he stated:

> But ***the second part is around the internally developed pipeline.*** And there, what I'm particularly excited about is ***the ability of our team to start to pivot away from topical development in the back half of this year towards injectable development, and to see those teams apply the same degree of productivity towards injectables, if not better, that we had around topicals in some of our bigger topical years for the internal development program.*** . . . [I]t is going to be driven by a very similar philosophy around R&D productivity and getting drugs approved.

[Emphasis added].

118. The foregoing statements in ¶¶111-17 were materially false and misleading, because they purported to disclose "risks" that had, in fact, already materialized at the time the statements were made:

(a) As explained in the October 2017 483 Letter, and confirmed by CW1, they concealed that Teligent was already experiencing serious development, manufacturing, quality control, laboratory and regulatory failures. Moreover, those failures were negatively impacting the Company's ability to develop new products, win ANDA approvals, and manufacture products. In turn, that undermined the purported value of Teligent's pipeline, the success of its TICO strategy, the benefits of its heavy R&D investments, and its positioning for growth and profitability.

(b) Moreover, they concealed the September 2016 483 Letter, a regulatory problem which by itself would have required substantial amount of Teligent's already overtaxed resources to respond to, thereby limiting Teligent's ability to execute its business plan. The September 2016 Letter was also a "regulatory challenge", which Teligent was implying its prospective competitors had but Teligent itself would not have. It further shows that Teligent was already experiencing serious regulatory problems with its *topical*

drugs, which were easier to produce than the new categories of drugs Teligent sought to expand into, and which Teligent had significantly greater expertise with, thereby undermining Defendants' claim that they were well positioned to expand into injectables drugs and the other new drug categories, that had better market conditions than topicals.

(c) Also, the injectable facility was already experiencing significant delays in its development timeline, making it unlikely to support injectable products on the timeline Defendants' promised. Moreover, amidst the development failures set forth in the preceding paragraphs, Teligent was already experiencing a substantial slowdown in its ANDA submissions for its core topical business, which in turn delayed and threatened its ability to develop and produce the more complex injectable drugs on the promised timeline.

119. On May 3, 2017, at a Deutsche Bank Health Care Conference, Defendant Grenfell-Gardner made the following false and misleading statement to the public: "If you look at the manufacturing site, so this is the site that's under significant expansion at the moment. It had a very solid track record at the FDA—the audits conducted ***over the last five years, there've been no 483 observations related to that.***" [Emphasis added].

120. The foregoing statement was false and misleading because Teligent had an FDA inspection, pursuant to the FDA's BIMO Program, in September 2016, which resulted in the Form 483 observations of the September 2016 Letter.

121. At the Bank of America Merrill Lynch Healthcare Conference on May 16, 2017, Defendant Grenfell-Gardner made false and misleading statements to the public. After emphasizing Teligent's pipeline of ANDA submissions and portfolio of ANDA approved products, he touted the company's purported development and production strength:

> All of this we do pretty much internally through a facility that we have in New Jersey, it's an FA approved site, ***No 483 inspections in the last three inspection***

> ***cycles, and it's a site that we're extending pretty rapidly in order to meet the demands of both at [sic] the pipeline as well as the strategy that we've set out.***

[Emphasis added].

122. He also touted Teligent's purported ability to develop its pipeline and secure a return on its high R&D costs:

> **[Teligent] is really an offensive play around how we grow this pipeline and how we get products approved.** You can see that over the course of the past five years, we've really invested a lot in that pipeline compared to our peers. If you look at our run rate of investment in R&D, we're at somewhere north of 20% in most years, this year somewhere between 27% and 30% I think, for the year, or 24% and 27% for the year, and last year almost 27% as well. That's a significant investment compared to industry, right. I mean, you look at an industry that's been investing 6%, 7%, 8% of revenue in R&D and have pipelines that look pretty anemic compared to many of our much larger brothers and sisters in this industry, Teligent has a very robust pipeline focused on the specialty area.
>
> * * *
>
> **And finally, you look at the productivity of what we do in R&D. While so many people have been disinvesting in R&D, Teligent has kind of shifted it into another gear. And if you look at the ability of this team to file 10, 12, 15 ANDAs a year and to process the amount of FDA correspondence that comes from that successfully and in a timely manner, I think, we've done a really great job.**

123. Grenfell-Gardner followed-on, claiming that Teligent was, in fact, successfully growing and expanding its pipeline into new and ever more complex products:

> **What Teligent has done in terms of strategy around that portfolio is to say we will be in every AT-rated product [topicals] and every AB-rated corticosteroid [includes topicals, pills, and injections] by the end of 2017, we will have filed those products, and we are on track now to meet that goal.** What that means for the topical development program inside of Teligent is that at the end of 2017, we sort of shift into a different phase and that's where we start working on these products that are clinical endpoint driven. The total number of ANDAs will come down in the topical space, because we're only going to do two, three of those a year as you think about a $5 million clinical spend, but the potential impact over time to the portfolio will continue to be meaningful.
>
> **So, that frees up some time for us to do some other things and particularly around the injectable strategy, which I'll talk about in a moment. If you look about all of this, this is driven by our manufacturing space.**

