**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| OKLAHOMA POLICE PENSION FUND AND RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>        v.<br><br>TELIGENT, INC. and JASON GRENFELL-GARDNER,<br><br>                    Defendants. | Civil Action No. 1:19-cv-03354-VM |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFF'S**
**MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF**
**CLASS REPRESENTATIVE AND CLASS COUNSEL**

# TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................... 1

II.  THE COMMON FACTS UNDERLYING THIS MOTION ................................. 3

    A.  Defendants' Exchange Act Violations ..................................................... 3

    B.  The Proposed Class Representative and Proposed Class ......................... 6

III.  ARGUMENT ............................................................................................... 6

    A.  The Standard for Class Certification Under Rule 23 ............................. 6

    B.  The Action Satisfies the Elements of Rule 23(a) .................................. 7

        1.  The Class Is Numerous ................................................................ 7

        2.  The Action Involves Common Questions ..................................... 8

        3.  Oklahoma Police Is Typical ......................................................... 9

        4.  Oklahoma Police Is a More Than Adequate Representative ....................... 9

    C.  The Action Satisfies Rule 23(b)(3) ..................................................... 11

        1.  Common Questions Predominate ............................................... 11

            a.  Common Questions of Reliance Predominate Because the Class Can Invoke the Fraud-on-the-Market Presumption ........... 12

                i.  The Alleged Misrepresentations Were Public, and the Relevant Transactions Took Place After Those Misrepresentations But Before the Disclosures ............... 13

                ii.  Teligent Stock Trades in an Efficient Market .................. 13

                    (a)  *Cammer* Factor 1: Teligent's Common Stock Experienced a High Weekly Trading Volume ................................................................. 14

                    (b)  *Cammer* Factor 2: Numerous Securities Analysts Covered and Reported on Teligent ........ 14

                    (c)  *Cammer* Factor 3: Teligent Stock Traded on the Nasdaq and Had Many Market Makers .......... 15

                    (d)  *Cammer* Factor 4: Teligent was Eligible to File Form S-3s with the SEC ............................... 15

(e)   *Cammer* Factor 5: A Cause-and-Effect Relationship Existed Between Company-Specific News and Teligent's Stock Price ............ 16

(f)   *Krogman* Factor 1: Teligent had a Substantial Market Capitalization During the Class Period ........................................ 18

(g)   *Krogman* Factor 2: Teligent Common Stock had a Narrow Bid-Ask Spread ............................. 18

(h)   *Krogman* Factor 3: Teligent's Significant Public Float ........................................... 19

(i)   Institutional Investors Hold a Significant Percentage of Teligent Common Stock ............... 19

(j)   Teligent Common Stock Does Not Exhibit Autocorrelation ...................................... 19

b.   Damages Will Be Calculated Using a Common Methodology that Is Consistent with the Class-Wide Theory of Liability ........................................ 20

2.   A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of the Claims Here ......................................... 21

D.   The Court Should Appoint Scott+Scott as Class Counsel Under Rule 23(g) ....... 22

IV.   CONCLUSION ................................................................................. 23

# TABLE OF AUTHORITIES

**PAGE(S)**

CASES

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
  692 F.3d 34 (2d Cir. 2012)................................................................20, 21

*In re Alstom SA Sec. Litig.*,
  253 F.R.D. 266 (S.D.N.Y. 2008) .............................................................18

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997)................................................................................10

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013)........................................................................9, 12, 13

*In re Bank of Am. Corp. Sec., Deriv., & Emp. Ret. Income Sec. Act (ERISA) Litig.*,
  281 F.R.D. 134 (S.D.N.Y. 2012) ......................................................7, 8, 9

*In re Barrick Gold Sec. Litig.*,
  314 F.R.D. 91 (S.D.N.Y. 2016) ........................................................17, 20

*Basic v. Levinson*,
  485 U.S. 224 (1988)............................................................................ *passim*

*Billhofer v. Flamel Techs., S.A.*,
  281 F.R.D. 150 (S.D.N.Y. 2012) ...............................................................7

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) ...................................................... *passim*

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  310 F.R.D. 69 (S.D.N.Y. 2015) ...............................................................17

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
  No. 12 Civ. 0256 (LAK) (AJP), 2017 WL 3608298 (S.D.N.Y. Aug. 22, 2017)................9, 11

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011)..................................................................8, 11, 12, 13

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
  312 F.R.D. 332 (S.D.N.Y. 2015) .........................................................7, 11

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  574 F.3d 29 (2d Cir. 2009).........................................................................9

*Fogarazzo v. Lehman Bros., Inc.*,
  263 F.R.D. 90 (S.D.N.Y. 2009) .................................................................7

*In re Globalstar Sec. Litig.*,
  No. 01 Civ. 1748(PKC), 2004 WL 2754674 (S.D.N.Y. Dec. 1, 2004) ....................................8

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014).................................................................................................11, 12

*In re IndyMac Mortg.-Backed Sec. Litig.*,
  286 F.R.D. 226 (S.D.N.Y. 2012) .............................................................................................8

*In re JPMorgan Chase & Co. Sec. Litig.*,
  No. 12 Civ. 03852 (GBD), 2015 WL 10433433 (S.D.N.Y. Sept. 29. 2015)............................15

*Krogman v. Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001) ...............................................................................14, 18, 19

*Lapin v. Goldman Sachs & Co.*,
  254 F.R.D. 168 (S.D.N.Y. 2008) ...........................................................................................21

*Lehocky v. Tidel Techs., Inc.*,
  220 F.R.D. 491 (S.D. Tex. 2004)............................................................................................19

*McIntire v. China MediaExpress Holdings, Inc.*,
  38 F. Supp. 3d 415 (S.D.N.Y. 2014)..........................................................................8, 13, 15

