**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

OKLAHOMA POLICE PENSION FUND AND
RETIREMENT SYSTEM, Individually and on
Behalf of All Others Similarly Situated

                          Plaintiff,

v.

TELIGENT, INC. and JASON GRENFELL-
GARDNER

                          Defendants.

Civil Action No.: 1:19-CV-03354-VM

---

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

**TABLE OF CONTENTS**

**Page(s)**

PRELIMINARY STATEMENT ..................................................................................................1

FACTUAL BACKGROUND....................................................................................................2

ARGUMENT ...........................................................................................................................4

I.     PLAINTIFF FAILS TO SATISFY ITS
EVIDENTIARY BURDEN TO CERTIFY THE CLASS....................................................5

        A.     Plaintiff Is Not An Adequate Class Representative..................................................5

        B.     Plaintiff Has Not Met Its Burden Of Showing That
Damages Can Be Calculated On A Class-Wide Basis..............................................9

                1.     Plaintiff's Proposed Damages Model Is Inappropriate Here ....................10

                2.     Plaintiff Fails To Adequately Support Its Proposed Damages Model.......13

II.    DEFENDANTS HAVE REBUTTED THE *BASIC*
PRESUMPTION OF CLASS-WIDE RELIANCE.............................................................15

        A.     Defendants Have Demonstrated That The Alleged
Misstatements Did Not Have Any Front-End Price Impact .................................17

        B.     Defendants Have Demonstrated That The Alleged
Misstatements Did Not Have Any Back-End Price Impact..................................19

        C.     Plaintiffs Have Not And Cannot Make Any Showing Of Price Impact ................21

CONCLUSION.......................................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Express Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013)................................................................................................4

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
568 U.S. 455 (2013) ............................................................................................17

*Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*,
597 F.3d 330 (5th Cir. 2010) ..............................................................................20

*Ark. Teachers Ret. Sys.* v. *Goldman Sachs Grp., Inc.*,
879 F.3d 474 (2d Cir. 2018) ..........................................................................16, 17

*Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*,
955 F.3d 254 (2d Cir. 2020).............................................................................17, 20

*Basic Inc.* v. *Levinson*,
485 U.S. 224 (1988)....................................................................................... *passim*

*Berger v. Compaq Comput. Corp.*,
257 F.3d 475 (5th Cir. 2001) ................................................................................6

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)......................................................................................... *passim*

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005)..............................................................................................10

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011)..............................................................................................15

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116
(S.D.N.Y. 2014) ...............................................................................................9, 15

*Greenspan v. Brassler*,
78 F.R.D. 130 (S.D.N.Y. 1978) .............................................................................9

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014).....................................................................................5, 16, 23

*In re BP P.L.C. Sec. Litig.*,
2014 U.S. Dist. LEXIS 69900 (S.D. Tex. May 20, 2014) ...............................10, 15

ii

*In re BP P.L.C. Sec. Litig.*,
    No. 10-MD-2185, 2013 U.S. Dist. LEXIS 173303 (S.D. Tex. Dec. 6, 2013) ........................14

*In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*
    281 F.R.D. 174 (S.D.N.Y. 2012) ...............................................................................................15

*In re Hydrogen Peroxide Antitrust Litig.*,
    552 F.3d 305 (3d Cir. 2008)......................................................................................................10

*In re Kosmos Energy Ltd. Sec. Litig.*,
    299 F.R.D. 133 (N.D. Tex. 2014) .......................................................................................6, 8, 9

*In re Monster Worldwide*, *Inc. Sec. Litig.*,
    251 F.R.D. 132 (S.D.N.Y. 2008) ..................................................................................................6

*Kulig v. Midland Funding, LLC*,
    No. 13-cv-4715 (PKC), 2014 U.S. Dist. LEXIS 169860 (S.D.N.Y. Nov. 20,
    2014) .............................................................................................................................................5

*Ludlow v. BP P.L.C.*, 800 F.3d 674 (5th Cir. 2015)  ....................................................................12

*Millowitz* v. *Citigroup Glob. Markets, Inc. (In re Salomon Analyst Metromedia*
    *Litig.)*, 544 F.3d 474 (2d Cir 2008)..........................................................................................16

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
    No. 4:08CV0160, 2018 U.S. Dist. LEXIS 137229 (N.D. Ohio Aug. 14, 2018).....................14

*Rahn v. Genzyme Corp. (In re Genzyme Corp. Sec. Litig.)*,
    No. 09-11267-GAO, 2012 U.S. Dist. LEXIS 44336 (D. Mass. Mar. 30, 2012).....................18

*Shiring v. Tier Techs., Inc.*,
    244 F.R.D. 307 (E.D Va. 2007) ...................................................................................................6

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017).........................................................................................................16

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011).........................................................................................................4, 5, 15

*Weisman v. Darneille*,
    78 F.R.D. 669 (S.D.N.Y. 1978) ...................................................................................................6

*Welling v. Alexy (In re Cirrus Logic Sec.)*,
    155 F.R.D. 654 (N.D. Cal. 1994)..................................................................................................6

## Other Authorities

Fed. R. Civ. P. 23.................................................................................................... *passim*

Teligent, Inc. ("Teligent" or the "Company") and Jason Grenfell-Gardener ("Grenfell-Gardner," and with Teligent, "Defendants") submit the Declaration of Douglas P. Baumstein ("Baumstein Dec.") and this memorandum of law in opposition to the Motion for Class Certification ("Motion") of Oklahoma Police Pension Fund and Retirement System ("Plaintiff").

## PRELIMINARY STATEMENT

Plaintiff treats class certification, an exception to the typical rule as to how litigation is conducted, as a foregone conclusion.  But Plaintiff fails to demonstrate key prerequisites to class certification: Plaintiff is an inadequate class representative pursuant to Rule 23(a) and cannot satisfy the predominance requirements of Rule 23(b)(3) with evidence that damages can be calculated using a common methodology.  Moreover, even if Plaintiff is presumed to have satisfied its *prima facie* showing, Defendants have rebutted the *Basic v. Levinson* fraud-on-the-market presumption with evidence demonstrating that the price of Teligent stock was not impacted by the alleged misstatements here, thereby severing the link between the alleged misstatements and the price paid by putative class members.  Thus, the key element of reliance must be proved by individual evidence and the predominance element is defeated.

