## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OKLAHOMA POLICE PENSION FUND AND RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | Case No. 1:19-cv-03354-VM |
| v. | |
| TELIGENT, INC. and JASON GRENFELL-GARDNER, | |
| Defendants. | |

**DECLARATION OF MAX R. SCHWARTZ IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION AND LEAD COUNSEL'S MOTION FOR AWARD OF ATTORNEYS' FEES, PAYMENT OF LITIGATION EXPENSES, AND REIMBURSEMENT OF PLAINTIFF'S COSTS AND EXPENSES**

I, Max R. Schwartz, declare as follows pursuant to 28 U.S.C. §1746:

1.     I am a partner at Scott+Scott Attorneys at Law LLP ("Scott+Scott" or "Lead Counsel"), Court-appointed Lead Counsel for Lead Plaintiff Oklahoma Police Pension and Retirement System ("Lead Plaintiff" or "Oklahoma Police") in the above-captioned securities class action (the "Action").[1]  I am familiar with the proceedings in this Action and have personal knowledge of the matters set forth herein based upon my firm's active participation in this Action. If called as a witness, I could and would testify competently thereto.

2.     I submit this declaration in support of: (1) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation ("Final Approval Memo"); and (2) Motion for Award of Attorneys' Fees, Payment of Litigation Expenses, and Reimbursement of Costs and Expenses ("Fee and Expense Memo").  I have personal knowledge of the matters set forth herein based on my extensive participation in the prosecution and settlement of the claims

---

[1]     All capitalized terms not otherwise defined herein have the same meaning as those set forth in the Stipulation and Agreement of Settlement and Release (the "Stipulation"), dated July 14, 2021 (ECF No. 82-1).  Citations to "Ex." herein refer to exhibits attached to this declaration.

asserted in the Action.  If called upon by the Court, I could and would competently testify that the following facts are true and correct.

## I.    PRELIMINARY STATEMENT

3.    After over two years of hard-fought litigation, Lead Plaintiff and Lead Counsel have succeeded in obtaining a significant recovery for the Class of $6,000,000.

4.    The accompanying Final Approval Memo and Fee and Expense Memo come after the Court preliminarily approved the settlement and ordered notice thereof to the Class.  As set forth in those Motions, the Court-ordered notice program has been completed, informing Class Members of the proposed settlement, as well as its terms, their rights and options in light of the settlement, and key dates for the effectuation of those rights.

5.    Lead Plaintiff and Lead Counsel respectfully submit that the settlement is an excellent result.  As explained herein, and in the accompanying Final Approval Memo, a recovery of $6,000,000 represents 15% of Lead Plaintiff's estimated maximum class-wide damages, and an even higher percentage, approximately 20%, of Defendants' corresponding estimate, exceeding most securities class action settlements.  *See* Janeen McIntosh & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2020 Full-Year Review*, NERA ECONOMIC CONSULTING, Jan. 25, 2021, https://www.nera.com/content/dam/nera/publications/2021/PUB_2020_Full-Year_ Trends_ 012221.pdf, at 19 (in securities class actions involving total investor losses of . . . $20 million to $50 million, the median recovery in settlements from 2012 to 2020 was . . . 5.2% of estimated losses).  Therefore, the Settlement compares very favorably to settlements in other securities class action cases.

6.    Further, this significant recovery was achieved notwithstanding the absence of events that often accompany similarly successful securities class action settlements, such as restatements of financial results or criminal indictments of defendants.

7.    By the time the Settlement was reached, document discovery was substantially complete, Defendants had deposed Lead Plaintiff's representative and class certification expert,

Lead Plaintiff had filed its opening brief in support of class certification, and the parties had engaged in two mediation sessions, along with substantial follow-up. Thus, Lead Plaintiff and Lead Counsel had a clear understanding of the strengths and weaknesses of the claims when evaluating the Settlement.

8.     Also militating in favor of the Settlement is the fact that it was accomplished through extensive arm's-length settlement discussions facilitated by an experienced mediator, Robert A. Meyer, Esq. ("the Mediator").

9.     Lead Plaintiff supports the Settlement, as set forth in the attached Declaration of Ginger Sigler on Behalf of Oklahoma Police Pension and Retirement System ("Oklahoma Police Decl.").

10.     For all of the reasons set forth herein, and in light of the excellent result obtained, notwithstanding the significant risks of the litigation detailed below, Lead Plaintiff and Lead Counsel respectfully submit that the proposed Settlement is fair, reasonable, and adequate in all respects and that the Court should enter final approval of same.

11.     In addition to seeking final approval of the Settlement, Lead Plaintiff also seeks approval of the proposed Plan of Allocation, which is similar to allocation plans that courts have approved in other securities class actions. The Plan of Allocation was developed by Lead Plaintiff's damages expert. It allocates the proceeds of the Settlement – net of any Court-approved fees and expenses, and the of administration costs – in a *pro rata* fashion among the Settlement Class and provides for the equitable distribution of the Net Settlement Fund to Class Members who submit valid Claim Forms. Accordingly, it is fair and reasonable, and merits approval.