* * *

**In terms of timing, we intend to fill the first liquid injectable product in this site before the end of this year. We are taking effective use of this site from September of this year, it will be substantially complete in October.**

* * *

**[I]f you think about what we've been able to do in topicals and R&D by presenting 10, 12, 15 ANDAs a year to the FDA**, the goal is, as we get into 2018 and add our second and our next two development teams, taking the total number of development teams to six, is that **we should be in a position to file somewhere around my goal of 20 ANDAs a year in injectables. I don't see anybody doing that and I know that this team is going to be able to make that happen in this site.**

124. Moreover, he claimed that Teligent was doing all of that while meeting high regulatory and quality control standards:

**If you look at a number of the folks in our space, you hear a lot of complaining about FDA, you hear challenges of getting drugs approved. We don't make those complaints, we don't have those challenges. . . . [P]art of this is about the responsiveness of the team that we have. I think last year, the count was that we had something like a 130-ish inbound increase from FDA**, all of which required either 7-day or 30-day response times. We responded to FDA in all of those cases on time. And when we talk to our peers in our industry, they say to us, why are you doing this? This is crazy, like nobody does that. But the reason we do it is because that's what it takes to get drugs approved on your GDUFA goal date.

* * *

I think I started with what Steve was saying about being - playing offense, right. **We don't worry so much about price erosion, perhaps we're the source of some people's price erosion, because we're launching products and we're bringing them to market. We're doing that very effectively and we're achieving the market shares that we set out as we bring those products to the market. It's supported by our pipeline, a pipeline that's been incredibly productive over the past couple of years and which we think will continue to drive the business as we move forward into these further product forms. It's supported by products that we make ourselves. This is not just call somebody up and have them make something and hope that their regulatory and quality systems will work. We take that responsibility very firmly in our hands, and it's driven by our people. And we've got about 160 people now between New Jersey, Toronto, Estonia that help to support this business. It's**

**a remarkable group of people who are frankly I think the best in this industry.**

125. The PowerPoint presentation accompanying Grenfell-Gardner's speech reiterated that Teligent purportedly had a "[t]rack record of successful FDA audits," with "[t]hree audits conducted over the past 5 years (last audit in January 2016) with no 483 observations." It separately stated that its facility had "No 483 observations in the last three cGMP inspections." It further stated that its facility was "cGMP-compliant." The presentation also emphasized the Company's purported "[b]road Scope of Organic R&D Opportunities," including "to file approximately 14 more ANDAs for all commercially reasonable AT-rated products and AB-rated corticosteroids," and also "[d]evelopment program to expand to topical products requiring clinical end point studies. First two development programs have commenced."

126. The foregoing statements in ¶¶119-25 were materially false and misleading, because at the time they were made:

(a) As explained in the October 2017 483 Letter, and confirmed by CW1, they concealed that Teligent was already experiencing serious development, manufacturing, quality control, laboratory and regulatory failures. Moreover, those failures were negatively impacting the Company's ability to develop new products, win ANDA approvals, and manufacture products. In turn, that undermined the purported value of Teligent's pipeline, the success of its TICO strategy, the benefits of its heavy R&D investments, and its positioning for growth and profitability.

(b) Moreover, they concealed the September 2016 483 Letter, a regulatory problem which by itself would have required substantial amount of Teligent's already overtaxed resources to respond to, thereby limiting Teligent's ability to execute its business plan. The September 2016 Letter was also a "regulatory challenge", which Teligent was

implying its prospective competitors had but Teligent itself would not have. It further shows that Teligent was already experiencing serious regulatory problems with its *topical* drugs, which were easier to produce than the new categories of drugs Teligent sought to expand into, and which Teligent had significantly greater expertise with, thereby undermining Defendants' claim that they were well positioned to expand into injectables drugs and the other new drug categories, that had better market conditions than topicals

127. Further, it was false and misleading to suggest that Teligent could file large numbers of injectable ANDAs per year because it had submitted large numbers of topical ANDAs in the past, when, at the time the statement was made, Teligent's submission of topical ANDAs had drastically slowed because of manufacturing and laboratory failures related to prospective ANDA applications. Those failures were reflected in the September 2016 Letter and had to be fixed to avoid ANDA rejections and future Form 483 issuances. Teligent could not hope to match its past rates of topical ANDA submissions, let alone submit large numbers of injectable ANDAs regarding which it had little expertise, given its myriad laboratory and manufacturing problems. Teligent simply did not have the capacity to expand into more complex topicals or injectables.

128. Moreover, the PowerPoint presentation that stated Teligent had "[t]hree audits over the past 5 years . . . with no 483 observations," and Defendant Grenfell-Gardner's oral statement that there had been there had been "No 483 inspections in the last three inspection cycles," were materially false and misleading because they did not disclose the September 2016 inspection that resulted in Form 483 observations.

129. Further, Teligent's boast about having no Form 483 observations following cGMP inspections was artful, deceptive hair-splitting because it did not disclose the September 2016 BIMO inspection and subsequent Form 483 observations in the September 2016 Letter, and was

therefore false and misleading. The September 2016 inspection was not a cGMP inspection, but rather, a related inspection pursuant to the FDA's BIMO Program focusing on laboratory and clinical practices. It was false and misleading for Teligent to tout its lack of Form 483 observations following a specific type of inspection, while failing to disclose the Form 483 observations it received after a related inspection by the same agency.