*In re MF Glob. Holdings Ltd. Inv. Litig.*,
  310 F.R.D. 230 (S.D.N.Y. 2015) .......................................................................................12, 21

*In re Petrobras Sec.*,
  862 F.3d 250 (2d Cir. 2017).....................................................................................................11

*In re Pfizer Inc. Sec. Litig.*,
  282 F.R.D. 38 (S.D.N.Y. 2012) ................................................................................................8

*Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*,
  277 F.R.D. 97 (S.D.N.Y. 2011) ..............................................................................................9

*In re SCOR Holding (Switz.) AG Litig.*,
  537 F. Supp. 2d 556 (S.D.N.Y. 2008)....................................................................................22

*In re Smith Barney Transfer Agent Litig.*,
  290 F.R.D. 42 (S.D.N.Y. 2013) ................................................................................................6

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
  No. 15cv1249, 2017 WL 2062985 (S.D.N.Y. May 15, 2017)..........................................6, 17

*In re Vivendi Universal, S.A. Sec. Litig.*,
  242 F.R.D. 76 (S.D.N.Y. 2007), *aff'd*,
  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016) ................................................6, 21

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017).........................................................................13, 16

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)......................................................................................8

*In re Winstar Commc'ns Sec. Litig*,
    290 F.R.D. 437 (S.D.N.Y. 2013) ...............................................................14, 15

**STATUTES, RULES & REGULATIONS**

17 C.F.R. §239.13 .........................................................................................15

**FEDERAL RULES OF CIVIL PROCEDURE**
    Rule 23 .................................................................................................7
    Rule 23(a)(1)........................................................................................7
    Rule 23(a)(2)........................................................................................8
    Rule 23(a)(3)........................................................................................9
    Rule 23(a)(4)........................................................................................9
    Rule 23(g)(1)(A)(i)-(iv) ........................................................................22

**OTHER AUTHORITIES**

SEC SECURITIES ACT RELEASE NO. 6331
    46 Fed. Reg. 41 (Aug. 13, 1981)..............................................................15

Lead Plaintiff Oklahoma Police Pension Fund and Retirement System ("Oklahoma Police") respectfully submits this memorandum of law in support of its motion for class certification pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking: (i) certification of a class of investors in the publicly traded common stock of Teligent, Inc. ("Teligent" or the "Company"), as defined below; (ii) the appointment of Oklahoma Police as Class Representative; and (iii) the appointment of Scott+Scott Attorneys at Law LLP ("Scott+Scott") as Class Counsel.

## I.    INTRODUCTION

The securities fraud claims at issue here present the ideal candidates for certification under Fed. R. Civ. P. 23.  Lead Plaintiff Oklahoma Police, a large institutional investor, alleges that Defendants Teligent and Jason Grenfell-Gardner ("Grenfell-Gardner") (collectively, "Defendants") made materially false and misleading statements denying that Teligent had received any 483 observations from the U.S. Food and Drug Administration ("FDA"), when, just months before the Class Period[1] began, the FDA specifically informed Defendants that it had made multiple 483 observations and indicated that Teligent had serious regulatory failures.  By the end of the Class Period, Teligent's operations had ground to a virtual halt, as it had to focus scarce resources on responding to the FDA.  When Defendants announced Teligent's resulting extremely poor performance, its stock price plummeted, thereby damaging Oklahoma Police and the other Class members who relied on the misrepresentations.

First, this Action satisfies the requirements of Rule 23(a).  With millions of shares of Teligent common stock traded on the Nasdaq Global Select Market ("Nasdaq") during the Class Period, there are likely thousands of Class members, making the Class so numerous that joinder

---

[1]     "Class Period" is defined as between March 8, 2017 and November 6, 2017, inclusive.

is impracticable.  There are also multiple common questions of law and fact, including whether Defendants' statements were false or misleading and whether they were material.  As such, Oklahoma Police's claims are typical of the other Class members' claims, because they all allege that the same actionable statements from Defendants caused the same injuries, and they all seek redress under the Securities Exchange Act of 1934 (the "Exchange Act").  For substantially similar reasons, Oklahoma Police will fairly and adequately represent the Class, as it has no conflicts with the Class, and has selected experienced counsel that has diligently prosecuted the Class' claims and has the resources to continue doing so.  Scott+Scott should therefore also be appointed as Class Counsel.

Second, this Action satisfies the requirements of Rule 23(b)(3) as well.  In securities fraud actions, plaintiffs generally satisfy the predominance requirement where, as here, they can invoke the fraud-on-the-market presumption for class-wide reliance.  As set forth in the accompanying report of Oklahoma Police's expert, Teligent's common stock traded in an efficient market during the Class Period – which is par for the course for a stock that trades on the Nasdaq.  Given that the actionable statements were also well-publicized – taking place, for example, at investor conference calls – and that Oklahoma Police purchased common stock after those statements were made but before the undisclosed risks were revealed, Class-wide reliance is established, along with predominance.  In addition, courts widely recognize that securities fraud damages are readily capable of class-wide measurement under the "out-of-pocket" methodology, which Oklahoma Police's expert has concluded is the appropriate methodology here.  Likewise, courts frequently hold that the superior method of adjudicating securities fraud claims is on a class-wide basis, as many class members would not otherwise have access to a

recovery, and proceeding as a class action is readily manageable.  For these reasons, as detailed herein, the Court should grant this motion in full.