*First*, Plaintiff is wholly inadequate as a class representative.  Plaintiff is unfamiliar with basic details of the case and it is clear from its testimony that this case is effectively under the control and direction of Scott+Scott, Plaintiff's counsel.  Indeed, Plaintiff was not even aware that it had invested in Teligent stock until Plaintiff's counsel brought this potential claim to Plaintiff's attention.  Such a scenario is expressly disapproved by the courts.

*Second,* Plaintiff has abdicated its burden of demonstrating a class-wide methodology for calculating damages here.  Rather than actually detailing an applicable and relevant class-wide damages model, Plaintiff has proffered vague assurances by its expert that such class-wide damages "can be measured" here.  Such "trust me" approach does not satisfy Plaintiff's burden of

establishing, and not merely presuming, the elements of class certification.

*Third*, and particularly fatal to any chance of class certification here, Defendants have submitted evidence severing the link between the price of Teligent stock and the allegations of the complaint, thereby rebutting the fraud-on-the-market presumption.  Defendants have submitted two reports from well-credentialed and knowledgeable experts—Dr. Maureen Chakraborty and Carl Seiden—that collectively demonstrate that the alleged misstatements here had no price impact whatsoever on Teligent stock.  And Plaintiff has proffered no evidence that the alleged misstatements had such a price impact—indeed, the sole expert relied upon by Plaintiff, Dr. Chad Coffman, explicitly disavowed any such claim, stating that it was outside the scope of his analysis and report.  The *Basic* presumption is therefore unavailable to satisfy the predominance requirement for the element of reliance, requiring denial of class certification.

## FACTUAL BACKGROUND

Teligent is a small specialty generic pharmaceutical company that has manufactured and sold topical generic pharmaceutical products under its own label since 2010.  Grenfell-Gardner, Teligent's former CEO, allegedly "overhaul[ed]" the Company to "dramatically accelerate the Company's transformation" and increase the number of Abbreviated New Drug Applications ("ANDAs") submitted to the Food and Drug Administration ("FDA") so as to increase the number of products it brought to market.  Second Amended Complaint ("SAC"), Dkt No. 39, ¶ 24.  Plaintiff alleges that while Teligent was outwardly touting the Company's successful ANDA pipeline, Teligent was actually experiencing "systematic" regulatory failures, which allegedly caused a slowdown in its submission of drug applications for approval, and that Teligent failed to disclose correspondence from the FDA that purportedly detailed these "systematic" failures.  SAC ¶ 2.

Plaintiff constructs its theory based upon two letters that Teligent received from the FDA in September 2016 and October 2017.  *Id.*  Each letter was contained on FDA Form 483, which is

used by the FDA to report observations made during an inspection. In September 2016, the FDA issued a Form 483 following a Bioresearch Monitoring ("BIMO") inspection of an in-vitro bioequivalence study related to a single product, Acyclovir, for which Teligent had submitted an ANDA, and listed the inspector's observations of possible deviations from the FDA's requirements for the study (the "September 2016 Form 483"). *Id.* ¶¶ 47-50. The September 2016 Form 483 is the *only* relevant alleged FDA communication Teligent received *before* the alleged misstatements were made in spring 2017. In October 2017, the FDA inspected Teligent's facility in Buena, New Jersey to ensure compliance with current Good Manufacturing Practices ("cGMP") regulations, and Teligent received a Form 483 with one observation regarding cGMP (the "October 2017 Form 483"). *Id.* ¶¶ 59, 61. Significantly, the October 2017 Form 483 was received in October, *after* each of the alleged misstatements and near the end of the proposed Class Period.

Plaintiff asserts claims under the Securities Exchange Act of 1934, alleging that various statements made by Teligent and Grenfell-Gardner were misleading in light of the September 2016 Form 483 and the October 2017 Form 483. This Court has already determined that several of the statements identified by Plaintiff are non-actionable (*see* Decision and Order, Dkt. No. 46, at 36-41) and determined that the following statements are potentially actionable:

(i) Statement made by Grenfell-Gardner during a March 7, 2017 earnings call where he contrasted Teligent to other companies that "continue to have ongoing regulatory challenges," such as "warning letters";

(ii) Statement made in Teligent's 2016 10-K that deviations from "current Good Manufacturing Practices" may result in FDA enforcement action such as "warning letters";

(iii) Statement made in Teligent's 2016 10-K that Teligent had a "cGMP-compliant facility"; and

(iv) Statements made by Grenfell-Gardner on March 13, 2017, May 3, 2017, and May 16, 2017 at investor conferences that Teligent had "no 483 observations" from the FDA during recent manufacturing audits.

3

*See* SAC ¶¶ 101, 103, 108, 110, 118, 120; *see also* Decision and Order at 41.  The Court concluded that these statements were potentially misleading because they omitted any reference to the September 2016 Form 483.  Decision and Order at 42-45.

Plaintiff alleges that Teligent's press release and subsequent earnings call on November 6, 2017, when Teligent announced its results for Q3 2017, constituted a corrective disclosure.  *Id.* ¶¶ 132-143.  Grenfell-Gardner stated at that time that Teligent's "results and [its] revised outlook for the remainder of the year [] are a result of the knock-on effect of ANDA approval delays" and the decreased performance of one product.  *Id.* ¶ 135.  During the earnings call on the same day, Grenfell-Gardner disclosed that Teligent had "faced manufacturing challenges" and "pipeline delays."  *Id.* ¶¶ 136, 139.  On November 7, 2017, the next trading day, the price of Teligent stock dropped 43.62 percent.  *Id.* ¶ 144.

Plaintiff theorizes that it, and other similarly situated members of the proposed class, purchased Teligent shares at artificially inflated prices caused by the allegedly false and misleading statements made by Defendants, and that once Teligent disclosed the regulatory hurdles, the stock price dropped, thereby harming the proposed class.  SAC ¶ 159.

## ARGUMENT

Class certification is not a routine matter.  Rather, a class action is the "exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *See Comcast Corp. v. Behrend,* 569 U.S. 27, 33 (2013) (citations omitted); *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 348 (2011).  Accordingly, "a party seeking to maintain a class action must affirmatively demonstrate his compliance with Rule 23."  *Comcast*, 569 U.S. at 33.