12.     Finally, Lead Counsel respectfully submits that the requested fee of 33 and 1/3% of the Settlement Fund, plus accrued interest, for its work in this case is fair and reasonable and merits approval as well. This fee request is at the benchmark that Courts this and other Circuits approve. It is also consistent with awards in similar securities class actions, particularly given the significant result achieved here, as well as the nature and extent of the work Lead Counsel performed here. Moreover, this award is below the lodestar value of Lead Counsel's time

dedicated to the case. Lead Counsel also seeks payment of its litigation expenses totaling $166,028.45, for costs necessary to prosecute the Action, including experts, legal research, electronic discovery support, and filing fees. Lead Plaintiff supports these requests. In addition, Lead Plaintiff requests $6,857 in reimbursement for its time and expenses incurred representing and serving the interests of the Settlement Class, an amount within the range typically granted to plaintiffs in similar class actions.

## II.    HISTORY OF THE ACTION AND SUMMARY OF THE WORK PERFORMED BY LEAD COUNSEL

### A.    Summary of the Allegations

13.    Teligent is a pharmaceutical company that produces generic ointments and lotions. *See* Second Amended Class Action Complaint ("SAC"), ¶¶1, 23. Its principal place of business, including its primary research, development, and production facility, is located in Buena, New Jersey. *Id.*, ¶19. Teligent's success depends on its ability to commercialize a large number of low-margin products and by striving to be one of the first generic manufacturers in a market before competitors offer similar or equivalent products, which necessarily bring prices down. *Id.*, ¶23. This strategy was overseen by Defendant Grenfell-Gardner, who was Teligent's chief executive officer ("CEO") at all relevant times. *Id.*, ¶¶20, 24. Defendants' efforts in pursuing this strategy gave rise to the issues in this Action.

14.    To obtain approval from the U.S. Food and Drug Administration ("FDA") to manufacture and sell its products, Defendants need to demonstrate that those products are safe and comply with applicable regulations. *Id.*, ¶25. This rigorous process culminates in the submission of an Abbreviated New Drug Application ("ANDA"), which the FDA must approve. *Id.* As Defendant Grenfell-Gardner noted shortly before the class period, ANDA approval was "the key to Teligent's growth." *Id.*, ¶31.

15.    Lead Plaintiff alleges that Defendants cut regulatory corners in their efforts to dramatically increase the number of ANDA submissions they complete, resulting in heightened FDA scrutiny, and a slowdown in their pipeline of new ANDA approvals and products. Just

months before the class period began, in September 2016, the FDA visited Teligent's Buena, New Jersey facility and made a series of "483 observations," which signify that the FDA identified "clear, specific and significant" conditions that may constitute regulatory violations and that are conveyed to the "company's senior management" so that "there is a full understanding of what the observations are[.]" *Id.*, ¶46.

16.     These 483 observations, along with the accompanying Establishment Inspection Report and follow-up correspondence between the FDA and Defendants, specifically found that Teligent's laboratory operations, where the studies that supported its ANDAs occurred, lacked basic required controls, known as standard operating procedures or "SOPs" (*e.g.*, Teligent's "SOP program is not adequate and current to ensure quality in analytical operations") and found inadequacies in Teligent's quality control operations and the tests it ran for ANDA applications. *Id.*, ¶¶49-51.   Lead Plaintiff alleges that Defendants had never installed the infrastructure, procedures, or personnel necessary to actually win approval of the Company's target of 10-plus ANDA submissions per year.  *Id.*, ¶32.

17.     The FDA would ultimately issue two more sets of 483 observations after inspections of Teligent's Buena, New Jersey facility in October 2017 and May 2019.  *Id.*, ¶¶59, 74.  Lead Plaintiff alleges that these findings showed Defendants' continued failure to address Teligent's regulatory shortcomings identified in the September 2016 FDA correspondence.  *Id.*, ¶2.

18.     Further, Lead Plaintiff alleges that during the Class Period, Defendants made false and misleading statements, with scienter, denying that these 483 observations had occurred.  *Id.*, ¶118.  However, Lead Plaintiff alleges that, as Teligent was forced to divert resources to respond to the FDA's findings, the Company's ANDA submissions fell substantially during and after the Class Period.  *Id.*, ¶¶5-6, 90.  When Defendants disclosed Teligent's poor performance and the materialization of this risk at the end of the Class Period, Lead Plaintiff alleges that Teligent's stock price fell substantially, damaging Lead Plaintiff and the Class.  *Id.*, ¶¶132-35, 144.

19.     The preliminarily approved Class consists of all Persons who purchased or otherwise acquired Teligent publicly traded common stock between March 7, 2017 in the aftermarket and November 6, 2017 at the close of regular trading, both dates inclusive, and who were damaged thereby.  As set forth in the Stipulation, excluded from the Class are Defendants and the officers and directors of Teligent, and their immediate family members, legal representatives, heirs, successors, assigns, and any entity in which they have a controlling interest. Stipulation, ¶¶3.d., 3.l.  Also excluded will be any person who validly requests exclusion from the Class.  *Id.*, ¶3.e.

20.     Defendants have denied, and continue to deny, all of Lead Plaintiff's allegations, and any liability therefrom.

**B.     Procedural History of the Action**

**1.     Lead Plaintiff Investigated the Claims, Prepared the Complaints and Successfully Contested Defendants' Letter Motions to Dismiss**

21.     On April 15, 2019, Mo-Kan Iron Workers Pension Fund filed the initial complaint in the Action in the United States District Court for the Southern District of New York (the "Court").  ECF No. 1.  Following an application to serve as Lead Plaintiff, on July 1, 2019, the Court appointed Oklahoma Police to that role, and appointed Scott+Scott Attorneys at Law LLP ("Scott+Scott") as Lead Counsel.  ECF No. 27.