130. Moreover, Teligent's facility was not cGMP-compliant at the time the presentation was made because it had ongoing breaches of cGMP that were later noted in the October 2017 Letter, including failure to protect against, detect, or investigate contamination, resulting in the distribution of contaminated product to the public, and which had not been remedied by the time of the October 2017 Letter.

131. On May 10 and August 9, 2017, Teligent filed its 10-Qs for Q1 and Q2 2017, respectively, incorporating by reference the risk disclosures in the 2016 10-K, which were materially false and misleading for the same reasons as stated with respect to the 2016 10-K, set forth in ¶¶109-11, *supra*.

132. On August 8, 2017, Teligent issued a press release announcing its quarterly results for Q2 2017. Teligent reported an increase in total revenue and in revenue from products it developed, as compared to the same quarter in the previous year, and also a decrease in gross margins on a year-over-year (and sequential) basis. With respect to ANDAs, it did not report any approvals by the FDA during the quarter and reported submitting two ANDAs to the FDA. As for the full FY2017, Teligent dropped its revenue guidance to between $75 million and $85 million (it had previously been between $85 million and $100 million), and dropped its gross margin guidance to between 47% and 50% (it had previously been between 50% and 54%).

133. In a conference call later day, Defendant Grenfell-Gardner made false and misleading statements to the public. He asserted that "Several of our pending ANDAs have been impacted by regulatory inspections at 3 of our API [Active Pharmaceutical Ingredient] suppliers, infecting 8 molecules in 21 ANDAs, representing $745 million of our pipeline's total addressable market, or 37%." (Note: these were inspectors at Teligent's *suppliers*, not at Teligent's own facility). Specifically, those suppliers received "483 observations" from the FDA. Although several of those observations had recently been cleared, that situation purportedly "delayed" the approval time of the "impacted" Teligent ANDAs, and along with changed market conditions for one approved product, "caused us to update our guidance for the year."

134. Grenfell-Gardner then assured investors, "Looking ahead to coming months, we have reviewed the applications pending with the FDA and believe that there are approximately 10 potential approvals that we could anticipate before the end of the year with the total addressable market of $345 million."

135. Additionally, in response to an analyst question regarding Teligent's implementation of the TICO strategy, and how that strategy impacted the Company's ability to withstand changes in the business cycle, Grenfell-Gardner touted the Company's development capabilities and R&D investment, along with its ANDA pipeline and ability to get ANDAs approved by the FDA:

> One of the challenges I think for all of us in this industry, whether we're are [*sic*] investors, analysts or management is to be mindful of the good things when they happen, but not expect them to last forever, right. The sole source position in a Zantac or in a lidocaine or anything is a passing event. And it's a great thing and you take advantage of it while you can and you make sure that you manage your supply chain to be able to have that advantage. **But underneath all of that, you have to be building a business that has a robust R&D pipeline. The ability to get drugs approved. And the diversification that allows you to have a portfolio approach to that market. And I think that's what we have done in the topical piece. And you translate that to what's going on in injectables.** In

> injectables we still see significant market disruption on a regular basis. That's what put us in this position with Zantac, it's put us from time to time in positions with some of the cephaelis forms. We look at Canada, and in Canada we're often in sole source positions because of supply-chain issues. **Again, those will come and go, what increases your optionality is the pipeline that supports it. And we continue to do our work in the complex side. We continue to do our work on ophthalmics.** So I think coming back to your question, are we hitting towards the bottom of this or not? I don't know. I don't know because it's all going to depend on what happens in individual products and supply chains over the course of the coming weeks and months. **What we do know is that FDA is being significantly more responsive. It is working through applications more quickly. And so for those of us who are in markets where we've developed these pipelines and these capabilities, I think we should benefit as they continue to get approved.**

136. The statements in ¶¶133-35 were materially false and misleading at the time they were because:

(a) As explained in the October 2017 483 Letter, and confirmed by CW1, they concealed that Teligent was already experiencing serious development, manufacturing, quality control, laboratory and regulatory failures. Moreover, those failures were negatively impacting the Company's ability to develop new products, win ANDA approvals, and manufacture products. In turn, that undermined the purported value of Teligent's pipeline, the success of its TICO strategy, the benefits of its heavy R&D investments, and its positioning for growth and profitability.

(b) Moreover, they concealed the September 2016 483 Letter, a regulatory problem which by itself would have required substantial amount of Teligent's already overtaxed resources to respond to, thereby limiting Teligent's ability to execute its business plan. The September 2016 Letter was also a "regulatory challenge", which Teligent was implying its prospective competitors had but Teligent itself would not have. It further shows that Teligent was already experiencing serious regulatory problems with its *topical* drugs, which were easier to produce than the new categories of drugs Teligent sought to

expand into, and which Teligent had significantly greater expertise with, thereby undermining Defendants' claim that they were well positioned to expand into injectables drugs and the other new drug categories, that had better market conditions than topicals.