## II.   THE COMMON FACTS UNDERLYING THIS MOTION

### A.   Defendants' Exchange Act Violations

Teligent has long been attempting to develop and sell generic treatments.  When Defendant Grenfell-Gardner joined Teligent in July 2012, the Company had been unsuccessfully trying to transition from a company that simply manufactured generic products for third-party customers, to one that develops its own generic products that it would sell on its own.  ¶24.[2] Doing so involves demonstrating to the FDA that those products are safe, through a rigorous regulatory process that culminates in the submission of Abbreviated New Drug Applications ("ANDAs"), which the FDA must approve.  ¶25.  From 2010, when Teligent's transition began, to 2012, the Company had only managed to submit two to three products per year for "ANDA" approval with the FDA.   ¶24.   But Grenfell-Gardner announced that "2014 is a year of transformation," in which the Company would make "at least 10 ANDA filings," while increasing "revenue growth between 40% and 45% . . . maintaining profitability . . . [and] at least doubling our R&D spend."  *Id*.[3]

At first, Defendants managed to create the impression that this plan was working and that Teligent had a robust and consistent ANDA pipeline.  Thus, they announced that Teligent submitted 11 ANDAs in 2014, 15 ANDAs in 2015, and 12 ANDAs in 2016.  ¶32.  Grenfell-Gardner amplified such announcements, with claims that ANDAs were "the key to Teligent's growth . . . we invest significantly more in R&D and we get significantly more out of it[.]"  ¶31.

---

[2]    All "¶__" cites are to the Second Amended Class Action Complaint for Violations of Federal Securities Laws (ECF No. 39) ("SAC").

[3]    Unless otherwise noted, all emphasis is added and internal citations and quotation marks are omitted.

But these submissions were little more than empty statistics for Grenfell-Gardner to tout, for Defendants never installed the infrastructure, procedures, or personnel necessary to make anywhere close to 10-plus ANDA submissions per year that could ***actually win*** approval. Instead, Defendants diverted Teligent's scarce resources to a series of grandiose endeavors, like attempting to develop entirely new categories of products that they had no experience with and that were much more complex than their core products, and attempting to dramatically expand the scale and scope of their headquarters in Buena, New Jersey (the "Buena Facility"), where their product development and manufacturing took place.  ¶29.

Accordingly, over three successive inspections at Teligent's Buena Facility, the FDA informed Grenfell-Gardner and his direct reports of widespread compliance failures in Teligent's laboratory operations and related practices that were undermining its vaunted ANDA submission pipeline.  The first inspection took place in September 2016 and included a series of follow-up correspondence, which ran through February 2017, shortly before the Class Period started. Notably, the FDA made a series of "483 observations," which, according to the FDA's website, signify "clear, specific and significant" conditions that may constitute regulatory violations and that are conveyed to the "company's senior management" so that "there is a full understanding of what the observations are[.]"  ¶46.  Among other things, the 483 observations found that Teligent's laboratory operations, where the studies that supported its ANDAs occurred, lacked basic required controls, known as standard operating procedures or "SOPs."  *E.g.*, ¶51 (Teligent's "***SOP program is not adequate and current to ensure quality in analytical operations***.").  The FDA also made 483 observations finding inadequacies in Teligent's quality control operations and the tests it ran for ANDA applications.  ¶¶49-51.

These 483 observations implicated a number of regulatory failures (¶52), and Teligent replied to the FDA, stating that it "takes these observations extremely seriously," admitting the accuracy of the observations, and acknowledging its obligation to come into full regulatory compliance notwithstanding that "any FDA inspection is limited in its scope, and therefore, the observations cited may not be all inclusive."  ¶¶53-54.  In turn, just before the Class Period began, the FDA sent a letter, addressed directly to "Grenfell-Gardner," emphasizing that "[y]ou failed to meet the regulatory requirements" and that this "*raises concerns about the validity and integrity of the studies conducted at your [Buena] study site*."  ¶56.

Notwithstanding that he was armed with that knowledge regarding the 483 observations, Grenfell-Gardner went on to make brazen and repeated misrepresentations denying their existence.  For example, he stated, "[i]f you look at the [Buena] manufacturing site[,] . . . *[i]t had a very solid track record with [the] FDA – the audits conducted over the last five years, there've been no 483 observations related to the site.*"  *E.g.*, ¶118.  In fact, Teligent's compliance failures were so broad that the FDA would soon go on to issue multiple follow-on 483 observations regarding Teligent's compliance failures.  ¶¶59-81.

As Teligent was forced to divert resources to respond to the FDA's 483 observations, such as creating new SOPs and redoing studies under more rigorous standards, its ANDA submissions ground to a virtual halt during and after the Class Period.  Compared to the 10-plus ANDAs Teligent submitted in the three years before the Class Period, the Company submitted only four in 2017, three in 2018, and zero in 2019, bringing the Company all way back to its low "pre-transformation" rates.  ¶¶87-90.  On November 6, 2017, after the market closed, Teligent announced decreased revenue, decreased gross margins, deepening net losses, and reduced its annual guidance, stating that "[*t]hese results and our revised outlook for the remainder of the*

*year, are a result of the knock-on effect of ANDA approval delays*."   ¶¶132-35.   The next trading day, due to this materialization of the undisclosed risk from the 483 observations and Teligent's compliance failures, Teligent common stock dropped 43.62%, from $5.25 per share to $2.96 per share, on a volume of 8.35 million shares, damaging Oklahoma Police and the Class. ¶144.

### B.      The Proposed Class Representative and Proposed Class

Lead Plaintiff, and proposed Class Representative, Oklahoma Police is a government-affiliated pension plan that provides a range of comprehensive benefits to approximately 10,000 working and retired police officers and beneficiaries in the State of Oklahoma.   It has investments to support its obligations to beneficiaries and operations, and as set forth below (at 9-10, 13), like the other members of the Class, purchased Teligent common stock during the Class Period and suffered damages as a result.