"Rule 23 does not set forth a mere pleading standard."  *Wal-Mart*, 564 U.S. at 350.  Rather, it "imposes stringent requirements for certification that in practice exclude most claims."  *Am. Express Co. v. Italian Colors Rest.,* 570 U.S. 228, 234 (2013).  Indeed, certification is only proper

if, after a "rigorous analysis," the trial court determines that plaintiffs have proven "*in fact*" all the prerequisites of Rule 23. *See Comcast*, 569 U.S. at 33 (quoting *Wal-Mart*, 564 U.S. at 351); *see also Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*")*,* 573 U.S. 258, 275 (2014) ("[P]laintiffs wishing to proceed through a class action must actually *prove—*not simply plead— that their proposed class satisfies each requirement of Rule 23."). This "rigorous analysis" will sometimes require the Court to look "behind the pleadings," even if this inquiry "overlap[s] with the merits of the plaintiff's underlying claim. That cannot be helped." *Wal-Mart,* 564 U.S. at 350-51 (citations omitted). Indeed, such overlaps occur "frequently," but do not reduce a plaintiff's burden of proof. *Comcast*, 569 U.S. at 33-34.

In this case, Plaintiff has not carried its burden under Rule 23. As set forth below, Plaintiff has failed to proffer sufficient evidence that it will fairly and adequately represent the putative class as required under Rule 23(a) or to satisfy Rule 23(b)(3)'s predominance requirement. In any event, Defendants have rebutted the *Basic* presumption necessary to certify a securities class action. Plaintiff's Motion should therefore be denied.

**I.      PLAINTIFF FAILS TO SATISFY ITS
         <u>EVIDENTIARY BURDEN TO CERTIFY THE CLASS</u>**

**A.      <u>Plaintiff Is Not An Adequate Class Representative</u>**

Plaintiff bears the burden of establishing by a preponderance of the evidence that it "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Here, Plaintiff has not satisfied the adequacy requirement because Plaintiff has little familiarity or involvement with the litigation, and proposed class *counsel* is controlling and directing this litigation. *See Kulig v. Midland Funding, LLC*, No. 13-cv-4715 (PKC), 2014 U.S. Dist. LEXIS 169860, at \*7 (S.D.N.Y. Nov. 20, 2014) (citing *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1077-78 (2d Cir. 1995)) (denying class certification where lead plaintiff had "so little knowledge of and

involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys").

The class is entitled to a representative who will "check the otherwise unfettered discretion of counsel in prosecuting the suit and who will provide his personal knowledge of the facts underlying the complaint." *Weisman v. Darneille,* 78 F.R.D. 669, 671 (S.D.N.Y. 1978). Indeed, the adequacy requirement is not met where a plaintiff has "simply len[t] his name to a suit controlled entirely by the class attorney." *In re Monster Worldwide*, *Inc. Sec. Litig.*, 251 F.R.D. 132, 135 (S.D.N.Y. 2008) (citations omitted). Moreover, the adequacy inquiry is "particularly searching" in the securities fraud context because "the PSLRA [*i.e.,* the Private Securities Litigation Reform Act] was 'intended to empower investors so that they, not their lawyers, control securities litigation.'" *Shiring v. Tier Techs., Inc.,* 244 F.R.D. 307, 315 (E.D Va. 2007) (quoting S. Rep. 104-98, a \*6 (1995)); *see also Berger v. Compaq Comput. Corp.*, 257 F.3d 475, 484 (5th Cir. 2001) ("[I]n complex class action securities cases governed by the PSLRA, the adequacy standard must reflect . . . Congress's emphatic command that competent plaintiffs, rather than lawyers, direct such cases."). Thus, in such cases, a lack of familiarity with the litigation and the alleged misstatements at issue, and a failure to provide sufficient supervision over the litigation, all indicate that a plaintiff is an inadequate class representative. *See, e.g.*, *In re Monster Worldwide,* 251 F.R.D. at 135-36; *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 145, 147 (N.D. Tex. 2014) (finding plaintiff inadequate where representative had never reviewed the registration statement—the central document challenged in the case—and could not point to any false statements in the document at her deposition); *Welling v. Alexy (In re Cirrus Logic Sec.),* 155 F.R.D. 654, 659 (N.D. Cal. 1994) (finding plaintiff inadequate where his "only role in deciding to file the case" was to call his counsel, notify them of a claim, and thereafter "cede[] control to his

lawyers").

Here, it is clear that Plaintiff has little familiarity or involvement with the litigation and, instead, proposed class counsel is directing this litigation. As an initial matter, Plaintiff has no independent understanding of the case, and relies almost entirely on counsel and the documents drafted by counsel. *See, e.g.*, Deposition of Ginger Sigler ("Sigler Tr."), March 4, 2021, 71:4-15, 91:5-92:2, attached as Exhibit A to Declaration of Douglas Baumstein. In fact, Plaintiff's Rule 30(b)(6) witness, Ginger Sigler, testified that she had not even seen the relevant documents in this case containing the alleged misstatements prior to her deposition. *See* Sigler Tr. 91:5-8 (acknowledging she had not seen previously Teligent's 2016 10-K, or the transcripts from the March 7, 2017 conference call, the March 13, 2017 Roth Capital Health Care Conference, the May 3, 2017 Deutsche Bank Health Care Conference, or the May 16, 2017 Bank of America Merrill Lynch Health Care Conference). When shown these documents at her deposition, she was unable to identify the alleged misstatements, and instead identified several statements that this Court had previously dismissed as non-actionable, as well as statements that had not even been alleged to be misstatements in the SAC. *Id.* 77:19-78:13, 81:13-22, 82:19-83:15, 86:8-24, 88:22-90:7. For example, when asked to identify the remaining alleged misleading statements made by Teligent in its 2016 10-K, Ms. Sigler testified she believed the 10-K contained statements that Teligent had a vibrant pipeline of new products, that it had a good working relationship with the FDA, and that the FDA would always approve the company's ANDAs. *Id.* 77:19-78:13. The SAC does not allege that the 2016 10-K contained any such statements. *See generally* SAC ¶¶ 108, 110. Moreover, this Court found similar statements in the March 7, 2017 conference call regarding Teligent's "growth, its pipeline, [and] its 'ability to navigate drugs through the approval process at FDA in a timely manner'" to be puffery, and thus non-actionable. *See* Decision and Order, at

7

44 n. 8.