22.     Lead Plaintiff and Lead Counsel undertook an extensive investigation before filing the operative complaint, and a previous complaint.  Among other things, this included:

(a)     filing multiple Freedom of Information Act ("FOIA") requests with the FDA and communicating with the FDA regarding the requests;

(b)     hiring as a consultant a pharmaceutical expert to assess the FDA's 483 observations, and their impact on Teligent's ability to obtain FDA approval of its products;

(c)     collecting and thoroughly reviewing Teligent's filings made with the SEC;

(d)   collecting and thoroughly reviewing analyst reports and news stories reports regarding Teligent;

(e)   searching for and reviewing applicable federal FDA regulations;

(f)   collecting and thoroughly reviewing transcripts of press conferences, analyst conference calls, and industry conferences regarding Teligent; and

(g)   identifying, locating, and contacting former Teligent employees who may have relevant information.

23.   On September 13, 2019, Oklahoma Police filed an Amended Class Action Complaint ("FAC") alleging violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") against Defendants Teligent and Grenfell-Gardner.  ECF No. 32.

24.   Consistent with the Court's Individual Practices, after Lead Plaintiff filed the FAC, Defendants sent Lead Plaintiff a letter on October 25, 2019, informing Lead Plaintiff that Defendants sought to request permission to move to dismiss the FAC for a number of reasons, including: (1) a lack of particularity, (2) failure to plead actionable misstatements or omissions, (3) protection under the PSLRA's safe harbor for forward-looking statements, (4) a lack of scienter, and (5) a lack of loss causation.  Lead Plaintiff responded by letter on November 5, 2019, asserting that while the FAC did state actionable claims for each statement challenged therein, Lead Plaintiff would seek leave to amend the complaint to ensure that the record is clear on the points Defendants appeared intent on raising in their motion to dismiss.  On November 12, 2019, the Court granted Lead Plaintiff permission to amend the complaint.  ECF No. 38.

25.   Thereafter, on December 9, 2019, Lead Plaintiff filed the SAC.  ECF No. 39.

26.   Following the filing of the SAC, on January 15, 2020, Defendants sent Lead Plaintiff another letter, this time stating that the SAC does not remedy the alleged defects Defendants identified in their October 25, 2019 letter, adding that (1) the challenged statements are accurate statements of fact, inactionable puffery, or opinions, and (2) the SAC mischaracterizes the correspondence Defendants received from the Food and Drug Administration ("FDA").  On

January 22, 2020, Lead Plaintiff responded to Defendants' second letter, again asserting that the SAC stated actionable claims, and Defendants replied thereto on January 28, 2020.

27.     On June 17, 2020, the Court issued an Order converting Defendants' pre-motion letters requesting permission to dismiss the SAC into a "Letter Motion" and denied in part and granted in part that motion.  ECF No. 46.

28.     On August 17, 2020, Defendants filed an answer to the SAC, denying the SAC's material allegations and asserting defenses thereto.  ECF No. 51.

### 2.    Lead Plaintiff Successfully Advanced Discovery

29.     On August 25, 2020, the Court signed the parties' stipulated Protective Order and their stipulated Electronically Stored Information Protocol Order.  ECF Nos. 54, 55.  Concurrently, the parties exchanged requests for production ("RFPs") and began negotiating appropriate search terms and related criteria.  These negotiations were extensive, including several iterated proposals, and took approximately four months.

30.     Following several rounds of rolling productions, by the end of April 2021, Defendants had produced 14,719 documents.  Upon receipt of the first production, Lead Plaintiff assembled a team to assist in the review of Defendants' documents, and by the time of the Settlement, had searched through, and reviewed almost the entirety of Defendants' production to date.

31.     Similarly, by the beginning of March 2021, Lead Plaintiff, through multiple rounds of rolling productions, produced 815 documents and completed its response to Defendants' requests.

32.     Additionally, Defendants subpoenaed Lead Plaintiff's relevant asset manager, who produced 176 documents across two rounds of production concluding at the end of February 2021. Defendants also subpoenaed Lead Plaintiff's class certification expert, Chad Coffman, CFA ("Coffman"), who made a single production of 215 documents in November 2020.

33.     Likewise, Lead Plaintiff subpoenaed Defendants' class certification experts, who made a single production of nine documents in April 2021.

34.     Further, Defendants deposed Lead Plaintiff's executive director and representative, Ginger Sigler, on March 4, 2021.  They also deposed Lead Plaintiff's class certification expert, Coffman, on March 11, 2021.  Lead Counsel defended both depositions.

35.     The documents and depositions discussed above provided Lead Plaintiff and Lead Counsel with a strong foundation from which to assess the risks and strengths of the claims.

### 3.     Lead Plaintiff's Contested Motion for Class Certification

36.     On September 30, 2020, Lead Plaintiff filed a motion for class certification, arguing that the standard under Fed. R. Civ. P. 23 was satisfied.  ECF No. 56.