(c) Also, the injectable facility was already experiencing significant delays in its development timeline, making it unlikely to support injectable products on the timeline Defendants' promised. Moreover, amidst the development failures set forth in the preceding paragraphs, Teligent was already experiencing a substantial slowdown in its ANDA submissions for its core topical business, which in turn delayed and threatened its ability to develop and produce the more complex injectable drugs on the promised timeline.

(d) The statements attributed the regulatory delays and slowdown in ANDA approvals to the FDA's 483 observations of with Teligent's *suppliers*, while omitting Teligent's own undisclosed violations, including the September 2016 483 Letter to *Teligent*, which Teligent had to spend its limited resources addressing, and were in fact negatively impacting its development, ANDA submissions, ANDA approvals and pipeline.

137. On November 9, 2017, Teligent filed its 10-Q for Q3 2017, incorporating by reference the risk disclosures in the 2016 10-K, which were materially false and misleading for the same reasons as stated with respect to the 2016 10-K.

**C. The Truth Emerges: Corrective Disclosure and Post-Class Period Events**

138. On November 6, 2017, Teligent issued a press release after the market closed announcing its results for Q3 2017. It reported $13.7 million in revenue, a 15% decrease compared to the same quarter a year ago, and a sequential decrease as well. Of that, $11.8 million was from sales of Teligent's own products, also a 15% decrease compared to the same quarter a year ago, and another sequential decrease. Gross margin dropped to 24%, down almost 50% from the same quarter a year ago, and almost as much sequentially. Through the first three quarters of 2017, the

Company had total revenue of approximately $45.4 million, compared to R&D expenses of $13.4 million, and a net loss of just over $9 million.

139. With respect to ANDAs, through the first three quarters of 2017, the Company received five approvals from the FDA (it also had one in partnership with another company) and reported filing two new submissions with the FDA.

140. For the second quarter in a row, Teligent reduced its full FY2017 revenue guidance, this time to between $65 million and $67 million (down approximately 33% from its original forecast and down approximately 13% to 21% from the initial reduction); and also reduced its full FY2017 gross margin guidance to 38% to 40% (down approximately 26% to from its original forecast and down approximately 19% to 20% from the initial reduction).

141. The press release quoted Grenfell-Gardner as stating, "[t]hese results and our revised outlook for the remainder of the year, are a result of the knock-on effect of ANDA approval delays," as well as decreased performance for one approved product.

142. On a conference call later that day, Defendants made additional corrective disclosures to the public. Grenfell-Gardner attributed Teligent's low quarterly revenue primarily to price erosion in the performance of a single approved product that "was not entirely unexpected," but admitted that Teligent's pipeline was not able to sufficiently mitigate that situation because "new launches do take time to ramp up."

143. He also disclosed that "our team faced manufacturing challenges." They included "an excipient in a high-volume product that was being provided to us with particles that had the potential to adulterate our finished goods" – an apparent reference to the lidocaine contaminant reported by the FDA in the October 2017 483 Letter, although he did not expressly discuss that 483 Letter or the September 2016 483 Letter during the conference call. He explained that "the

team spent a significant amount of effort in resolving these challenges." As a result, "the engineering expenses related to the fix contributed to lower-than-anticipated margins in the quarter."

144. With respect to Teligent's 10 ANDA submissions that Grenfell-Gardner had said could be approved by the end of the year during the August 6, 2017, conference call, he now expressed doubt as to that timing, and as to whether the delay was actually related to problems at the *supplier's* manufacturing sites: "Of those 10, I mean, certainly there are 4 there where I see minor complete response letters that really were often related to the sites that we talked about earlier or other sort of minor issues."

145. In response to a question about how much of the latest reduction in the FY2017 revenue guidance was attributable to pipeline delays, Grenfell-Gardner stated:

> It's really almost entirely driven by pipeline delays. I mean, there were expectations that we had of products that we believe were ripe for approval, that we have been pre-staging materials and inventory for, but then you'd come up with another sort of question and another cycle of review. That's the biggest impact to us in terms of the forecast.

146. As for Teligent's ability to produce its own injectable products to diversify into the more attractive part of the TICO strategy, Grenfell-Gardner explained that this was far off, with the schedule becoming more oblique and distant than his earlier, firm pronouncements. Now, Teligent simply had a "goal" of "produc[ing] the first lots to support pre-approval inspection in the second quarter [of 2018]." In turn, the Company had the "goal" of "hav[ing] product available in the market by the fourth quarter of 2018[,]" although it was not clear how that latter goal was possible given the late timing of the former goal.