The proposed class is defined as: all persons and entities who purchased or otherwise acquired Teligent's publicly traded common stock during the period from March 8, 2017 through November 6, 2017, inclusive, and who were damaged thereby (the "Class").   Excluded therefrom are Defendants; the officers and directors of the Company at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants have, or had, a controlling interest.

## III.   ARGUMENT

### A.      The Standard for Class Certification Under Rule 23

"Generally, claims alleging violations of Section[] 10(b) … of the Exchange Act are especially amenable to class certification[.]"   *In re Virtus Inv. Partners, Inc. Sec. Litig.*, No. 15cv1249, 2017 WL 2062985, at *2 (S.D.N.Y. May 15, 2017) (alterations added and in original); *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 45 (S.D.N.Y. 2013); *In re*

*Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 91 (S.D.N.Y. 2007), *aff'd*, *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016).   To be certified, a putative class must satisfy Rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements and also meet the requirements of at least one of Rule 23(b)'s subsections.   Fed. R. Civ. P. 23; *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 155 (S.D.N.Y. 2012).   Courts interpret Rule 23's requirements liberally, with doubts resolved in favor of granting certification.   *See, e.g.*, *In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 312 F.R.D. 332, 340 (S.D.N.Y. 2015).

### B.     The Action Satisfies the Elements of Rule 23(a)

#### 1.     The Class Is Numerous

A class must be "so numerous that joinder of all members is impracticable[.]"   Fed. R. Civ. P. 23(a)(1).   "Impracticable does not mean impossible; joinder may merely be difficult or inconvenient, rendering use of a class action the most efficient method to resolve plaintiffs' claims."   *Fogarazzo v. Lehman Bros., Inc.*, 263 F.R.D. 90, 96 (S.D.N.Y. 2009).   "Numerosity may be presumed when a class consists of forty or more [members]."   *In re Bank of Am. Corp. Sec., Deriv., & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 281 F.R.D. 134, 138 (S.D.N.Y. 2012) (citing *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)).   As Courts have long recognized, "[i]n securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period."   *Id.*

Here, the proposed Class easily satisfies the numerosity requirement.   During the Class Period, Teligent had approximately 53 million shares of common stock outstanding, with an average weekly trading volume of 1.83 million shares on the Nasdaq.   *See* Ex. A ¶¶26, 67

(Expert Report of Chad Coffman, CFA ("Coffman Report")).[4]   Accordingly, there are likely thousands of members of the proposed Class.   *See In re Globalstar Sec. Litig.*, No. 01 Civ. 1748(PKC), 2004 WL 2754674, at *3-4 (S.D.N.Y. Dec. 1, 2004) (numerosity satisfied where there were approximately 108 million outstanding shares of common stock).

### 2.   The Action Involves Common Questions

Rule 23(a)(2) asks whether "there are questions of law or fact common to the class[.]"   It does not require that all issues be identical for each class member, but simply that their claims have "some unifying thread."   *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 44 (S.D.N.Y. 2012). For purposes of Rule 23(a)(2), "[e]ven a single [common] question will do[.]"   *E.g. Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) (alterations in original and added); *In re IndyMac Mortg.-Backed Sec. Litig.*, 286 F.R.D. 226, 233, 233 n.50 (S.D.N.Y. 2012).   "The commonality requirement has been applied permissively in securities fraud litigation . . . where putative class members have been injured by similar material misrepresentations and omissions[.]"   *Bank of Am.*, 281 F.R.D. at 139 (quoting *Fogarazzo v. Lehman Bros., Inc.*, 232 F.R.D. 176, 180 (S.D.N.Y.2005)); *McIntire v. China MediaExpress Holdings, Inc*., 38 F. Supp. 3d 415, 424 (S.D.N.Y. 2014) (commonality is a "low hurdle").

This Action presents many common questions of law and fact.   They include whether the alleged misrepresentations were false and misleading, whether they were material, and whether and how Class members were damaged as a result.   *See, e.g*., *Pfizer*, 282 F.R.D. at 44 (issues involving the "existence and concealment of material information," as well as "the impact of Defendants' alleged misrepresentations and omissions on the [stock] price," were common); *Erica P. John Fund, Inc. v. Halliburton Co*., 563 U.S. 804, 813 (2011) ("*Halliburton I*") (holding

---

[4]     All "Ex. __" cites are to exhibits attached to the Declaration of Max R. Schwartz filed in support hereof.

that materiality and loss causation present common questions); *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 470 (2013) ("the question of materiality is common to the class").

### 3.     Oklahoma Police Is Typical

Rule 23(a)(3) requires that the representative parties' claims be "typical" of the claims of the prospective class. "Courts in this Circuit have held that the typicality requirement is not demanding." *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., Inc.*, 277 F.R.D. 97, 107 (S.D.N.Y. 2011). It simply asks whether "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009). "In a securities class action, when plaintiffs will necessarily seek to develop facts relating to ... the dissemination of allegedly false or misleading statements underlying their claims, the claims and nature of evidence are generally considered sufficient to satisfy the typicality requirement." *Bank of Am.*, 281 F.R.D. at 139 (quoting *Vivendi*, 242 F.R.D. at 85) (ellipsis in original).

Typicality is easily established here because the claims of both Oklahoma Police and the Class arise from the same course of Defendants' misconduct and assert the same legal theories. Specifically, Oklahoma Police and all Class members were injured by purchasing Teligent stock in reliance on the same public misrepresentations from Defendants, and they all seek a recovery under the Exchange Act.