As to the three healthcare conferences, Ms. Sigler similarly identified several statements made by Grenfell-Gardner that were not "actionable" misleading statements following this Court's decision on the motion to dismiss. For example, she identified as potentially "false or misleading": (1) statements at the Roth Healthcare Conference regarding Teligent's cooperation with the FDA and that R&D was an important investment; (2) statements at the Deutsche Bank Healthcare Conference relating to the expansion of Teligent's development team; and (3) statements at the Bank of America Healthcare Conference relating to Teligent's ANDA pipeline, timely responses to the FDA, and a reduction in gross margin percentage. *See* Sigler Tr. 81:13-22, 82:19-83:15, 86:8-16, 88:22-90:7. None of these statements were identified as actionable statements by this Court. *See* Decision and Order, at 46-47. Indeed, Ms. Sigler acknowledged that she relied on counsel in identifying these statements as false or misleading, and in support of why *she* believed the statements identified in the SAC were "false or misleading," she vaguely stated that Teligent outwardly told its investors that "the company was in good shape when, in fact, it wasn't." Sigler Tr. 91:9-92:20.

Further underscoring the lawyer-driven nature of the case, Ms. Sigler acknowledged that Plaintiff was not even aware of any potential claims until counsel—who acts as a "security reviewer," reviewing Plaintiff's investments for potential litigation—brought these claims to Plaintiff. *Id.* 62:1-24; 67:1-3. Courts have criticized similar monitoring services as "fostering the very tendencies toward lawyer-driven litigation that the PSLRA was designed to curtail, as it creates a clear incentive for [the securities monitoring law firm] to discover 'fraud' in the investments it monitors and to recommend . . . that [the client], at no cost to itself, bring a class action lawsuit." *In re Kosmos Energy*, 299 F.R.D. at 149 (citations omitted). The same incentives

8

exist here, in particular because Plaintiff had not even been aware that it had invested in Teligent until counsel brought the proposed action to them. *See* Sigler Tr. 117:11-14, 127:14-16; *see generally In re Kosmos Energy*, 299 F.R.D. at 135, 148-49 (denying class certification where plaintiff was unaware of any potential securities claims until a securities monitoring firm urged it to pursue the lawsuit).

Plaintiff also does very little to oversee or participate in the litigation. Ms. Sigler, who has primary responsibility for supervising this case, acknowledged that she spends only ten minutes to an hour per month on this litigation. *See* Sigler Tr. 65:4-25, 129:21-24. Ms. Sigler also admitted that Plaintiff's ownership in Teligent stock made up "such a small portion of [its] investment" portfolio that the alleged loss it suffered had "no major significance" to its overall investment portfolio, making it clear that Plaintiff is oblivious as to how, or even if, it was damaged. *Id.* 113:4-7. Simply put, Plaintiff's demonstrated unfamiliarity with the litigation and reliance on counsel renders it an inadequate presentative for the proposed class. *See Greenspan v. Brassler*, 78 F.R.D. 130, 133-34 (S.D.N.Y. 1978) (finding putative class representatives inadequate where they "appear[ed] to place undue emphasis on their counsel's ability to conduct the litigation"); *In re Kosmos*, 299 F.R.D. at 145 ("When it appears that the potential representatives are 'simply lending their names to a suit controlled entirely by the class attorney,' . . . courts may find them to be inadequate.") (citations omitted).

### B. Plaintiff Has Not Met Its Burden Of Showing That Damages Can Be Calculated On A Class-Wide Basis

Plaintiff must show now, at the class-certification stage, that "damages are capable of measurement on a classwide basis" and that the "model supporting a plaintiff's damages case … [is] consistent with its liability case." *Comcast*, 569 U.S. at 34-35 (citations omitted); *see also Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 141 (S.D.N.Y. 2014).

9

Further, Plaintiff may only recover the economic losses "actually cause[d]" by the revelation of previously (and fraudulently) concealed information. *See Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 345 (2005). Moreover, Plaintiff's damages model cannot be "speculative" or "arbitrary," as "[s]uch a proposition would reduce Rule 23(b)(3)'s predominance requirement to a nullity." *Comcast*, 569 U.S. at 33-36. Thus, Plaintiff cannot meet its burden with a mere "assurance to the court that it intends or plans" to create such a model in the future. *See In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d 305, 318 (3d Cir. 2008); *see also In re BP P.L.C. Sec. Litig.*, 2014 U.S. Dist. LEXIS 69900, at *90 (S.D. Tex. May 20, 2014), *aff'd, Ludlow v. BP P.L.C.*, 800 F.3d 674 (5th Cir. 2015) (Plaintiff's "conclusory assertion that damages *will* be calculated on a classwide basis" is insufficient because "Plaintiffs bear the burden of proving all relevant elements of Rule 23") (emphasis added).

### 1.    *Plaintiff's Proposed Damages Model Is Inappropriate Here*

Here, Plaintiff has offered no proof that it can develop a model for measuring class-wide damages that is consistent with its theory of liability. Plaintiff relies exclusively on the Coffman Report, stating that damages can be calculated using the "out-of-pocket method." Mot. at 20. As Coffman explains, under this method, "damages are equal to the artificial inflation in the share price at the time of purchase minus the artificial inflation per share at the time of sale." Expert Report of Chad Coffman, CFA, Sept. 30, 2020, ¶ 78. Thus, the amount of artificial inflation on each day during the Class Period must be quantified first, and then applied to each class member. *Id.* ¶¶ 78-79. As Coffman acknowledges, the calculation of this "artificial inflation" is a "case-specific, fact specific loss causation exercise," which Coffman claims can be done through a variety of "techniques," but generally "starts from an event study." *Id.* ¶ 81.

As a preliminary matter, Coffman acknowledges that his proposed methodology is not case-specific, and is copied nearly verbatim from reports he prepared in other securities cases. *See*

Deposition of Chad Coffman ("Coffman Tr."), March 11, 2021, 164:20-165:12, attached as Exhibit B to Baumstein Dec. (acknowledging that "a lot of the language" in Section 8 of his report is "exactly the same" as similar sections in expert reports he has submitted in other securities cases). At his deposition, Coffman claimed there was "no reason to change the language" in his report because the out-of-pocket methodology is a "well accepted standard methodology." *Id.* 165:5-166:22. But Coffman's vague and conclusory justification for recycling his past reports fails to explain how his proposed damages methodology will be utilized in *this* particular case in a manner that is consistent with *this* Plaintiff's theory of liability as permitted by the Court. More significantly, it fails to account for the individualized inquiry required under the framework for damages this Court recognized applies in this case.