37.     On April 2, 2021, Defendants filed an opposition memorandum,  arguing, among other things, that: (1) Lead Plaintiff is not an adequate class representative due to individualized knowledge issues, (2) damages cannot be calculated on a class-wide basis, in particular on account of Lead Plaintiff's damages model; and (3) that Defendants rebutted the *Basic Inc. v. Levinson* fraud-on-the-market presumption of reliance by demonstrating that the price of Teligent stock was not impacted by the alleged misstatements.  ECF No. 73.

38.     Defendants' opposition to that motion provided Lead Plaintiff an additional basis from which to assess the risks and strengths of the Action.  The parties agreed to a settlement-in-principal before Lead Plaintiff filed its reply memorandum in support of class certification.

### 4.     Lead Plaintiff Participated in Multiple Mediations, Culminating in the Settlement

39.     Shortly after the Court's decision on Defendants' motion to dismiss, the parties agreed to retain Robert A. Meyer, Esq., of JAMS, a mediator with extensive experience in complex litigation, including securities class actions.

40.     In advance of the first mediation, the parties exchanged detailed mediation statements (and exhibits thereto) highlighting the factual and legal issues in dispute and held a pre-mediation conference call with the Mediator.  In connection with the mediation, Lead Plaintiff also consulted extensively with Mr. Coffman of Global Economics Group regarding damages.

41.     On October 2, 2020, the parties attended a full-day mediation via Zoom.  Despite negotiating in good faith, the parties were unable to reach an accord at that session.

42.     In the months thereafter, the Mediator continued to work with the parties, and the parties continued to prepare and exchange information, while they simultaneously litigated the Action, as described above.

43.     On April 5, 2021, the parties engaged in another mediation session with Meyer, a half-day session via Zoom.  Again, the parties did not reach an agreement.  However, the parties narrowed the outstanding issues and several weeks later, on May 5, 2021, agreed to settle the Action in-principle for $6,000,000.

44.     The $6,000,000 cash Settlement, discussed in further detail below, is a product of vigorous, arm's-length negotiations by the parties spanning six months and numerous discussions with the Mediator.  Throughout the negotiations, Lead Plaintiff and Lead Counsel were fully prepared to, and indeed did, continue litigating rather than accept a settlement that was not in the best interests of the Class.

> **5.     Lead Plaintiff Finalized the Stipulation, Sought Approval of the Settlement, Provided Notice of the Settlement, and if Approved, Will Oversee the Administration of the Settlement**

45.     Following their agreement to settle-in-principal, the parties negotiated formal settlement documentation, including the Stipulation, Class and Summary Notices, Proof of Claim and Release form ("Proof of Claim"), and proposed orders, which were filed with the Court in connection with Lead Plaintiff's Motion for Preliminary Approval of Settlement on July 15, 2021. ECF Nos. 80-82.

46.     Pursuant to the Court's July 20, 2021 Order granting preliminary approval and appointing Kroll Settlement Administration ("Kroll") as the Claims Administrator, the Claims Administrator, under Lead Counsel's supervision, carried out the approved notice program.  As further detailed in the accompanying Declaration of Justin R. Hughes Regarding Notice Dissemination, Publication, and Requests for Exclusion Received to Date ("Hughes Decl."), on

behalf of Kroll, this included: mailing the Notice and Claim Form to potential Class Members and their nominees identified through records, publishing the Summary Notice in *The Wall Street Journal* and transmitting it over *Business Wire*, and establishing a website for Class Members regarding the Settlement along with a toll-free number for Class Members to contact the Claims Administrator with any inquiries.

47.     Finally, Lead Counsel has prepared and coordinated all the filings in support of the pending Final Approval Memo and will continue to oversee the Settlement should that Motion be approved.

### 6.     Summary

48.     As described above, it is respectfully submitted that Lead Plaintiff and Lead Counsel aggressively and diligently prosecuted the Action, through successful motions and fulsome discovery, until achieving a significant Settlement for the Class.

## III.    THE SETTLEMENT IS FAIR AND REASONABLE, AND MERITS FINAL APPROVAL

### A.    The Settlement Provides an Excellent Recovery

49.     By thoroughly undertaking discovery and prosecuting this Action, Lead Plaintiff and Lead Counsel have achieved a substantial settlement.  The $6 million Settlement is a substantial recovery and represents approximately 15% of Lead Plaintiff's estimated maximum class-wide damages, and an even higher percentage, approximately 20%, of Defendants' corresponding estimate, a larger recovery as a percentage of damages than in most securities cases – where total losses are between $20 million and $50 million, the median recovery is 5.2% of estimated losses.  *See* McIntosh & Starykh, *Recent Trends in Securities Class Action Litigation: 2020 Full-Year Review*, NERA ECONOMIC CONSULTING, at 19 (Jan. 25, 2021).

50.     The result is also notable when viewed in light of the substantial risks that this Action and continued litigation entail (discussed below), which absent the Settlement could readily result in a smaller recovery or no recovery at all.

**B.      Summary of Litigation Risks Face by Lead Plaintiff and the Class**

51.      While Lead Plaintiff and Lead Counsel believe that the claims against Defendants have substantial merit, they also recognize that there are considerable risks involved in pursuing the claims through the completion of class certification, summary judgment, trial, and appeal.