147. Other figures Teligent revealed in the press release and during the conference call indicated that Teligent's vaunted pipeline had sharply declined compared to the previous year. Through the first nine months of 2017, Teligent had only submitted two ANDAs with the FDA,

far below the eight ANDAs it had submitted in the first nine months of 2015 and the six ANDAs it had submitted in the first nine months of 2016. (Teligent went on to submit only a total of four ANDAs in FY2017, compared to 15 ANDAs in FY2015, and 12 in FY2016). Moreover, through the first nine months of 2017, Teligent had only received five ANDA approvals from the FDA, with a collective TAM (total addressable market) of $87.1M. (Teligent would only have a total of eight ANDAs approved in 2017 through its internal pipeline, with an approximate TAM of $150.6 million (and also one approval of a partnered application), compared to nine ANDA approvals in FY2016 with a collective TAM of $1.64B). Teligent was not meeting its goal of replacing ANDA approvals with ANDA submissions, so its overall ANDA pipeline was shrinking. Further, Teligent had still not submitted with the FDA any ANDA that it had developed on its own for any product outside of the topical category, despite its vaunted TICO strategy.

148. As a result of these disclosures, on the next trading day, November 7, 2017, the price of Teligent common stock dropped 43.62%, from $5.25 per share to $2.96 per share, on a volume of 8.35 million shares.

149. Due to its deeply entrenched problems and related FDA investigations, Teligent's poor performance persisted well after the end of the Class Period. In FY2018, it submitted only three ANDAs with the FDA, even fewer than in 2017. Accordingly, even though Teligent's ANDA approvals did increase somewhat from 2017, the Company's overall ANDA pipeline continued to decline sharply over the course of 2018. By the end of 2018, the Company had still only managed to submit with the FDA one ANDA that it had developed on its own for any product outside of the topical category, despite its vaunted TICO strategy, and still none for injectable drugs. That one ANDA was for a complex generic, part of the 'C' in the TICO strategy. As such, for FY2018, the Company's revenue was close to flat with the disappointing FY2017 numbers,

while its net loss more than doubled compared to FY2017 and its R&D costs remained approximately 20% of its revenue.

150. Additionally, in the spring of 2019, Teligent received yet another 483 Letter from the FDA. In the Spring 2019 483 Letter, the FDA noted, *inter alia*, the following objectionable conditions, citing to various provisions of 21 C.F.R. 211 and 314: lack of required written control procedures to ensure uniformity and integrity of drug products; failing drug products not rejected; failure to follow written programs; records not made readily available to the FDA; insufficient investigation into failures and discrepancies; no written record of investigations into failures and discrepancies; failure to record how tested products compare with specifications; failure to have written procedures for handling complaints; and failure to submit FARs reporting contamination or deterioration. These are similar to the failures cited in the October 2017 483 Letter and indicate that long after the Class Period, Teligent's entrenched development, quality control, and production flaws were still undermining its business.

151. Currently, Teligent's stock price is just $1.00.

**D. Additional Scienter Allegations**

152. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

153. As Defendant Grenfell-Gardner said of Teligent, on March 13, 2017, "[w]e're 152 people, we're a small management team[.]"

154. The administrative offices where Grenfell-Gardner has his work address, 105 Lincoln Avenue in Buena, New Jersey, are part of the same facility where Teligent develops and produces its drugs, which the FDA inspected as the basis of its 483 Letters, and that the Company was failing to expand.

155. Grenfell-Gardener's biography on the Company website states that he is "leading [Teligent's] transformation into an R&D-centered pharmaceutical company." He has served as CEO since 2012 and lead Teligent's strategy to invest heavily in R&D and build up an ANDA pipeline, which he presented to investors as the engine for Teligent's growth.

156. Not only was the TICO strategy lead by Grenfell-Gardner, but developing generic products, having them approved by the FDA, and having facilities that could produce those products was Teligent's primary aim.

157. Also, Grenfell-Gardner's direct reports – in this small company – were personally responsible for development, manufacturing, and quality control. For instance, the October 2017 EIR stated that Defendant Grenfell-Gardner "has direct reports from ***Quality, Manufacturing***, Finance, Business Development, and Corporate Counsel." [Emphasis added]. Among others, the October 2017 EIR stated that Woelfel, General Manager/Plant Manager, and Lani, Senior Vice President of Quality, both reported directly to Defendant Grenfell-Gardner. Woelfel was personally issued the October 2017 483 Letter and had "direct reports from Supply Chain, Technical Services, Training, Sterile and Topical Production." Lani had "direct reports from Quality Control, Quality Assurance and Compliance."

158. Furthermore, as head of Teligent's management, Defendant Grenfell-Gardner had "the ultimate responsibility to ensure an effective pharmaceutical quality system was in place" and was responsible for "participat[ing] in the design, implementation, monitoring, and maintenance of an effective pharmaceutical quality system" and "conduct[ing] management reviews of process performance and product quality and of the pharmaceutical quality system." *See* FDA's *Guidance for Industry: Q10 Pharmaceutical Quality System*. He was also responsible for ensuring that NCRs were tracked – as reflected in the October 2017 Letter, Teligent did track them.

159. Thus, Teligent tracked the serious flaws in its development and production operations prior to and throughout the Class Period, and Grenfell-Gardner was obligated to know of and ensure that the Company adequately addressed them.

160. For all of the foregoing reasons, Grenfell-Gardner knew of the serious problems that plagued Teligent's development and production attempts, and its TICO strategy, prior to and throughout the Class Period.

161. Indeed, Grenfell-Gardner knew about the September 2016 FDA inspection and subsequent Form 483 because: (1) Forms 483 are inherently addressed to management; and (2) Grenfell-Gardner personally knew about the October 2017 inspection and October 2017 483 Letter and EIR.