### 4.     Oklahoma Police Is a More Than Adequate Representative

Under Rule 23(a)(4), a plaintiff must show that it "will fairly and adequately protect the interests of the class." This element is satisfied where: (i) the proposed class representative's interests are not antagonistic to the interests of other class members; and (ii) the proposed class counsel is qualified to conduct the litigation. *See, e.g.*, *Flag Telecom*, 574 F.3d at 35; *City of*

*Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, No. 12 Civ. 0256 (LAK) (AJP), 2017 WL 3608298, at *7 (S.D.N.Y. Aug. 22, 2017).

Here, far from any conflicts, let alone fundamental ones that might be disabling, Oklahoma Police's interests are directly aligned with the interests of absent Class members. Oklahoma Police is a public retirement fund established to provide retirement plans and benefits to qualifying employees. As discussed above, like the other Class members, Oklahoma Police purchased Teligent common stock during the Class Period and suffered damages as a result of the conduct alleged in the SAC, which means that it is incented to maximize any recovery on behalf of the Class. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997) ("[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members.") (alteration in original).

Oklahoma Police has also protected the interests of the Class by retaining well-qualified counsel, Scott+Scott, to represent the Class. Scott+Scott has substantial experience in securities matters and class actions and has recovered billions of dollars for injured investors. *See* Ex. B. Further, Scott+Scott has diligently advanced the Class' claims, devoted substantial time and resources to the litigation, and will continue to do so. *See also infra* at §III.D. (showing that Rule 23(g) is satisfied).

While the foregoing considerations establish that adequacy is satisfied, since the Court appointed Oklahoma Police as Lead Plaintiff (ECF No. 27), it has undertaken multiple other actions that demonstrate its adequacy. For example, Oklahoma Police has protected the interests of absent Class members by, through its experienced counsel, investigating Defendants' misconduct, filing two amended complaints (ECF Nos. 32, 39), and successfully opposing Defendants' planned motion to dismiss (ECF No. 46). Further, Oklahoma Police has monitored

the litigation, regularly communicated with counsel, and is committed to continuing to discharge its fiduciary duties to the Class.  *See* Ex. C.  Accordingly, Oklahoma Police will fairly and more than adequately represent the Class.[5]

### C.  The Action Satisfies Rule 23(b)(3)

The proposed Class satisfies Rule 23(b)(3)'s requirements that common questions of law or fact predominate over individual questions and that a class action is the superior method to adjudicate this dispute.

### 1.  Common Questions Predominate

The predominance requirement is satisfied if: "(1) resolution of any material legal or factual questions … can be achieved through generalized proof, and (2) these [common] issues are more substantial than the issues subject only to individualized proof."  *Petrobras*, 862 F.3d at 270 (quoting *Mazzei v. The Money Store*, 829 F.3d 260, 272 (2d Cir. 2016)).  It "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *MetLife*, 2017 WL 3608298, at *14.  "That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate."  *Halliburton Co. v. Erica P. John Fund, Inc*., 573 U.S. 258, 276 (2014) ("*Halliburton II*").  Moreover, common issues predominate when liability can be determined on a class-wide basis, even when there are some "individualized" damage issues.  *Id.*

Determining whether common questions predominate over individual questions "begins, of course, with the elements of the underlying cause of action."  *Halliburton I*, 563 U.S. at 809.

---

[5]     The proposed Class is also ascertainable.  The Second Circuit has held that "a freestanding administrative feasibility requirement is neither compelled by precedent nor consistent with Rule 23" and that establishing ascertainability "requires only that a class be defined using objective criteria that establish a membership with definite boundaries."  *In re Petrobras Sec.*, 862 F.3d 250, 264 (2d Cir. 2017).  Here, the Class definition clearly delineates the Class' boundaries and ascertaining members of the Class will be easily administrable by reference to investor records.  *See, e.g*., *id*. at 269-70; *Facebook*, 312 F.R.D. at 353 (availability of "investor records" made class ascertainable).

In *Amgen*, the Supreme Court affirmed that two core elements of Exchange Act claims – materiality and falsity – present common questions of law and fact.  568 U.S. at 470.  That is because materiality must be assessed by an "objective standard," and "[t]he alleged misrepresentations and omissions, whether material or immaterial, would be so equally for all investors composing the class."  *Id*. at 459.  Further, the Supreme Court has affirmed that "loss causation and the falsity or misleading nature of the defendant's alleged statements or omissions are common questions that need not be adjudicated before a class is certified."  *Id.* at 475.  Courts therefore regularly hold that common questions predominate in securities fraud actions, and, just so, the claims here are well-suited for class treatment because the core factual and legal questions – in particular falsity and materiality, as well as loss causation – are common to all Class members and will rise or fall on common proof.  *See, e.g.*, *In re MF Glob. Holdings Ltd. Inv. Litig.*, 310 F.R.D. 230, 238 (S.D.N.Y. 2015).

> ### a.     Common Questions of Reliance Predominate Because the Class Can Invoke the Fraud-on-the-Market Presumption

Given the many common questions in a securities fraud claim, whether they predominate often turns on the additional element relevant at class certification, namely reliance.  *See Halliburton I*, 563 U.S. at 810.  The Supreme Court has, again, held that at class certification, a class may readily "satisfy the reliance element of the Rule 10b-5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at market price may be considered to have done so in reliance on the misrepresentation."  *Halliburton II*, 573 U.S. at 283-84; *see also Basic v. Levinson*, 485 U.S. 224, 241-47 (1988).  To invoke this "*Basic*" presumption of class-wide reliance, a class, like this one, of investors in publicly traded stock must establish that: (i) the alleged misrepresentations were public, (ii) the stock traded in an efficient market, and (iii)

the relevant transactions took place between the time the misrepresentations were made and the time the truth was revealed. *Halliburton I*, 563 U.S. at 811. As set forth below, Oklahoma Police has made the requisite showing here.