As Dr. Maureen Chakraborty explains in her rebuttal expert report, Coffman's "out-of-pocket" damages methodology is not amenable to a class-wide basis under the damages framework this Court has determined is applicable here—a materialization of concealed risk framework. Expert Report of Maureen Chakraborty, April 2, 2021, ¶ 52, attached as Exhibit C to Baumstein Dec.; *see also* Decision and Order at 61. Specifically, a materialization of risk theory alleges that a defendant made statements that defrauded the investor into taking a greater risk than was disclosed, and here Plaintiff alleges that Defendants' statements concealed "adverse material facts from the market, leading investors to believe . . . that Teligent was complying with FDA regulations, producing a pipeline of ANDA submissions, and nearing the ability to produce injectable drugs." Decision and Order at 21. As Dr. Chakraborty explains, however, even if the observations contained in the September 2016 Form 483 were indicative of a heightened risk of regulatory non-compliance or pipeline slowdowns (which is doubtful, at best), not all investors would have reacted similarly if Teligent had disclosed the FDA's observations from the September

11

2016 Form 483. *See* Chakraborty ¶ 52. Rather, individual inquiry would be necessary to determine each class member's damages. *See id.* ¶¶ 52-57. Coffman has failed to propose a common damages method to address the individual issues that arise when calculating damages under a "materialization of the concealed risk" theory. *See id.* ¶¶ 56-57.

The Fifth Circuit decision in *Ludlow v. BP, P.L.C.* is instructive. *See* 800 F.3d 674 (5th Cir. 2015). In that case, plaintiffs moved to certify two classes, one for misrepresentations made prior to the 2010 Deepwater Horizon oil spill relating to BP's safety and process improvements that had not actually been implemented. *Id.* at 677, 680. As here, that "pre-spill class" relied on a "materialization of the concealed risk" theory, claiming that "BP understated the risk of catastrophe, and when that risk materialized, they could recover its resulting damages." *Id.* at 680. The Fifth Circuit Court of Appeals affirmed the decision denying certification of the pre-spill class, holding the materialization of the risk theory presented by Dr. Coffman was not capable of class-wide determination because it hinged on the determination that "each plaintiff would not have bought the BP stock *at all* were it not for the alleged misrepresentations," and this determination was "not derivable as a common question, but rather one requiring individualized inquiry." *Id.* at 690. Specifically, the Fifth Circuit acknowledged that investors tolerate different levels of risk, with some low-risk investors who, if they knew the true risk of an oil spill, would not invest at all, and other high-risk investors who would nevertheless invest, just at a lower price. *Id.* A full materialization-of-the-risk damages theory rewards both investors the same in damages, resulting in a "windfall" to the high-risk investor. *Id.* Further, the court held that because "the Coffman model here does not provide any mechanism for separating these two classes of plaintiffs . . . [and] because it lacks the ability to do so, it cannot provide an adequate measure of class-wide damages under *Comcast*." *Id.* (rejecting Coffman's model).

12

The same is true here.   As Dr. Chakraborty observes, even if Teligent had made an alternative disclosure at the beginning of the proposed Class Period reflecting the substance of the September 2016 Form 483, investors with varying risk tolerances would have reacted differently, with some investors avoiding the November 2017 stock drop entirely, whereas others may have paid a lower price but still incurred a portion of the November 2017 price decline.  Chakraborty ¶¶ 52, 56.  Therefore, as in *BP*, the difference in investors' risk tolerances is a matter of individual inquiry, and the damages model proposed by Coffman is not an appropriate measure of class-wide damages because it would treat both low-risk and high-risk investors the same, and provides no mechanism to separate the two.  *Id.*  ¶¶ 52-57.

### 2.  *Plaintiff Fails To Adequately Support Its Proposed Damages Model*

Coffman's "model" is also insufficient because it provides only a vague description of the potential methods to quantify the artificial inflation caused by the alleged misstatements.  As outlined in Coffman's Report, the "out-of-pocket" damages methodology requires an "input" of the quantification of the artificial inflation per share, which Coffman acknowledges requires a detailed loss causation analysis that generally "starts from an event study."  *See* Coffman ¶¶ 80-81.  Coffman's explanation of the event study, however, makes clear that he has not provided any meaningful insight into how those inputs would be obtained or utilized in this particular case.  For example, Coffman acknowledges that any event study would need to consider whether and to what extent any confounding information could have impacted Teligent's stock price.  *See id.* ¶ 81; *see also* Coffman Tr. 153:10-23.  In fact, as Dr. Chakraborty notes, a variety of news was publicly disclosed by Teligent simultaneously with the alleged corrective disclosures, including "lower-than-expected earnings, revised guidance for fiscal year 2017, increased competition, manufacturing challenges, and ANDA approval delays."  Chakraborty ¶ 59.  Disaggregating the corrective and confounding statements is, as Coffman admits, "inherently case-specific" and

13

"depends on specific facts and circumstances." *See* Coffman ¶ 81. Yet Coffman fails to explain how he would perform such a disaggregation analysis other than providing a non-exhaustive list of supposed "techniques." *See* Coffman ¶ 81; *see also* Coffman Tr. 152:15-153:23.

Merely using the words "event study" or referring to other unspecified "tools" or "techniques" is not sufficient under *Comcast.* As the court in *In re BP* explained:

> Simply invoking the event study methodology may have . . . satisfie[d] the first half of *Comcast's* test: that damages be measurable on a class-wide basis. But it does not satisfy the second half of that test. It does not assuage the Court that the class-wide damages methodology proposed will track Plaintiffs' theories of liability, as the Supreme Court expressly required in *Comcast* before a class may be certified. . . . Plaintiffs cannot avoid this hard look [the rigorous analysis of its damages methodology] by refusing to provide the specifics of their proposed methodology.