52.      All elements of liability were vigorously disputed by Defendants.  As noted in the Court's Opinion granting in part and denying in part Defendants' motion to dismiss, "[i]n resolving a Rule 12(b)(6) motion, the Court's task is 'merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof."  2020 WL 3268531, at *8 (S.D.N.Y. June 17, 2020).  The stages in which the Court and finders of fact would test the legal sufficiency of and resolve the factual disputes in the case – summary judgment and later trial – presented Lead Plaintiff with serious risks that weighed in favor of settlement.

**1.      Risks of Proving Liability**

53.      As discussed in ¶¶24, 26, *supra*, Defendants vigorously disputed whether any of the alleged misstatements and omissions were material or even misleading.

54.      Throughout litigation, Defendants consistently and vigorously asserted that the challenged statements are accurate statements of fact, inactionable puffery or opinions, and that the SAC mischaracterizes the FDA's 483 observations and related correspondence, particularly with regard to sophisticated investors who understand the different types of FDA investigations. Defendants also argued that a number of cases have held that a company's failure to disclose 483 observations is not sufficient grounds to support a securities fraud claim.

55.      For similar reasons, Defendants maintained that the SAC failed to allege that the challenged statements were made with scienter.  Instead, Defendants adamantly asserted that they believed their statements were truthful when made.

56.      While Lead Plaintiff has substantial responses to Defendants' arguments, a successful outcome was not guaranteed, and the uncertainty of establishing false and untrue statements, along with scienter, weighs strongly in favor of approving the Settlement.

**2.      Risks Related to Reliance, Loss Causation, and Damages**

57.      Even if Lead Plaintiff were able to establish liability and scienter, there is also the risk that it would not prevail on the important issues of reliance, loss causation, and damages. Throughout the litigation, including at the class certification stage, Defendants asserted that they had defeated the fraud-on-the-market presumption of reliance by severing the link between the alleged misrepresentation and the price paid for Teligent common stock and showing that the misrepresentation did not lead to a distorted price.  ECF No. 73.  Next, Defendants asserted that the SAC's alleged corrective disclosures in November 2017 neither "corrected" any prior misstatement nor "revealed" any concealed information.  ECF No. 40.  Further, Defendants aggressively asserted that the damages analysis developed by Lead Plaintiff's expert, Coffman, is inappropriate on the grounds that (1) he had used a similar analysis in other securities cases and (2) the model provides only a vague description of the potential methods to quantify the artificial inflation caused by the alleged misstatements.  ECF No. 73.  On these bases, Defendants asserted that damages cannot be calculated using the "out-of-pocket method" Coffman utilized.  *Id.*

58.      Throughout litigation, Lead Plaintiff believed that it had strong responses to these arguments, including that the presumption of reliance applied, the SAC properly alleges loss causation due to both corrective disclosures and materialization of concealed risks, and that the damages methodology outlined by Mr. Coffman was standard at the class-certification stage. However, had Defendants prevailed on any of these arguments it would have dramatically reduced or eliminated recoverable damages.  This uncertainty also militates strongly in favor of approving the Settlement.

**3.      Risks at Class Certification**

59.      In opposing Lead Plaintiff's motion for class certification, Defendants argued, *inter alia*, that (1) Lead Plaintiff is not an adequate class representative due to individualized knowledge issues, (2) damages cannot be calculated on a class-wide basis, in particular, on account of the damages methodology submitted by Lead Plaintiff's class certification expert; and (3) that

Defendants rebutted the *Basic Inc. v. Levinson* fraud-on-the-market presumption of reliance by demonstrating that the price of Teligent's stock was not impacted by the alleged misstatements.

60.     The parties notified the Court that they had reached a "settlement in principle" before Lead Plaintiff filed its reply brief in support of class certification.

61.     Although Lead Plaintiff believed that its motion would have been granted in full, there nevertheless was a risk that the Court would deny or limit class certification based on Defendants' arguments in opposition.

### 4.     Appellate Risks

62.     Finally, even if Lead Plaintiff and the Class overcame all of the foregoing risks before this Court and at trial, if the parties' litigation experience in this hard-fought case is any guide, it is extremely likely that Defendants would then file post-verdict motions, followed by further appeals on all of these issues.  This not only increases the overall litigation risk, but also highlights the extent to which, absent a Settlement, litigating this case to finality would have required the Class to wait additional years and undertake additional expense before being able to collect any recovery.  By comparison, the Settlement represents an excellent recovery, as well as a certain and immediate one.

### 5.     Summary

63.     Having considered the various risks of continued litigation and the factors discussed above, it is the considered and informed judgment of Lead Plaintiff and Lead Counsel, based upon experience in similar matters and the extensive proceedings here, that the proposed Settlement is very favorable, in the best interests of the Class, and fair and reasonable.

## IV.     THE PLAN OF ALLOCATION IS CUSTOMARY, FAIR, AND REASONABLE

64.     To receive a distribution from the Settlement Fund, Class Members will be required to submit a Proof of Claim form.  The Proof of Claim form was mailed with the Notice and is also

available on the Settlement website.[2] Claimants will have the option of completing the form online and uploading supporting documentation, or mailing them to the Claims Administrator. Kroll will review the claim forms and supporting documentation submitted, provide an opportunity to cure any deficiencies, and mail or wire Authorized Claimants their *pro rata* share of the Net Settlement Fund in accordance with the proposed Plan of Allocation.