162. The October 2017 EIR stated that all official correspondence from the FDA to Teligent should be directed to Grenfell-Gardner. Further, it states that he was "present and participated during the inspection."

163. Grenfell-Gardner's misleading discussion of the cGMP inspections at the May 16, 2017, conference demonstrates his knowledge of the September 2016 483 Letter. That Letter involved an FDA BIMO inspection, and by stating that Teligent had not received a 483 Letter from an FDA cGMP inspection, he sought to conceal the September 2016 483 Letter involving the BIMO inspection, while, for the reasons set forth above, misleadingly touting Teligent's purported development, production, and regulatory capabilities. Similarly, as of this filing, Plaintiff has searched for and not found any evidence that Teligent publicly disclosed any of the September 2016, October 2017, or Spring 2019 483 Letters.

164. For all of the foregoing reasons, Grenfell-Gardner also knew of the significant delays in Teligent's expansion of its development and production facility, including the injectable

capabilities. In addition, after making the statement set forth above in which he described Teligent's "small management team," Grenfell-Gardner went on to state that Teligent specifically designed the facility expansion so that management could oversee it, stating, with respect to that expansion: "I think if you go after some of these things aggressively and you don't have the ability to integrate them well and to manage them, you're going to put your base business at risk. That wasn't something that we wanted to do. So we chose to do this stepwise somewhat slower rather than big bang development." Further, Grenfell-Gardner had experience with similar projects, and at his prior job, had led the acquisition of a sterile injectable facility for West-Ward Pharmaceuticals. He also repeatedly published updates, including on his Twitter account, regarding the expansion work being done at the facility.

**E. Loss Causation**

165. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiff and members of the Class (defined herein). During the Class Period, Plaintiff and Class members purchased Teligent common stock at artificially inflated prices caused by Defendants' misconduct, as alleged herein. The price of the Company's common stock declined significantly when the substantial problems and risks concealed by Defendants were disclosed and Defendants' material misrepresentations and omissions were revealed to the market, causing investors' losses.

166. Before the end of the Class Period, on November 6, 2017, investors had been unaware of the following material facts about Teligent that had been known to Defendants throughout the Class Period:

(a) As explained in the October 2017 483 Letter, and confirmed by CW1, they concealed that Teligent was already experiencing serious development, manufacturing, quality control, laboratory, and regulatory failures. Moreover, those failures were

negatively impacting the Company's ability to develop new products, win ANDA approvals, and manufacture products. In turn, that undermined the purported value of Teligent's pipeline, the success of its TICO strategy, the benefits of its heavy R&D investments, and its positioning for growth and profitability;

(b) Moreover, they concealed the September 2016 483 Letter, a regulatory problem which, by itself, would have required substantial amount of Teligent's already overtaxed resources to respond to, thereby limiting Teligent's ability to execute its business plan. The September 2016 Letter was also a "regulatory challenge," which Teligent was implying its prospective competitors had, but Teligent itself would not have. It further shows that Teligent was already experiencing serious regulatory problems with its *topical* drugs, which were easier to produce than the new categories of drugs Teligent sought to expand into, and which Teligent had significantly greater expertise with, thereby undermining Defendants' claim that they were well positioned to expand into injectables drugs and the other new drug categories, that had better market conditions than topicals; and

(c) Also, they concealed that the injectable facility was already experiencing significant delays in its development timeline, making it unlikely to support injectable products on the timeline Defendants' promised. Moreover, amidst the development failures set forth in the preceding paragraphs, Teligent was already experiencing a substantial slowdown in its ANDA submissions for its core topical business, which, in turn, delayed and threatened its ability to develop and produce the more complex injectable drugs on the promised timeline.

167. Defendants' misrepresentations and omissions and fraudulent scheme, as alleged in §IV, *supra*, misrepresented and concealed the true adverse material facts from the market during the Class Period, leading investors to wrongly believe that Teligent: was complying with the stringent FDA regulations; was at the same time capable of producing, and was, in fact, producing a valuable pipeline of ANDA submissions; was capable of executing its TICO strategy; was nearing the ability to produce injectable drugs; and was poised for growth and a return on its heavy investment in R&D and the facility expansion.

168. As alleged in §IV, *supra*, these material facts were revealed to investors for the first time on November 6, 2017. For example, Defendants disclosed pipeline delays, manufacturing challenges, and products that were not launched, resulting in reduced revenue, margins, and guidance.

169. The market reacted swiftly and negatively to these disclosures, which were made after trading hours on November 6, 2017. As a result of them, on the next trading day, November 7, 2017, the price of Teligent common stock dropped 43.62%, from $5.25 per share to $2.96 per share, on a volume of 8.35 million shares.

## V. CLASS ACTION ALLEGATIONS

170. Plaintiff brings this action as a class action, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), on behalf of a class consisting of all persons and entities that purchased, or otherwise acquired, the securities of Teligent during the Class Period (March 7, 2017 to November 6, 2017, inclusive), seeking to pursue remedies under the Exchange Act (the "Class"). Excluded from the Class are Defendants; the officers and directors of the Company, at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants have, or had, a controlling interest.

171. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Teligent common stock was actively traded on the NASDAQ Global Select Market (the "NASDAQ"). While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Millions of Teligent shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Teligent or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

172. Plaintiff's claims are typical of the claims of Class members, who were all similarly affected by Defendants' wrongful conduct in violation of federal securities laws, which is complained of herein. Further, Plaintiff will fairly and adequately protect the interests of Class members and have retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

173. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' conduct alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted or misrepresented material facts about the business, operations, and prospects of Teligent; and

(c) to what extent Class members have sustained damages and the proper measure of damages.

174. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VI. APPLICABILITY OF THE FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE

175. The market for Teligent common stock was open, well developed, and efficient at all relevant times. As a result of Defendants' materially false or misleading statements and material omissions, the Company's common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's common stock, relying on the integrity of the market price of such securities and on publicly available market information relating to Teligent. Plaintiff and Class members have been damaged thereby.

176. During the Class Period, the artificial inflation of the value of Teligent common stock was caused by the material misrepresentations and omissions alleged in this Complaint, thereby causing the damages sustained by Plaintiff and other Class members. As alleged herein, during the Class Period, Defendants made, or caused to be made, a series of materially false or misleading statements about the Company's business, prospects, and operations, causing the price of the Company's common stock to be artificially inflated at all relevant times. When the truth was disclosed, it drove down the value of the Company's common stock, causing Plaintiff and

other Class members that had purchased the securities at artificially inflated prices to be damaged as a result.

177. At all relevant times, the market for Teligent common stock was efficient for the following reasons, among others:

(a) Teligent stock met the requirements for listing and it was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Teligent filed periodic public reports with the SEC and/or the NASDAQ;

(c) Teligent regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Teligent was followed by securities analysts employed by brokerage firms, who wrote reports about the Company, which reports were distributed to the sales force and certain customers of their respective brokerage firms and were made publicly available.

178. Based on the foregoing, during the Class Period, the market for Teligent common stock promptly digested information regarding the Company from all publicly available sources and impounded such information into the price of Teligent stock. Under these circumstances, the market for Teligent common stock was efficient during the Class Period and, therefore, investors' purchases of Teligent common stock at artificially inflated market prices give rise to a Class-wide presumption of reliance under the fraud-on-the-market doctrine.

179. In the alternative, the *Affiliated Ute* presumption of reliance applies to the extent that Defendants' statements during the Class Period involved omissions of material facts, which concealed that:

(a) As explained in the October 2017 483 Letter, and confirmed by CW1, Defendants concealed that Teligent was already experiencing serious development, manufacturing, quality control, laboratory, and regulatory failures. Moreover, those failures were negatively impacting the Company's ability to develop new products, win ANDA approvals, and manufacture products. In turn, that undermined the purported value of Teligent's pipeline, the success of its TICO strategy, the benefits of its heavy R&D investments, and its positioning for growth and profitability;

(b) Moreover, Defendants concealed the September 2016 483 Letter, a regulatory problem which, by itself, would have required a substantial amount of Teligent's already overtaxed resources to respond to, thereby limiting Teligent's ability to execute its business plan. The September 2016 Letter was also a "regulatory challenge," which Teligent was implying its prospective competitors had, but Teligent itself would not have. It further shows that Teligent was already experiencing serious regulatory problems with its *topical* drugs, which were easier to produce than the new categories of drugs Teligent sought to expand into, and which Teligent had significantly greater expertise with, thereby undermining Defendants' claim that they were well positioned to expand into injectables drugs and the other new drug categories that had better market conditions than topicals; and

(c) Also, they concealed that the injectable facility was already experiencing significant delays in its development timeline, making it unlikely to support injectable

products on the timeline Defendants' promised. Moreover, amidst the development failures set forth in the preceding paragraphs, Teligent was already experiencing a substantial slowdown in its ANDA submissions for its core topical business, which, in turn, delayed and threatened its ability to develop and produce the more complex injectable drugs on the promised timeline.

## VII. NO SAFE HARBOR

180. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be false or misleading herein that relate to then-existing facts and conditions, nor does it apply to any material omissions alleged herein. To the extent that statements alleged to be false or misleading are characterized as forward-looking, the statutory safe harbor does not apply to such statements because they were not sufficiently identified as "forward-looking statements" when made, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements, and Defendants had actual knowledge that the forward-looking statements were materially false or misleading at the time each such statement was made.

## VIII. COUNTS

### FIRST COUNT
### Violation of §10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

181. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein. This claim is asserted against all Defendants.

182. During the Class Period, Defendants: (i) knowingly, or with reckless disregard, deceived the investing public, including Plaintiff and Class members, as alleged herein; (ii) artificially inflated and/or maintained the market price of Teligent common stock; and (iii) caused

Plaintiff and Class members to purchase, or otherwise acquire, Teligent common stock at artificially inflated prices.