### i. The Alleged Misrepresentations Were Public, and the Relevant Transactions Took Place After Those Misrepresentations But Before the Disclosures

The first and third elements of the *Basic* presumption are particularly simple, and are satisfied here. First, Defendants made the alleged false and misleading statements in an annual report publicly filed with the SEC, on a conference call, and in public presentations at three healthcare conferences to analysts and investors. *See* ¶¶92-131. There is accordingly no question that the false and misleading statements were made publicly and widely disseminated. In addition, Oklahoma Police purchased Teligent common stock after Defendants made those misrepresentations, which began on March 7, 2017, but before Defendants revealed the truth on November 6, 2017. ¶¶132-44; ECF No. 17-2. Thus, Oklahoma Police purchased Teligent stock when its price was distorted on account of the Defendants' material misstatements and omissions. *Amgen*, 568 U.S. at 493 n.8, 490.

### ii. Teligent Stock Trades in an Efficient Market

The market efficiency requirement is a flexible inquiry, as the Second Circuit has "repeatedly—and recently—declined to adopt a particular test for market efficiency." *Waggoner v. Barclays PLC*, 875 F.3d 79, 94 (2d Cir. 2017) (citing *Petrobras*, 862 F.3d at 276)). The Second Circuit specifically refused "to view direct and indirect evidence [of market efficiency] as distinct requirements, opting instead for a holistic analysis based on the totality of the evidence presented[.]" *Id.* at 97. Courts in this District and elsewhere frequently find that public stock trades in an efficient market by applying the "*Cammer* factors." *Id.* at 94; *see also, e.g.,* *China MediaExpress*, 38 F. Supp. 3d at 431 (citing *Cammer v. Bloom*, 711 F. Supp. 1264, 1285-

87 (D.N.J. 1989)).   These factors are: (i) a large average weekly trading volume; (ii) the existence of a significant number of analyst reports; (iii) the existence of market makers and arbitrageurs in the security; (iv) the eligibility of the company to file a Form S-3 ("S-3") registration statement; and (v) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases.   *See Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989).   Courts may consider certain other factors as well.   *See Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001).   Here, based on both direct and indirect evidence, and based on the report of its expert, Chad Coffman (*see* Ex. A), Oklahoma Police easily establishes that Teligent common stock traded in an efficient market during the Class Period and therefore that the *Basic* presumption of reliance applies.

> (a)     ***Cammer* Factor 1: Teligent's Common Stock Experienced a High Weekly Trading Volume**

"Average weekly trading volume of 2% or more of outstanding securities justifies a strong presumption of an efficient market for that security."   *In re Winstar Commc'ns Sec. Litig*, 290 F.R.D. 437, 447 (S.D.N.Y. 2013).   During the Class Period, the average weekly trading volume of Teligent common stock was 1.83 million shares, or 3.42% of shares outstanding, which far surpasses that threshold.   Ex. A ¶26.   This strongly supports that the market for Teligent common stock was efficient during the Class Period.

> (b)     ***Cammer* Factor 2: Numerous Securities Analysts Covered and Reported on Teligent**

"The existence of a number of analysts who report on a security supports a finding of market efficiency because it permits an inference that financial statements relating to a security are closely watched by investment professionals, who in turn inject their views on the company and the security into the market."   *Winstar*, 290 F.R.D. at 446.   In Teligent's case, at least 12 separate analysts covered the Company and published reports during the Class Period.   Ex. A

¶34.   Prominent investment firms, such as Roth Capital Partners, LLC and Deutsche Bank, among others, issued over 40 analyst reports about Teligent throughout the Class Period.   *Id.* This extensive coverage supports the conclusion that the market for Teligent common stock was efficient.

(c)   ***Cammer* Factor 3: Teligent Stock Traded on the Nasdaq and Had Many Market Makers**

The third *Cammer* factor concerns the number of "market makers and arbitrageurs" who can react quickly to news and facilitate trading.   *Cammer*, 711 F. Supp. at 1286-87.   Teligent common stock traded on the Nasdaq exchange, which is one of the largest and most liquid security exchanges in the world, and on top of that had 77 market makers during the Class Period, far beyond the number found sufficient in *Cammer*.   Ex. A ¶42.   The fact that Teligent common stock traded on the Nasdaq is itself a strong indication that the market for that stock was efficient.   *See In re JPMorgan Chase & Co. Sec. Litig.*, No. 12 Civ. 03852 (GBD), 2015 WL 10433433, at *7 (S.D.N.Y. Sept. 29, 2015).

(d)   ***Cammer* Factor 4: Teligent was Eligible to File Form S-3s with the SEC**

Eligibility to file a S-3 registration statement with the U.S. Securities and Exchange Commission ("SEC") is "an important factor weighing in favor of a finding that a market is efficient," *China MediaExpress*, 38 F. Supp. 3d at 431, because S-3 status is "predicated on the Commission's belief that the market operates efficiently for these companies[.]"   SEC Securities Act Release No. 6331, 46 Fed. Reg. 41, 902 (Aug. 13, 1981).   A company is eligible to file an S-3 if it has timely filed required SEC reports for three years and has a "float" of at least $75 million.   *See* 17 C.F.R. §239.13.   "The ability to file this form indicates that the company is easily able to issue new securities."   *Winstar*, 290 F.R.D. at 447.   Teligent satisfied the

15

conditions for S-3 registration eligibility for its common stock throughout the Class Period.  Ex. A ¶45.