*In re BP P.L.C. Sec. Litig.,* No. 10-MD-2185, 2013 U.S. Dist. LEXIS 173303, at *74-75 (S.D. Tex. Dec. 6, 2013), *aff'd* 800 F.3d 674 (5th Cir. 2015); *see also Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, No. 4:08CV0160, 2018 U.S. Dist. LEXIS 137229, at *54 (N.D. Ohio Aug. 14, 2018) (where a "class plaintiff presents a damages model that is vague, indefinite, and unspecific, or simply asserts . . . that there are unspecified 'tools' available to measure damages, the model amounts to 'no damages model at all,' and the class cannot be certified").

Additionally, although Coffman explains that any loss causation analysis here "would also require an analysis of how inflation per share may have evolved over the class period," *see* Coffman ¶ 82, Coffman fails to specify the nature of that separate analysis and offers no opinion on whether inflation evolved during the proposed class period. *See* Coffman Tr. 156:10-157:16. When asked what information he would need to make that assessment, he testified that was "not something [he] analyzed," but that "it [is] hard to say the entirety of what might be relevant to that [analysis]." *Id.* at 156:18-157:1. This failure to provide case-specific detail is inconsistent with Plaintiff's obligation to provide a class-wide methodology consistent with its theory of liability.

14

Plaintiff's damages approach is therefore insufficient under Rule 23 and *Comcast*, and class certification is consequently improper. *See Fort Worth Emps.' Ret. Fund*, 301 F.R.D. at 142 (denying class certification in a securities case and finding that, "without assurance beyond [plaintiffs' proffered expert]'s say-so, the Court cannot conclude that there is a damages model that will permit the calculation of damages on a classwide basis"); *In re BP*, 2014 U.S. Dist. LEXIS 69900, at \*90 (Plaintiff's burden of providing a reliable methodology for measuring class-wide damages "is not met by asking the Court simply to trust them"). Plaintiff's Motion should therefore be denied.

## II.   DEFENDANTS HAVE REBUTTED THE *BASIC* PRESUMPTION OF CLASS-WIDE RELIANCE

Because reliance, an inherently individualized issue, is an element of a claim under Rule 10b-5, "[c]lass certification is available only if plaintiff[s] can establish a class-wide presumption of reliance through the 'fraud on the market' theory." *In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.* 281 F.R.D. 174, 177 (S.D.N.Y. 2012) (citations omitted); *see also Wal-Mart,* 564 U.S. at 351 n.6 (absent applicability of the *Basic* presumption, the predominance requirement is "an insuperable barrier to class certification" in securities fraud cases). "*Basic*'s fundamental premise [is] that an investor presumptively relies on a misrepresentation so long as it was reflected in the market price at the time of his transaction." *Erica P. John Fund, Inc. v. Halliburton Co.* ("*Halliburton I*"), 563 U.S. 804, 813 (2011).

A defendant may defeat the fraud-on-the-market presumption with "*[a]ny* showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." *Basic Inc.* v. *Levinson*, 485 U.S. 224, 248 (1988) (emphasis added). That causal link may be severed by "show[ing] that the misrepresentation in fact did not lead to a distortion of price." *Id.*

15

Such a rebuttal breaks the "causal connection" because "the basis for finding that the fraud had been transmitted through [the] market price would be gone." *Id.; see also Halliburton II,* 573 U.S. at 279 ("*Basic* . . . affords defendants an opportunity to rebut the presumption by showing, among other things, that the particular misrepresentation at issue did not affect the stock's market price."). Thus, "if a defendant could show that the alleged misrepresentation did not, for whatever reason, actually affect the market price . . . then the presumption of reliance would not apply." *Halliburton II,* 573 U.S. at 269; *see also Ark. Teachers Ret. Sys.* v. *Goldman Sachs Grp., Inc.* ("*Goldman I*"), 879 F.3d 474, 486 (2d Cir. 2018) (defendants may introduce evidence showing that a misrepresentation did not affect market price of the stock and thereby demonstrate that "the fraud-on-the-market theory underlying the [*Basic*] presumption would 'completely collapse[].'"). A defendant need only rebut the *Basic* presumption by a preponderance of the evidence. *Waggoner v. Barclays PLC*, 875 F.3d 79, 101 (2d Cir. 2017). "A successful rebuttal *defeats* class certification by defeating the Rule 23(b)(3) predominance requirement." *Millowitz* v. *Citigroup Glob. Markets, Inc. (In re Salomon Analyst Metromedia Litig.)*, 544 F.3d 474, 485 (2d Cir. 2008), *abrogated in part on other grounds by Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455 (2013).

The courts have recognized significant flexibility as to the means by which defendants may present evidence of lack of price impact and so rebut the *Basic* presumption, with the Supreme Court holding that "[d]efendants may seek to defeat the *Basic* presumption at [the class certification] stage through direct as well as indirect price impact evidence." *Halliburton II,* 573 U.S. at 283. Notably, Judge Sullivan of the Second Circuit recently stated that a court should "consider the nature of the alleged misstatements in assessing whether and why 'the misrepresentations did not in fact affect the market price of [the] stock,'" and that even when a price impact "inquiry 'resembles' an assessment of materiality," that "does not make it improper"

16

in deciding a motion for class certification.[1]   *Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.* ("*Goldman II*"), 955 F.3d 254, 278 (2d Cir. 2020) (Sullivan, J., dissenting) (citations omitted).[2]

Defendants here successfully rebut the *Basic* presumption because the alleged misrepresentations did not impact the price of Teligent stock.

### A.   Defendants Have Demonstrated That The Alleged Misstatements Did Not Have Any Front-End Price Impact

The alleged misstatements made by the Defendants regarding Teligent's compliance with FDA regulations and its ability to develop and submit ANDAs to the FDA can only have had a price impact if the September 2016 Form 483 contained information that a reasonable investor would have regarded as important in assessing the value of Teligent's share price.   To evaluate this theory, Carl Seiden, Defendants' expert, analyzed the effect of a possible alternative disclosure by Teligent of the FDA's observations in the September 2016 Form 483 (the "alternative disclosure").[3]   *See* Expert Report of Carl Seiden, April 2, 2021, ¶ 22 attached as Exhibit D to Baumstein Dec.   Mr. Seiden found that a reasonable investor would not have considered the alternative disclosure of the allegedly omitted information regarding a single ANDA and Form 483 to have been relevant to the price of Teligent stock.   *Id.* ¶ 26.