65.     The proposed Plan of Allocation was developed by Lead Plaintiff's damages consultant, Coffman, and is similar to the plans approved in other securities fraud cases. The recovery of individual Class Members under the Plan of Allocation will be applied in the same manner to all Class Members. That common application will depend on several factors, including: the aggregate value of the Recognized Claims from valid Proofs of Claim submitted by Class Members; when a given Class Member's Teligent shares were purchased or acquired and the price at the time of purchase; and whether a given Class Member's shares were sold, and if so, when they were sold and for how much. Thus, the Plan of Allocation is fair and equitable.

66.     After deducting any attorneys' fees and expenses approved by the Court, notice and administration costs, and any taxes, the Net Settlement Fund will be distributed to authorized Claimants (Class Members who submit timely and valid Proof of Claims) on a *pro rata* basis in accordance with the Plan of Allocation. If there is sufficient money left in the Net Settlement Fund from unclaimed payments after the initial distribution, Kroll will make successive distributions under the same methodology as long as it is economically feasible to do so. Any balance that still remains in the Net Settlement Fund after such distributions, which is not feasible or economical to reallocate, will be contributed to Legal Services NYC, or any other such non-profit organization as the Court may designate. (Neither Lead Plaintiff nor Lead Counsel has any relationship to Legal Services NYC).

---

[2]     Notice by U.S. mail and publication plainly satisfies Fed. R. Civ. P. 23(c)(2)'s requirement that class members receive '"the best notice practicable under the circumstances."' *Peters v. Nat'l R.R. Passenger Corp.*, 966 F.2d 1483, 1486 (D.C. Cir. 1992).

67.     To date, there have been no objections filed to the Plan of Allocation, and Lead Plaintiff and Lead Counsel respectfully submit that the Plan of Allocation is fair and reasonable and should be approved.

## V.     LEAD COUNSEL'S FEE APPLICATION IS REASONABLE

68.     Lead Counsel respectfully requests an attorneys' fee award of 33 and 1/3% of the Settlement, and the accrued interest thereon.  The request is consistent with the noticed amount, the excellent result achieved, the complex and extensive work performed, and is fully supported by Plaintiff, who is a sophisticated institutional investor.  As further detailed in the accompanying Fee and Expense Memo, an award of 33 and 1/3% of the Settlement amount is commonly granted by New York federals courts, and other courts throughout the country, in similar securities cases.

69.     As further detailed in the accompanying Fee and Expense Memo, the fee request satisfies all of the factors that courts commonly consider when assessing such requests.

### A.     The Result Obtained

70.     The result achieved is an important factor to be considered in making a fee award. Here, the Settlement Amount of $6,000,000 is a significant recovery, which was obtained owing to the efforts of Lead Counsel and Lead Plaintiff.  As detailed above (*supra*, ¶5) and in the Final Approval Memo (at 2), this represents 15% of Plaintiff's estimated maximum class-wide damages, and an even higher percentage, approximately 20%, of Defendants' corresponding estimate, which exceeds many similar securities class action settlements, an excellent recovery for the Class.

71.     The significance of the Settlement is also demonstrated by the numerous obstacles that Lead Counsel overcame in order to achieve it, including Defendants' attempts to dismiss the case, the complexity of the claims, and the considerable risks and costs that that the litigation already entailed.  *See supra*, §III.B; Final Approval Memo at §II.C.

### B.     Time, Labor, and Fee Percentage Requested

72.     Over the course of over two years, Lead Counsel's vigorous prosecution of this Action, which resulted in the excellent Settlement for the Class, included such numerous tasks as:

(a)     filing multiple Freedom of Information Act ("FOIA") requests with the FDA and communicating with the FDA regarding the requests;

(b)     reviewing and analyzing the representations made by Defendants in SEC filings, healthcare presentations, on conference calls, and in press releases before, during, and after the Class Period regarding the Company's compliance with federal FDA regulations;

(c)     reviewing and analyzing securities analyst reports and comprehensive news reports, press releases, and other media files concerning Teligent;

(d)     consulting with an FDA expert regarding the FDA's 483 observations and the impact they had on Teligent's ability to obtain FDA approval of its products;

(e)     reviewing, analyzing, researching, and filing two detailed amended complaints;

(f)     drafting responses to Defendants' two rounds of letters seeking dismissal of the Action, and prevailing in large part on Defendants' motion to dismiss;

(g)     issuing document requests to Defendants, undertaking extensive meet and confers with the Defendants to ensure that they undertook a satisfactory search and production of documents, and issuing subpoenas to Defendants' class certification experts;

(h)     reviewing almost 15,000 internal documents produced by Defendants, Defendants' class certification experts, and a third party in discovery;

(i)     responding to the requests for production and interrogatories that Defendants served on Lead Plaintiff, and reviewing and producing documents on behalf of Lead Plaintiff;

(j)     briefing Lead Plaintiff's opening motion for class certification;

(k)     retaining and consulting with an expert in connection with class certification and mediation;

(l)    defending the depositions of Lead Plaintiff's representative and class certification expert;

(m)    preparing for and participating in multiple mediation sessions with Robert A. Meyer, including a day-long session on October 2, 2020 and a half-day session on April 5, 2021; submitting a detailed mediation statement, and other mediation papers, and participating in follow-up negotiations with the Mediator culminating in the Settlement; and

(n)    preparing the Settlement and preliminary approval papers, the final approval papers, and over-seeing the notice and claims process.