183. Each of the Defendants, in violation of §10(b) of the Exchange Act and Rule 10b-5(b), made false statements of material facts and omitted to state material facts necessary to make the statements made by Defendants not misleading, which operated as a fraud and deceit upon Plaintiff and the Class, in an effort to create or maintain an artificially inflated price of Teligent common stock during the Class Period. Defendants' material misrepresentations and omissions are alleged in §IV, *supra*.

184. As a result of their making and/or substantially participating in the creation of affirmative statements to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with applicable laws and regulations.

185. As an officer, director, and controlling person of a publicly held Company, whose common stock is registered with the SEC, pursuant to the Exchange Act, traded on the NASDAQ, and governed by the provisions of the federal securities laws, Grenfell-Gardner had a duty to promptly disseminate accurate and truthful information regarding the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially false or misleading, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.

186. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, made, or substantially participated in, the creation and/or dissemination of false or misleading statements of material fact, as set forth

herein, or with reckless disregard failed to ascertain and disclose truthful facts, even though such facts were available to them.

187. The facts alleged herein give rise to a strong inference that each of the Defendants acted with scienter. Each of the Defendants knew, or recklessly disregarded, that the Class Period statements set forth in §IV, *supra*, contained material misrepresentations and omissions for the reasons set forth herein.

188. By virtue of Grenfell-Gardner's position of management and control within Teligent, he had access to undisclosed adverse information about the Company, its business, operations, operational trends, finances, and present and future business prospects. Grenfell-Gardner would ascertain such information through the Company's internal corporate documents; conversations and connections with corporate officers and employees; attendance at sales, management, and Board of Directors meetings, including committees thereof; and reports and other information provided to him in connection with his roles and duties as Teligent officer and director, including from the FDA.

189. Grenfell-Gardner was aware of, or recklessly disregarded, that material misrepresentations and omissions were being made regarding the Company, and approved or ratified such statements in violation of the federal securities laws.

190. As a result of Defendants' dissemination of the materially false or misleading information, and their failure to disclose material facts, as alleged herein, the market price of Teligent common stock was artificially inflated throughout the Class Period. Unaware that the market price of Teligent common stock was artificially inflated; relying directly or indirectly on the false or misleading statements made by Defendants, at the times such statements were made, or relying upon the integrity of the markets in which Teligent common stock traded; and in the

absence of material adverse information that was known, or recklessly disregarded, by Defendants, but not disclosed to the public, Plaintiff and Class members purchased or otherwise acquired Teligent common stock at artificially inflated prices.

191. Had Plaintiff and the other Class members known the truth regarding the problems that Teligent was experiencing, which was not disclosed by Defendants, Plaintiff and other Class members would not have purchased, or otherwise acquired, Teligent common stock, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

192. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other Class members suffered damages in connection with their respective purchases and sales of Teligent common stock during the Class Period, when the artificial inflation in the price of such securities dissipated, as the truth regarding Defendants' conduct was revealed, causing the price of Teligent common stock to decline, resulting in economic losses to Plaintiff and the Class.

193. By reason of the foregoing, Defendants violated §10(b) of the Exchange Act and Rule 10b-5(b), promulgated thereunder, and they are liable to Plaintiff and the Class for damages suffered in connection with their transactions in Teligent common stock during the Class Period.

## SECOND COUNT
## Violation of §20(a) of the Exchange Act
## Against Grenfell-Gardner

194. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein. This claim is asserted against Defendant Grenfell-Gardner.

195. Teligent is a primary violator of §10(b) and Rule 10b-5, promulgated thereunder.

196. Grenfell-Gardner acted as controlling persons of Teligent within the meaning of §20(a) of the Exchange Act. Grenfell-Gardner had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or

influence, and during the Class Period, did exercise his power to control and influence, the conduct giving rise to the violations of the federal securities laws alleged herein. Grenfell-Gardner prepared, or was responsible for preparing, the Company's press releases and SEC filings, and made statements to the market in SEC filings, annual reports, press releases, news articles, and conference calls. Grenfell-Gardner controlled Teligent and each of its employees.

197. Grenfell-Gardner was able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Grenfell-Gardner was provided with copies of the documents, as alleged herein, to contain material misrepresentations and omissions prior to, or shortly after, their issuance and had the ability and/or opportunity to prevent the issuance of such documents or cause them to be corrected. Accordingly, Grenfell-Gardner is responsible for the accuracy of the Company's public reports and releases.

198. By virtue of his position as a controlling person of Teligent, and by reason of the conduct described in this Count, Grenfell-Gardner is liable pursuant to §20(a) of the Exchange Act for controlling a primary violator of the federal securities laws. As a direct and proximate result of Grenfell-Gardner's wrongful conduct, Plaintiff and other Class members suffered damages in connection with their purchases of the Company's securities during the Class Period.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiff and all other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

## X. JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: September 13, 2019

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

*/s/ Max R. Schwartz*
Max R. Schwartz
Thomas L. Laughlin, IV
Donald A. Broggi
Anjali Bhat
Jeffrey P. Jacobson
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
mschwartz@scott-scott.com
tlaughlin@scott-scott.com
dbroggi@scott-scott.com
abhat@scott-scott.com
jjacobson@scott-scott.com

*Counsel for Plaintiff Oklahoma Police Pension Fund and Retirement System*