        (e)    **_Cammer_ Factor 5: A Cause-and-Effect Relationship Existed Between Company-Specific News and Teligent's Stock Price**

The final *Cammer* factor asks whether Oklahoma Police can make a *prima facie* showing that, during the Class Period, there was a cause-and-effect relationship between new Company disclosures and movements in its stock price.  *See Cammer*, 711 F. Supp. at 1287.  This direct evidence of price impact – usually shown through an event study – "is not always necessary to establish market efficiency and invoke the *Basic* presumption[.]"  *Barclays*, 875 F.3d at 96-97.  Nevertheless, as detailed in his expert report, Mr. Coffman conducted statistical analyses, which easily establish such direct evidence of price impact and market efficiency.

In particular, Mr. Coffman performed an event study, which is a statistical technique that measures the effect of new information – such as press releases, earnings reports, or SEC filings – on the market price of publicly traded securities.  Ex. A ¶¶48-49.  The study determines how much of a stock price's movement can be attributed to the release of company-specific information and how much is attributable to outside market factors.  *Id*.  A common method of running an event study is through a regression model, which Mr. Coffman used to compare, over trading days in the relevant analysis period, the price movement of Teligent common stock to the price movement of the S&P 500 Total Return Index and an equal weighted Peer Index (of six companies that Teligent lists as its competitors).  *Id.* ¶50.  This model indicates a positive correlation between Teligent common stock and both the S&P 500 Total Return Index and Peer Index, meaning that the movements of those indices help explain the price movements of Teligent common stock.  *Id.* ¶52.

To analyze whether specific new information regarding Teligent had a causal effect on the Company's common stock price, Mr. Coffman then examined how the price of that stock reacted on days when Teligent issued new earnings announcements during the analysis period and also how it reacted on days when there was no news regarding Teligent during that time. *Id.* ¶¶58-60. On 7 of the 12 days with an earnings announcement (or 58.33%), there was a statistically significant price movement above the 95% confidence level. *Id.* ¶¶58-60 (noting that one would not expect a statistically significant price movement on all earnings announcements because some of those announcements would not reveal unexpected information). By comparison, of the 394 days with no news, there was only a statistically significant price movement on 18 days (or 4.57%). *Id.* ¶60.

Mr. Coffman concludes that this demonstrates a clear, prompt cause-and-effect relationship between new material news regarding Teligent and changes in its common stock price. *Id.* ¶65. *E.g.*, *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 92 (S.D.N.Y. 2015) (expert's event study and analysis showing statistically significant movement on selected event days provided "evidence of market efficiency"); *Virtus*, 2017 WL 2062985, at *4-6 (relying, in part, on Mr. Coffman's event study, finding Virtus Partners' common stock traded on an efficient market); *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 104 n.78 (S.D.N.Y. 2016) (finding market efficiency where Mr. Coffman produced "an event study of share price reactions to Barrick-related news"). Moreover, given the high confidence level and presence of new company-specific information, randomness can reasonably be rejected as the cause of the price movements. Ex. A ¶54. Mr. Coffman further supports that conclusion with a comparison to the lack of statistically significant price movements on days with no news, as well as showing that, on average, Teligent common stock experienced greater price

movements (after removing broad market and industry effects) and higher trading volume on days when the Company provided earnings announcements versus days with no news.  *Id.* ¶¶61-63; *see In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008) (endorsing application of a similar analysis and finding market efficiency where "Alstom was over 6 times more likely to have a statistically significant stock return on a day with news than on a day with no news").

        (f)    *Krogman* **Factor 1: Teligent had a Substantial Market Capitalization During the Class Period**

In addition to the *Cammer* factors, courts in this Circuit may also consider the three *Krogman* factors when evaluating market efficiency.  The first *Krogman* factor looks at a company's market capitalization because it may indicate how well-known and closely followed a company is.  *See Krogman*, 202 F.R.D. at 478.  Teligent common stock had a substantial market capitalization during the Class Period, averaging $407.5 million, and was larger than between 41% and 25% of all other publicly traded companies on the NYSE and Nasdaq over that time. *See* Ex. A ¶68

        (g)    *Krogman* **Factor 2: Teligent Common Stock had a Narrow Bid-Ask Spread**

The second *Krogman* factor considers the bid-ask spread for a company's stock transactions.  *Krogman*, 202 F.R.D. at 478.  The bid-ask spread is an important metric because it indicates how developed and costly it is to transact in a certain market.  Narrow bid-ask spreads indicate lesser liquidity costs and greater certainty around a company's valuation.  Here, the bid-ask spread for Teligent common stock was even more narrow than the average-bid ask spread on the NYSE and Nasdaq.  More specifically, the time-weighted average bid-ask spread for Teligent common stock in each month of the Class Period was between 0.158% and 0.218%.  Ex. A ¶71. By comparison, during September 2017, the month when Teligent had its highest bid-ask spread during the relevant period, the average bid-ask spread of a random sample of 100 other stocks

trading on the NYSE and Nasdaq in September 2017 was 1.10%.  Thus, even Teligent's highest bid-ask spread was well below the market average.  *Id.*  Teligent's narrow bid-ask spreads support a finding of market efficiency because they make it easy to trade in Teligent common stock and arbitrage away any mispricing.

(h)   ***Krogman* Factor 3: Teligent's Significant Public Float**

The third *Krogman* factor considers a company's publicly traded stock, also known as its public float.  *Krogman*, 202 F.R.D. at 478.  Mr. Coffman found that, on average over the Class Period, over 80% of Teligent's shares were held by non-insiders, a considerable number that strongly supports a finding of public participation and market efficiency.  Ex. A ¶72.

(i)   **Institutional Investors Hold a Significant Percentage of Teligent Common Stock**

Courts may consider certain other factors besides those set forth in *Cammer* and *Krogman*.  For example, institutional investors, which have substantial resources to analyze information disseminated regarding the securities they purchase, owned an average of 72% of Teligent's public float during the Class Period, further supporting market efficiency.  Ex. A ¶73 (citing Coffman Report Ex. 12).