---

[1] Although the Supreme Court has held that a plaintiff does not need to prove materiality at the class certification stage, *Amgen*, 568 U.S. at 478-82, and the Second Circuit has opined that "materiality [] is not an appropriate consideration at the class certification stage," *Goldman I*, 879 F.3d at 486, the Second Circuit also held—in the same opinion—that an inquiry into "[w]hether a misrepresentation was reflected in the market price at the time of the transaction—whether it had price impact—'is *Basic*'s fundamental premise. . . . It has everything to do with the issue of predominance at the class certification stage.'"   *Id.* (quoting *Halliburton II*, 573 U.S. at 283).   So, when evidence of lack of materiality is linked to the absence of price impact, that information is appropriate to consider at the class certification stage and is not precluded by *Amgen*.

[2] The Supreme Court granted certiorari to resolve the question as to whether a defendant in a class securities class action can rebut the *Basic* presumption of class-wide reliance by emphasizing the generic nature of the alleged misstatements when showing that the statements had no impact on the price of the stock, even though the evidence is also relevant to the substantive element of materiality.   No. 20-222, 2020 U.S. LEXIS 5993 (Dec. 11, 2020) (petition granted).   This matter is currently *sub judice* and its outcome may affect the disposition of the Motion here.

[3] Because the September 2016 Form 483 was the only Form 483 that Teligent received prior to the alleged misstatements, the alternative disclosure addressed by Mr. Seiden focused only on the observations listed in that Form 483.   The October 2017 Form 483 and inspection occurred after each of the alleged misstatements had been made.

Specifically, Mr. Seiden concluded, based upon his expert analysis, that investors and analysts would not have found the disclosure of the September 2016 Form 483 important to the performance of Teligent's stock since it was not a Warning Letter. Mr. Seiden found that reasonable investors and analysts have a baseline understanding of the various types of regulatory inspections applicable to a generic pharmaceutical company, such as Teligent. *Id.* ¶ 26(i). These sophisticated market participants comprehend the differing implications of a Form 483 and a Warning Letter. Since a Form 483 following an FDA inspection is routine and does not imply the rejection of an ANDA, investors would likely disregard such information. *See id.* ¶ 26; *id.* ¶ 43 (noting that from 2014-2016 the FDA's CDER completed and classified 7,978 inspections and issued 2,014 Form 483s); ¶¶ 41-42 (describing FDA's use of Form 483s); ¶ 45 (concluding that investors "do not generally focus" on 483s). Further, a Form 483 related to an ANDA for a single unnamed drug[4] would not have been significant to a reasonable investor as "ANDA approval rates were already known to be low." *Id.* ¶ 64. In contrast, investors "focus on significant actions such as Warning Letters, as these might affect a pharmaceutical company's future prospects." *Id.* ¶¶ 26(vi)(a), 45-46. But the September 2016 Form 483 *was not* a Warning Letter.[5] *See Rahn v. Genzyme Corp. (In re Genzyme Corp. Sec. Litig.)*, No. 09-11267-GAO, 2012 U.S. Dist. LEXIS 44336, at *29 (D. Mass. Mar. 30, 2012) ("Form 483 observations . . . are necessarily interim statements, subject to revision. They are meant to prod a company into taking corrective steps before more substantial agency action is necessary."); *see also* Seiden ¶¶ 41-49 (contrasting Form 483s with warning letters). Indeed, as Mr. Seiden points out, for at least the eight years prior to 2016, there were *no instances* whatsoever of an FDA Form 483 in connection with a BIMO

---

[4] It is common, according to Seiden, for pharmaceutical companies to not disclose a particular drug candidate's name, and therefore the hypothetical alternative disclosure did not specifically mention acyclovir. Seiden ¶ 65.

[5] The FDA never issued Teligent a Warning Letter relating to the inspection in September 2016. Seiden ¶ 62.

bioequivalence inspection, such as the one at issue in this matter, leading to a warning letter. Seiden ¶ 49. If Teligent had disclosed the September 2016 Form 483 from the FDA BIMO bioequivalence inspection, this would not have altered a reasonable investor's assessment of Teligent.

Further, any such disclosure of the September 2016 Form 483 would not have indicated to investors that Teligent was suffering from "systemic" regulatory compliance failures. Mr. Seiden concluded that the alternative disclosure would not have foreshadowed the broader cGMP concerns that were identified in the October 2017 Form 483 following the cGMP inspection because "cGMP inspections are fundamentally different from BIMO BE studies inspections." Seiden ¶¶ 26(vii), 68-71. Receipt of a Form 483 following a BIMO inspection (such as the September 2016 inspection), does not imply that a pharmaceutical company was not cGMP compliant. *Id.* ¶ 69. There is no relation between the two types of investigations, and a reasonable investor would understand that. *Id.* ¶¶ 26(vii), 35-38. Moreover, Teligent, in fact, was cGMP-compliant for the entirety of the Class Period despite the September 2016 Form 483 *and* the observations in the October 2017 Form 483. *Id.* ¶¶ 26(i)(b), 69(i). "In short, a reasonable investor would not have viewed the alternative disclosure about the September 2016 Form 483 as foreshadowing any of the observations listed in the October 2017 Form 483." *Id.* ¶ 71.

### B. Defendants Have Demonstrated That The Alleged Misstatements Did Not Have Any Back-End Price Impact

Plaintiff alleges, but does not show, that price impact exists based on a stock drop at the end of the class period. SAC ¶¶ 159-165. But Defendants' expert, Dr. Chakraborty, has demonstrated that the cause of Teligent's stock price drop in November 2017 does not relate to the September 2016 Form 483. *See* Chakraborty ¶¶ 16-19. And Plaintiff's only "evidence"—the Coffman Report—does not even attempt to show price impact for the alleged misstatements.