73.    While Lead Counsel makes this fee request based on a percentage-of-recovery methodology, using the lodestar approach as a cross-check further establishes the reasonableness of the requested fee.  *See* Fee and Expense Memo at §II.B.3.  In total, Lead Counsel and their paraprofessionals expended 3,077.4 hours prosecuting the Action, as described above, which resulted in a lodestar of $2,180,102.50.  Declaration of Daryl F. Scott on Behalf of Scott+Scott Attorneys at Law LLP in Support of Application for Award of Attorneys' Fees and Expenses ("Scott+Scott Decl."), ¶4.  The requested fee of 33 and 1/3%, or $1,998,000, represents a "negative" multiplier of approximately 0.92.  That is, the requested fee would award Lead Counsel less than the lodestar they expended in hard-fought litigation securing the Settlement for the Class.

**C.    The Risk, Magnitude, and Complexity of the Litigation**

74.    The Action involved complex issues of law and fact that presented considerable obstacles to prevailing on the claims.  As noted above (at §III.B) and in the accompanying memoranda, this Action was subject to substantial risks, including liability, reliance, causation, and damages.  Given these and other risks, along with Defendants' commitment to advocating their position and the complexity of the claims, a favorable resolution was never assured in this Action, and certainly not a quick or substantial one.

75.    When Lead Counsel undertook this representation, there was no assurance that the Action would survive a motion to dismiss, contested briefing on class certification, a motion for

summary judgment, trial and/or any appeals, and therefore there was no assurance Lead Counsel would recover any payment for its services.

76.     Lead Counsel prosecuted this Action on a contingent-fee basis, assuming a significant risk that the Action would not result in any recovery and that it would not receive any compensation.  To date, Lead Counsel has not been compensated for any time or expense since the Action's inception in April 2019.

77.     Therefore, the contingent nature of Lead Counsel's representation, especially under the foregoing circumstances, supports the percentage fee requested.  It is also notable that, unlike many class actions where risk is spread and expenses are shared by several firms working on a case, Scott+Scott investigated, filed, and prosecuted this case by itself, and bore the entire risk of non-payment by itself.

### D.     Quality of the Representation

78.     Lead Counsel worked diligently to obtain an exceptional result for the Class.  From the outset, Lead Counsel devoted significant time and resources to researching and investigating the facts to support a pleading that could survive a motion to dismiss, developing the case for trial and positioning it for class certification.  Theories of damages and regulatory issues were complex and Lead Counsel devoted significant time working with its consultant to analyze potential defenses.

79.     As noted above and in the Firm Profile, attached as Ex. C to the Scott+Scott Decl., Lead Counsel has extensive and significant experience in the highly specialized field of securities class action litigation.  This experience was evident in the diligent and rigorous work undertaken by Lead Counsel in prosecuting this Action and arriving at the Settlement in the face of Defendants' strong opposition and the many hurdles to success.

80.     The quality of work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition.  Defendants were represented by skillful and experienced counsel, White & Case LLP and then Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.  Defense Counsel presented a thorough and thoughtful defense, and challenged Lead

Counsel at every turn in the Action.  Lead Counsel was nevertheless able to achieve an outstanding Settlement for the Class.

> **E.**    **Lead Plaintiff's Informed Consent to the Fee Request**

81.    Lead Counsel's fee and expense request has the full support of Lead Plaintiff, who is a sophisticated institutional investor.  Oklahoma Police Decl., ¶¶4, 11-12.  When Lead Plaintiff retained Lead Counsel to prosecute the Action, both Plaintiff and Lead Counsel understood that Lead Counsel would be compensated on a purely contingent basis and would only be paid if successful, subject to Court approval.  Lead Plaintiff supports the request for a fee award as fair and reasonable, in light of the excellent result achieved, and substantial effort necessary to achieve it.  *Id*., at ¶¶11-12.

## VI.    LEAD COUNSEL'S REQUEST FOR REIMBURSEMENT OF NECESSARY LITIGATION EXPENSES IS REASONABLE

82.    Lead Counsel also requests payment of expenses incurred in connection with the prosecution of this Action in the amount of $166,028.45, plus accrued interest, which it incurred on behalf of the Class.  *See* Scott+Scott Decl., ¶5 and Ex. B.  This amount is well below the $265,000 maximum expense amount that the Class was advised could be requested in the Notice. Lead Counsel has not received any reimbursement for these expenses to date.  Again, Lead Plaintiff supports this request.

83.    From the beginning of this Action, Lead Counsel was aware that it might not recover any of its expenses and, at the very least, would not recover anything until this Action was successfully resolved.  Lead Counsel closely managed its expenses throughout Action, including negotiating strict fee caps with its expert consultants, while always ensuring they took all steps necessary to aggressively prosecute Lead Plaintiff's claims.

84.    The requested expenses reflect typical expenditures incurred in the course of litigation.

85.    For example, of the total amount of expenses, $131,531.90, or approximately 79%, was expended on experts and consultants.  To that point, Lead Counsel retained an expert who

supported Lead Plaintiff's motion for class certification effort and mediation efforts by performing analysis on class-wide reliance, recoverable damages, class-wide damages methodology, and developing the Plan of Allocation. Lead Counsel also retained an FDA expert, who aided in Lead Counsel's investigation into the 483 observations the FDA issued to Defendants, as well as the subsequent correspondence between the FDA and Defendants. All of this work was critical to the overall prosecution of the Action.