(j)   **Teligent Common Stock Does Not Exhibit Autocorrelation**

One final factor, testing for the absence of autocorrelation, is "an accepted test for determining market efficiency."  *Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 506-07, 506 n.20 (S.D. Tex. 2004).  Mr. Coffman performed a test for autocorrelation, and concluded that Teligent common stock does not exhibit any consistent patterns of autocorrelation over the Class Period. *Id.* ¶¶74-77.  This result is consistent with the notion that Teligent common stock rapidly reacted to and incorporated new Company-specific information, as is expected in an efficient market.  *Id.*

19

* * *

To summarize, as each of the five *Cammer* factors, along with each of the other five factors discussed above, support a showing of market efficiency, there is no question that, under a holistic test, the market for Teligent common stock was efficient during the Class Period.  As the two other elements of the *Basic* presumption are also satisfied, Oklahoma Police has established class-wide reliance, and in turn predominance, under Rule 23(b)(3).  *Supra* at 12-13.

  **b.** **Damages Will Be Calculated Using a Common Methodology that Is Consistent with the Class-Wide Theory of Liability**

Courts in this Circuit and elsewhere routinely find that damage questions in securities fraud cases are common to all class members because they can be calculated on a class-wide basis using an event study that measures the impact of company-specific information alleged to reveal the true state of affairs on a company's market price.  *See, e.g.*, *Barrick Gold*, 314 F.R.D. at 106 (§10(b) damages are "measurable on a class-wide basis" and "do[] not create individualized damages issues that defeat predominance").

As Mr. Coffman explains, this is referred to as the "out-of-pocket" methodology and commonly used in securities fraud cases.  Ex. A ¶78.  Under that methodology, damages are quantified in terms of the artificial inflation per share caused by material misrepresentations and omissions.  *Id.* ¶¶81-82; *see also Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 38 (2d Cir. 2012) (out-of-pocket damages in securities fraud cases are the "difference between the price paid [for stock] and the value of the stock when bought").

More specifically, Mr. Coffman explains how, by applying the "out-of-pocket" methodology and using standard tools of valuation and attribution analysis, the amount of artificial inflation from Defendants' false and misleading statements can be measured simultaneously for all Class members.  Ex. A ¶¶78-83 (setting forth examples of the

methodological tools that can be used).  Moreover, once the amount of artificial inflation on each day of the Class Period is determined, this artificial inflation can be applied to each Class member's trades to compute their individual damages.  *Id.*  This methodology is also entirely consistent with the Class' theory of liability, that Class members relied on the misrepresentations when they purchased Teligent common stock at artificially inflated prices, and were damaged when the actual state of affairs was revealed, causing the artificial inflation to dissipate from the stock price. *Id.* ¶¶78, 83.

### 2.   A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of the Claims Here

"The superiority requirement asks courts to balance, in terms of fairness and efficiency, the advantages of a class action against those of alternative available methods of adjudication." *Vivendi*, 242 F.R.D. at 91.  Securities class actions "easily satisfy" this requirement "because the alternatives are either no recourse for thousands of stockholders or a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake." *MF Glob.*, 310 F.R.D. at 239.

Rule 23(b)(3) identifies four factors to determine whether a class action is superior to other methods of adjudication, all of which militate in favor of class treatment here.  First, Oklahoma Police seeks to represent a Class consisting of a large number of geographically dispersed purchasers of Teligent common stock whose individual damages are likely small enough to render individual litigation prohibitively expensive, minimizing any interest in individual actions.  *See, e.g., Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 187 (S.D.N.Y. 2008).  Second, Oklahoma Police is not aware of any other actions bringing the same claims at issue here.   Third, concentrating this litigation in a single forum eliminates the risk of inconsistent adjudications and promotes the fair and efficient use of the judicial system.  *See id.*

Finally, managing this case as a class action presents no unusual difficulties that would preclude certification.  Indeed, litigating each claim separately would be wasteful and effectively preclude numerous investors from obtaining redress.  *See In re SCOR Holding (Switz.) AG Litig.*, 537 F. Supp. 2d 556, 579 (S.D.N.Y. 2008).

### D.    The Court Should Appoint Scott+Scott as Class Counsel Under Rule 23(g)

Pursuant to Rule 23(g), in appointing lead counsel, courts take into account: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class."  Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).  These considerations all militate in favor of appointing Scott+Scott as Class Counsel.

Scott+Scott has devoted extensive time and resources to identifying and prosecuting the claims at issue here.   To investigate those claims, draft two amended complaints, oppose Defendants' motion to dismiss, and pursue discovery, Scott+Scott assembled a team of attorneys that is familiar with the action and dedicated to continue representing the Class.   Moreover, Scott+Scott has considerable experience successfully prosecuting complex securities fraud actions, as well as the resources to prosecute this Action.  *See* Ex. B.  In short, Scott+Scott will fairly and adequately represent the Class, and pursuant to Oklahoma Police's request, should be appointed Class Counsel.

## IV.     CONCLUSION

For the foregoing reasons, Oklahoma Police respectfully requests that the Court: (i) certify this Action as a class action under Rules 23(a) and 23(b)(3); (ii) appoint Oklahoma Police as Class Representative; and (iii) appoint Scott+Scott as Class Counsel.

DATED:  September 30, 2020

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

 */s/ Max R. Schwartz*
Max R. Schwartz
Anjali Bhat
Jeffrey P. Jacobson
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile:  212-223-6334
mschwartz@scott-scott.com
abhat@scott-scott.com
jjacobson@scott-scott.com

*Counsel for Lead Plaintiff Oklahoma Police*
*Pension Fund and Retirement System and*
*Proposed Lead Counsel for the Class*