19

Plaintiff alleges five potentially actionable misstatements and one corrective disclosure in support of its claims, but offers no evidence in support of any link between an alleged misstatement and a price impact on Teligent's stock. The various purported misstatements are based upon the failure to disclose the FDA's findings in the September 2016 Form 483, which Plaintiff alleges artificially inflated Teligent's stock price until the "truth emerge[d]" on November 6, 2017 when Teligent announced its earnings results for Q3 2017 and disclosed for the first time the Company's "pipeline delays," "manufacturing problems", and their impact on Teligent's performance and revenue guidance. SAC ¶¶ 132, 159, 163. The following day Teligent's stock price dropped 43.62%. *Id.* ¶ 144. Plaintiff infers a price impact based upon the drop in Teligent's stock price that occurred on the alleged corrective disclosure date. SAC ¶¶ 159-165. Plaintiff, however, fails to link the stock price decline after the November 6, 2017 disclosures to the alleged omissions earlier in the class period as required. *See e.g. Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*, 597 F.3d 330, 336 (5th Cir. 2010) (explaining that unless stock price declined "because of the correction to a prior misleading statement . . . , there would be no inference raised that the original, allegedly false statement caused an inflation in the price to begin with"), *vacated on other grounds*, 563 U.S. 804 (2011); *Goldman II*, 955 F.3d at 278-79 (Sullivan, J., dissenting) (back-end price movement cannot provide evidence of price impact if the corrective disclosure does not reveal the "falsity of the alleged misstatements").

But Dr. Chakraborty found no evidence showing that the stock price decline following the November 6, 2017 disclosure was attributable or related to the September 2016 Form 483. Chakraborty ¶¶ 44-47. Rather, Dr. Chakraborty found that the stock price drop was attributable to other events in the market. *Id.* ¶¶ 17, 23-43. Dr. Chakraborty's findings therefore sever any alleged link between the stock price decline and the alleged misrepresentations.

*First*, the information Teligent revealed on November 6, 2017 did not mention, or relate in any way, to acyclovir, the product that was the subject of the September 2016 BIMO inspection and Form 483. Defendants' public statements had revealed that the Company's reduced revenues were attributed to increased competition for Teligent's core products and "manufacturing challenges" related to a "high-volume product." *Id.* at ¶¶ 27-37. The acyclovir product was not an available product as of November 2017, and therefore could not have contributed to the market competition Teligent was facing at the time, or have been the cause of the manufacturing challenges. *Id.* *Second*, though Plaintiff assumed that the "manufacturing challenges" referred to the cGMP inspection in October 2017 and subsequent Form 483, the broader cGMP issues raised by the FDA in that Form 483 were not related to, or even previewed by, the September 2016 Form 483. Seiden ¶¶ 68-71. *Third*, the disclosed "pipeline delays" related to inspections at Teligent's suppliers, and not the acyclovir BIMO inspection that occurred at Teligent's facility. Chakraborty ¶¶ 38-43 ("[F]or the pipeline delays to be related to the alleged misstatements, one of the four ANDAs that was delayed into 2018 would need to be acyclovir, and the reason for the delay would need to be related to the September 2016 Form 483."). The drop in Teligent's stock price thus cannot be attributed to Defendants' alleged concealment of the September 2016 Form 483 from the investors.

## C.    Plaintiffs Have Not And Cannot Make Any Showing Of Price Impact

Plaintiff fails to make *any* showing that any of the alleged misstatements impacted the price of Teligent's stock. Plaintiff's expert offered no opinion on the price impact of the alleged misrepresentations, and specifically testified that the Form 483s were not relevant to his analysis or conclusions. *See* Coffman Tr. 83:22-84:5. When asked to review the various alleged misstatements, Coffman testified either that he had never seen the document containing the alleged misstatement before or that he had not analyzed or evaluated the relevant document. *Id.* 91:17-

21

103:1.  Without analyzing the specific misstatements in the case, Coffman nonetheless concluded without basis that his event study "demonstrate[d] a clear cause-and-effect relationship between new material news and changes in the market price of Teligent Common Stock" during the Class Period.  Coffman ¶ 65.    Coffman, however, testified repeatedly that he was "not opining or analyzing on whether or not the misstatements or corrective information moved the market in any particular way based on my event study" and that his report did not analyze the price impact of any of the alleged misstatements or corrective information.  Coffman Tr. 107:25-108:9; 109:2-6.  Coffman's report states that "the market finally learned of Teligent's pipeline disruption caused by ANDA delays" through a "corrective disclosure," but Coffman testified that he did "not carefully study or identif[y] what information may or may not have been corrective."  Coffman ¶ 14; Coffman Tr. 132:25-133:10, 133:11-134:3.

Plaintiff similarly only discusses price impact in general terms and states in conclusory fashion that the commonality requirement is met because "the impact of Defendants' alleged misrepresentations and omissions on the [stock] price were common."  Mot. at 8 (quoting *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 44 (S.D.N.Y. 2012)).  Plaintiff argues further that there is a "cause-and-effect relationship between [Defendants'] disclosures and movements in its stock price" as evidenced by Coffman's event study.  Mot. at 16.  But the event study did not "analyze the price impact of any of the alleged misstatements or corrective information."  Coffman Tr. 108:5-9.  Although Coffman analyzed whether the stock price reacted to certain new information, he did not test whether certain statements made by Defendants caused that price movement.  Coffman Tr. 145:16-146:5 (testifying that his event study solely evaluated whether the market for Teligent stock was efficient).  Plaintiff has introduced no evidence that the price of Teligent stock was impacted by the alleged misstatements—and, as demonstrated by the expert reports of Dr.

22

Chakraborty and Mr. Seiden, cannot proffer any such evidence.  The absence of price impact is fatal to class certification.  *See Halliburton II*, 573 U.S. at 279 (price impact must be attributable to "the particular misrepresentation at issue").

## CONCLUSION

For all the foregoing reasons, Defendants respectfully request that this Court deny Plaintiff's Motion.

Date:  April 2, 2021

MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY and POPEO, P.C.


*s/ Douglas P. Baumstein*
Douglas P. Baumstein
Jacob H. Hupart
Chrysler Center
666 Third Avenue
New York, NY 10017
(212) 692-6203
DBaumstein@mintz.com
JHHupart@mintz.com

*Counsel for Teligent, Inc. and*
*Jason Grenfell-Gardner*

23

## <u>CERTIFICATE OF SERVICE</u>

I, Douglas P. Baumstein, hereby certify that on April 2, 2021, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF System, which will automatically provide notice to all counsel of record.

*s/ Douglas P. Baumstein*
Douglas P. Baumstein

24