86.     A significant amount of document discovery was taken in the case as well. Lead Counsel therefore seeks $12,857.46 (approximately 8% of total expenses) relating to litigation support services, such as the costs associated with electronic discovery.

87.     Expenses totaling $2,005 (nearly 1.2% of total expenses) were also incurred in connection with court reporting and the two depositions (Oklahoma Police's representative and damages expert) taken in this Action.

88.     Mediation fees were an additional $10,993 (almost 7% of total expenses).

89.     The other expenses for which Lead Counsel seeks payment are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. The expenses include court fees, online legal and factual research, court reporting, and costs related to document production.

90.     As set forth in the Scott+Scott Decl., these expenses are reflected in the books and records of Lead Counsel, which are accurately prepared from invoices and similar materials.

91.     Accordingly, as these expenses were reasonably necessary to the prosecution of the Action, Lead Plaintiff respectfully submits that they merit reimbursement.

## VII.    LEAD PLAINTIFF'S REQUESTED REIMBURSEMENT IS FAIR AND REASONABLE

92.     Lead Plaintiff requests reimbursement for its time and expense in prosecuting the Action on behalf of the Settlement Class in the amount of $6,857.

93.     As discussed in the Oklahoma Police Decl., Lead Plaintiff has diligently fulfilled its fiduciary obligations to the Settlement Class since it initiated the Action. *See* Oklahoma Police

Decl., ¶¶7-8.  Its efforts assisting and supervising Lead Counsel required Lead Plaintiff to dedicate time and resources to this Action and were of considerable assistance to both Lead Counsel and the Settlement Class.  Among other things, Lead Plaintiff's representative sat for a deposition, was involved in extensive discovery efforts, reviewed filings, regularly communicated with counsel, and assessed the proposed Settlement.

94.    These efforts required Lead Plaintiff to dedicate time and resources to this Action that it would have otherwise devoted to Lead Plaintiff's primary duties – operating a retirement system for public employees.  This reimbursement request is accordingly based on the cost to Lead Plaintiff of the time that its staff members devoted to this Action, as opposed to their regular duties. *See id.*, ¶¶14-15.

95.    The Notice informed potential Settlement Class Members of Lead Plaintiff's intent to request reimbursement for its time and expenses prosecuting this Action of up to $15,000, which is more than Lead Plaintiff is hereby requesting.

96.    The efforts expended by Lead Plaintiff during the course of this Action are precisely the types of activities courts have found merit reimbursement, and the amount sought is fair and reasonable.  Such requests have been granted in similar cases and are supportive of the broad public policy that encourages institutional investors to take an active role in commencing and supervising private securities litigation.

## VIII.  THE REACTION OF THE CLASS TO DATE SUPPORTS FINAL APPROVAL, LEAD COUNSEL'S FEE AND EXPENSE APPLICATION, AND THE PROPOSED REIMBURSEMENT FOR LEAD PLAINTIFF

97.    The Court-ordered notice program, described above, informed Class Members of the Settlement's material terms, the Plan of Allocation, the potential amounts of fees and reimbursement that Lead Counsel would seek, the potential amount of reimbursement that Lead Plaintiff would seek, and of the time and manner by which they could object to any of the above or exclude themselves from the Settlement Class altogether.

98.     As set forth in the accompanying Hughes Decl., ¶11, 10,175 copies of the Notice and Proof of Claim form have been mailed to potential Settlement Class Members and nominees. In addition, copies of the Notice were posted on the Settlement website, and the Summary Notice was published in *The Wall Street Journal* and *Business Wire*.

99.     The deadline for submitting objections or exclusions is October 22, 2021.

100.     Although that deadline has not yet passed, as of the date of this Declaration, the Claims Administrator has not received any requests for exclusion from the Settlement Class. Additionally, even though Class Members were instructed to file any objections they may have by the foregoing deadline, to date, no potential Class Member has submitted any objection.[3]

101.     This reaction of the Class indicates support for, and the reasonableness of, finally approving the settlement and approving the fee and expense requests.

## IX.    CONCLUSION

102.     In light of the significant recovery to the Settlement Class and the substantial risks of continued litigation, as described above and in the accompanying Memoranda, Lead Counsel respectfully submits that the Settlement and Plan of Allocation should be approved as fair, reasonable, and adequate.

103.     For the same reasons, and in light of the substantial work performed, Lead Counsel respectfully submits that the Court should award attorneys' fees in the amount of 33 and 1/3% of the Settlement, plus $166,028.45 in expenses, and the interest earned on those amounts at the same rate and for the same period as that earned on the Settlement Fund.

104.     Similarly, Lead Plaintiff respectfully submits that the Court should grant its request for $6,857 in reimbursement for the time and expenses it incurred representing the Settlement Class.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

---

[3]     If any objections or exclusions are received prior to the Final Approval Hearing, Lead Counsel will inform the Court and address them in reply papers.

Executed in New York, New York on October 7, 2021.

/s/ Max R. Schwartz
Max R. Schwartz

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 7, 2021, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will automatically provide notice to all counsel of record.

_/s/ Max R. Schwartz_

Max R. Schwartz
